UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

───────────────────────────────

EXELIS, INC.,

          Plaintiff,

    -vs-

SRC, INC., JOHN F. LoSECCO, ANDREA M.
BELMONT-GWILT, JAMES M. MARCINKOWSKI,
ROBERT A. MARCEAU, MARK W. WEBB,
ANTHONY G. CASALE, and MICHAEL J. SEAKAN,

          Defendants.

───────────────────────────────

**COMPLAINT**

Civil Action No. 5:12-CV-0858
(GTS/TWD)

TRIAL BY JURY
DEMANDED ON
ALL ISSUES

Plaintiff Exelis, Inc. (hereinafter "Plaintiff" or "Exelis"), by and through its attorneys The Wolford Law Firm LLP, for its Complaint against the Defendants alleges upon information and belief as follows:

<u>**PRELIMINARY BACKGROUND**</u>

1.    This case involves a systematic scheme by a competitor of Exelis and at least seven of Exelis' former employees to misappropriate trade secrets, breach contractual obligations and fiduciary duties, and steal confidential and proprietary information in an effort to engage in unfair competition.

2.    Beginning in or before November 2011, Defendants SRC, Inc. and John F. LoSecco conspired with six employees of Exelis (Defendants Andrea M. Belmont-Gwilt, James M. Marcinkowski, Robert A. Marceau, Mark W. Webb, Anthony G. Casale, and Michael J. Seakan) to engage in harmful and wrongful actions to promote efforts by SRC, Inc., to unfairly compete with Exelis.  While the full scope of Defendants' wrongful activity has not yet been uncovered, the investigation to date has revealed that

Defendants misappropriated Exelis' trade secrets and other confidential and proprietary information, and breached their contractual and fiduciary obligations, by electronically transferring Exelis' trade secret, confidential and proprietary documents to their personal e-mail accounts so that the material could be used by SRC, Inc. to unfairly compete with Exelis.   The investigation has further revealed that certain of the Defendants, while employed by Exelis, performed unauthorized work for SRC, Inc., in an effort to unfairly compete with Exelis.  All of these actions are detailed further below.

3.      After engaging in these wrongful acts, Defendants Andrea M. Belmont-Gwilt, James M. Marcinkowski, Robert A. Marceau, Mark W. Webb, Anthony G. Casale, and Michael J. Seakan abruptly announced their mass resignations from employment with Exelis in March and April 2012, in order to become employed by SRC, Inc..

4.      In order to provide a stable work environment for its current employees, Exelis must protect is trade secrets and confidential and proprietary information; it must protect against contractual and fiduciary breaches by its employees; and it must otherwise protect against wrongful and tortious conduct.  If Defendants are allowed to engage in the unlawful and wrongful conduct detailed herein, it will impair the financial security of Exelis and its current employees, and more specifically those employees located in Rome, New York.

5.      Defendants' conduct has caused and is continuing to cause irreparable injury to Exelis and should be preliminarily and permanently enjoined.  In addition, Exelis has been damaged in an amount as of yet undetermined but estimated to be in excess of one million dollars ($1,000,000).

## THE PARTIES

### *Plaintiff Exelis, Inc.*

6.     Exelis is an Indiana corporation with its principal place of business located at 1650 Tysons Boulevard, McLean, Virginia 22102.  Exelis was a subsidiary of ITT Corporation (hereinafter "ITT"), but was spun-off from ITT on October 31, 2011.  As a result of the spin-off, all of the assets and liabilities associated with ITT's Defense business were transferred to Exelis, and thus Exelis became the successor-in-interest to the Defense business assets and liabilities, including but not limited to the contractual rights set forth herein.

7.     Prior to the spin-off, in September 2007, ITT acquired Dolphin Technology, Inc. (hereinafter "Dolphin"), which had been founded in or around March 1994, by Michael Miravalle (hereinafter "Miravalle").  Dolphin was considered part of ITT's Defense business.

8.     In sum, Exelis is a successor to ITT, and ITT is a successor to Dolphin. Unless otherwise specified, Dolphin, ITT and Exelis will hereinafter be referred to as "Exelis" or "Plaintiff."

9.     Exelis operates an office at 474 Phoenix Drive in Rome, New York 13441. The Rome Office is part of the Information Systems Division of Exelis.  Approximately 134 individuals are employed at the Exelis Rome Office.  The primary work performed at the Exelis Rome Office relates to Information Server Security Environment (hereinafter "ISSE"), a Cross Domain Development solution that allows users to send images electronically across security domains.

- 3 -

10.    The primary customer of the Exelis Rome Office is the Air Force Research Laboratory/Rome Research Site (hereinafter "AFRL").  AFRL is one of ten technical directorates established under the Air Force Research Laboratory Headquarters, Dayton, Ohio, and it is focused on information technology research, including cyber security.

<u>*The Defendants*</u>

11.    Defendant SRC, Inc. (hereinafter "SRC") is a New York not-for-profit corporation with a principal place of business at 7502 Round Pond Road in North Syracuse, New York 13212.  SRC is a research and development company focused in the area of defense, and it currently employs all of the other Defendants.  Prior to the recent hiring of employees from Exelis, upon information and belief SRC had approximately one to two individuals working at its offices in Rome, New York.  SRC intends to attempt to grow its Rome office and compete against Exelis for work from AFRL.

12.    Defendant John F. LoSecco (hereinafter "LoSecco") is an individual residing at 8471 No. 2 Road East, Manlius, New York 13104.  LoSecco was employed by Exelis from on or about January 17, 2001, until on or about June 26, 2009.  LoSecco currently is employed by SRC as Assistant Vice President, Information Science and Engineering Center.

13.    Defendant Andrea M. Belmont-Gwilt (hereinafter "Belmont-Gwilt") is an individual residing at 9 Jessica Place, Whitesboro, New York 13492.  Belmont-Gwilt was employed by Exelis from on or about January 17, 2001, until she voluntarily terminated her employment effective March 9, 2012.  Belmont-Gwilt's job title upon termination of

- 4 -

her employment was Business Proposal Analyst IV.  In that capacity, Belmont-Gwilt was responsible for business development.

14.     Defendant James M. Marcinkowski (hereinafter "Marcinkowski") is an individual residing at 8600 Sudol Hill Road, Boonville, New York 13309.  Marcinkowski was employed by Exelis from on or about January 17, 2001, until he voluntarily terminated his employment effective April 19, 2012.  Marcinkowski's job title upon termination of his employment was Senior Program Manager.  In that capacity, he served as the Program Manager for the Rome Office's Research and Development Group, managing a 31-person staff that supported research and development for Cross Domain Solutions and on-site work at the AFRL.

15.     Defendant Robert A. Marceau (hereinafter "Marceau") is an individual residing at 3016 State Route 12B, Deansboro, New York 13328.  Marceau was employed by Exelis from on or about February 17, 2004, until he voluntarily terminated his employment with Exelis effective April 19, 2012.  Marceau's job title upon termination of employment was Associate Principal Software Engineer, and in that capacity, he served as a Technical Lead for Cross Collaboration Services and he reported to Marcinkowski.

16.     Defendant Mark W. Webb (hereinafter "Webb") is an individual residing at 18 Oleana Drive, Whitesboro, New York 13492.  Webb was employed by Exelis from on or about January 17, 2001, until he voluntarily terminated his employment on or about April 11, 2008.  Webb then accepted reemployment with Exelis on or about July 8, 2010, and remained employed until he voluntarily terminated his employment with

Exelis effective April 19, 2012, at which time Webb's job title was Software Engineer IV. In that capacity, he worked as a software engineer and he reported to Marcinkowski.

17.     Defendant Anthony G. Casale (hereinafter "Casale") is an individual residing at 467 North Columbia Road, Ilion, New York 13357.  Casale was employed by Exelis from on or about September 16, 2003, until he voluntarily terminated his employment on or about April 24, 2012.   Casale's job title upon termination of employment was Principal Software Engineer.   In that capacity, he worked as the Program Manager for a software application known as Security And Workflow Enforcement Services ("SAWES"), and he reported to Marcinkowski.

18.     Defendant Michael J. Seakan (hereinafter "Seakan") is an individual residing at 63 Stebbins Drive, Clinton, New York 13323.  Seakan was employed by Exelis from on or about August 11, 2004, until he voluntarily terminated his employment effective April 24, 2012.   Seakan's job title upon termination of employment was Principal Software Engineer.  In that capacity, Seakan worked as a SAWES Software Developer and he reported to Marcinkowski.

## JURISDICTION AND VENUE

19.     Jurisdiction is proper pursuant to 28 U.S.C. §1332(a) because the amount in controversy exceeds seventy-five thousand dollars ($75,000), and the parties are citizens of different states with Defendants all being citizens of New York and Plaintiff being a citizen of Indiana and Virginia.

20.     Personal jurisdiction and venue are predicated upon 18 U.S.C. §1965(a) and 28 U.S.C. §1391(b) since all of the Defendants are residents of the Northern District

of New York, and a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of New York.

## ISSE GUARD AND RELATED PROJECTS

21.   In the early 1990's, while working for Sterling Software, Inc., Miravalle, LoSecco and Marcinkowski conceived and developed software for sending images electronically across security domains.  Thereafter, Miravalle left Sterling Software, Inc. and founded Dolphin.  Northrup Grumman ultimately acquired a successor company of Sterling Software, Inc., and LoSecco, Marcinkowski, and Belmont-Gwilt became employees of Northrup Grumman.

22.   In or around January 2001, LoSecco, Marcinkowski, Belmont-Gwilt, Webb, and others, resigned en-masse from Northrup Grumman and joined Miravalle at Dolphin.

23.   In or around February 2004, Dolphin was awarded the ISSE Guard contract by AFRL, a contract ultimately worth approximately fifty-seven million dollars ($57,000,000).

24.   In or around January/February 2005, Dolphin received funding from AFRL via U.S. Special Operations Command to develop workflow software for Reliable Human Review.  This became the initial funding for what ultimately became the software application known as SAWES.  SAWES is a Microsoft Windows based interface that allows users to submit files for transfer across the ISSE Guard.  SAWES was developed by Marcinkowski, Marceau, Webb, Casale and Seakan.  At the time of his resignation from Exelis, Casale was the Program Manager for SAWES and Seakan

was a SAWES software developer who was knowledgeable about interfaces with SAWES and ISSE.

26. In or around February 2009, Exelis submitted its proposal in response to a Request for Proposal from the AFRL for the contract that would ultimately become ISSE Guard II. LoSecco was the principal author of this submission.

26. In June 2009, Exelis was awarded the ISSE Guard II contract, and that same month, LoSecco resigned to join SRC. The ISSE Guard II contract is an approximate fifty million dollar ($50,000,000) contract and remains in place to this day.

27. Marceau was a member of the ISSE Core Team and knows the technology well.

28. AFRL has begun the initial solicitation process for the Research, Enhancement and Development of Enterprise Cross Domain Solutions ("REDE-CDS") contract. The REDE-CDS contract will include the continuing evolution of the work currently performed under the ISSE Guard II contract, and it is also expected to be worth approximately fifty million dollars ($50,000,000).

29. As part of that solicitation, in or around February/March 2012, AFRL issued its Sources Sought Announcement for REDE-CDS. The SAWES application was directly referenced in the AFRL REDE-CDS Sources Sought Announcement that stated qualifications contractors needed to demonstrate included "an understanding of the underlying technologies and system concepts for Security and Workflow Enforcement Services (SAWES)."

30. The REDE-CDS Sources Sought Announcement represents the early stages of the bidding for continuation of the work currently performed under ISSE II. It

- 8 -

is anticipated that a draft request for proposal for the REDE-CDS contract will be issued by the AFRL in June 2012.

31.     In connection with the REDE-CDS Sources Sought Announcement and the anticipated request for proposal for the REDE-CDS contract, Exelis formed a six-person REDE-CDS Capture Team charged with designing and formulating Exelis' strategy for competing for this work.

32.     Prior to her resignation, Belmont-Gwilt served as Proposal Manager for the six-person REDE-CDS Capture Team and Deputy Capture Manager for REDE-CDS.   She prepared the business capture strategy plan, and participated in the development of competition-sensitive win themes, discriminators, and Milestone Reviews that were required for Bid and Proposal funding approval.   She helped prepare the Exelis response to the REDE-CDS Sources Sought Announcement, prepared agendas for REDE-CDS capture strategy meetings, and contributed to teaming discussions.

33.     Marcinkowski was also a member of the six-person REDE-CDS Capture Team.   In that role, he helped develop the business capture strategy plan, participated in the development of competition-sensitive win themes and discriminators, and attended and participated in the Milestone Review and several subsequent planning meetings.   He was tasked with developing a vision for the future state of Cross Domain Solutions, and he used Internal Research and Development Funds (hereinafter "IR&D") to explore new Cross Domain Solutions technologies, wrote white papers, and authored proposals that were submitted to AFRL.

34.     One of the white papers that Marcinkowski helped write, with the assistance of Webb, was submitted in response to Broad Area Announcement from AFRL 10-09-RIKA (hereinafter "the BAA").   The BAA was distributed on or about October 20, 2011, by AFRL.  On or about November 30, 2011, Exelis responded with a white paper titled Secure Cross Domain Orchestration Engine (hereinafter "SCORE"). SCORE, which is addressed further below at paragraphs 71 through 84, contained information relevant to Exelis' ultimate response to the planned AFRL solicitation for the REDE-CDS contract.  Specifically, the requirements cited in the REDE-CDS Sources Sought Announcement reflect technology proposed in the Exelis SCORE proposal.

35.     In addition, the IR&D invested by Exelis in this area includes the following:

(a)     In 2008 and 2009, Exelis invested approximately five hundred thousand dollars ($500,000) in IR&D to develop a cross domain device for non-Department of Defense markets, such as the Department of Homeland Security and the Department of Justice.  The IR&D was performed under Marcinkowski's Research and Development Group;

(b)     Between July and November 2010, Exelis invested approximately one hundred forty six thousand dollars ($146,000) in IR&D to develop audit software for ISSE and other network security devices.   The IR&D was performed under Marcinkowski's Research and Development Group; and,

(c)     Between June and December 2011, Exelis invested approximately seventy-five thousand dollars ($75,000) in IR&D to develop a vision for the future state of information sharing.  The IR&D was performed under Marcinkowski's Research and Development Group.

## THE RESIGNATIONS

36.     Belmont-Gwilt abruptly announced her decision to voluntarily leave Exelis' employment on March 9, 2012, and at her request, she ceased working for Exelis that same day.

37.     Marcinkowski provided notice to Exelis of his intention to terminate his employment with Exelis and his acceptance of employment with SRC, by letter dated April 16, 2012.   In his resignation letter, Marcinkowski expressly acknowledged the "sensitive nature of the REDE-CDS proposal and teaming arrangements."   At his request, Marcinkowski ceased working for Exelis three days after he gave notice of his intention to leave.   Marcinkowski told Exelis upon his departure that his move to SRC had been planned since January 2012.

38.     Marceau and Webb provided notice to Exelis of their decisions to terminate employment on the same day as Marcinkowski – April 16, 2012.   Like Marcinkowski, Marceau and Webb stopped working for Exelis three days after providing notice.

39.     On April 19, 2012 (the last day of employment for Marcinkowski, Marceau and Webb), Casale and Seakan provided notice to Exelis of their intention to terminate their employment.   At their request, their employment terminated five days later – on April 24, 2012.

## THE CONFIDENTIALITY AND PROPRIETARY RIGHTS AGREEMENTS

40.     LoSecco, Belmont-Gwilt, Marcinkowski, Marceau, Webb, Casale and Seakan (hereinafter collectively referred to as "the Individual Defendants"), all executed

"Confidentiality and Proprietary Rights Agreements" on or about July 5, 2005, copies of which are attached hereto as Exhibit 1 (hereinafter referred to as "the Agreements").

41.    The Agreements were designed to "preserve and protect" the disclosure and dissemination of proprietary and confidential information, and they also granted Exelis[1] ownership of works by its employees.

42.    "Confidential Information" is defined under the Agreements as follows:

"any nonpublic information that is designated by Company as being confidential or which, under the circumstances surrounding the disclosure by Company or receipt or development by Employee on behalf of Company, ought to be treated as confidential.  Without limiting the applicability of the foregoing to any future confidentiality designation under this Agreement, Confidential Information shall include information relating to:  unreleased, planned or otherwise non-public information regarding the Company's products, services, pricing, costs, profits, sales, marketing or business plans;   budgets, forecasts, customer lists, customer requirements, internally developed methods of customer solicitation, facts relating to existing or prospective customers, or arrangements with customers or suppliers;  possible acquisitions or divestitures, markets or market extensions;   processes, know-how, procedures, methods of operation, or technical developments, including, but not limited to, any software, documentation, work papers or other materials;  or any other non-public information Employee may acquire possession or knowledge of in connection with the services performed pursuant to or in connection with this Agreement."

[Exhibit 1 at p. 1].

43.    "Work" or "Works" was defined under the Agreements as follows:

"any and all works of authorship, inventions, know-how, trade secrets, proprietary technology, processes, procedures, methodologies, algorithms, financial, operating, and training ideas, and other materials that are made, developed, created, or conceived by the Employee (either alone or in collaboration with others) during the term of and in the course of Employee's performance of services on behalf of Company.  For the

---

[1]    Although the Confidentiality and Proprietary Rights Agreements were executed while the Individual Defendants were employed by Dolphin, section 4.3 expressly provides that the Agreements are binding upon the parties' heirs, successors and assigns, and therefore, the Agreements apply to and protect Exelis.

avoidance of doubt, Works shall be deemed to be Confidential Information under this Agreement."

[Exhibit 1 at p. 2].

44.    By signing the Agreements, the Individual Defendants agreed that they "shall not sell, distribute, disclose, divulge, make public or otherwise reveal the Confidential Information without the prior, express written consent of Company, nor shall Employee do or omit to do anything that would permit such disclosure by a third party."  [Exhibit 1 at ¶1.1].

45.    The Individual Defendants also agreed that they "shall take all necessary security precautions to maintain and safeguard the confidentiality of the Confidential Information and Confidential Materials, including by way of example and not limitation, ensuring that such Confidential Information or Confidential Materials are not copied, relocated, or transmitted to, or accessed by or through or otherwise <u>distributed to or on computers, or computer systems or networks not operated by or on behalf of the Company</u>."  [Exhibit 1 at ¶1.2 (emphasis added)].

46.    The Individual Defendants also agreed that "all Works, and all copies or other tangible embodiments of the Works, that are made, developed, created, or conceived by the Employee (either alone or in collaboration with others) during the term of and in the course of performance of Employee's services on behalf of the Company, shall be works made for hire for the Company in which the Company shall own all right, title and interest, including without limitation all rights of copyright."  [Exhibit 1 at ¶2.1].

47.    In the event the Works were deemed not to be works made for hire, the Individual Defendants "irrevocably" assigned to Exelis "the ownership of all rights, title

and interest in and to the Works without the necessity of further consideration. . . ."
[Exhibit 1 at ¶2.1].

48.     The Individual Defendants also agreed "to disclose and deliver to Company all inventions (whether patentable or not), discoveries, and improvements, trade secrets and all works subject to copyright made, developed, created, or conceived by the Employee (either alone or in collaboration with others) during the term of and in the course of performing services on behalf of the Company, and further agree[d] to execute in favor of Company, and without any payment therefore, all assignments, patent applications, copyright registration or copyright renewal applications, and any other documents the Company may deem necessary or advisable to secure the rights assigned hereunder."  [Exhibit 1 at ¶2.2].

49.     Pursuant to the terms of the Agreements, the Individual Defendants were required to immediately notify Exelis "upon discovery of any unauthorized sale, distribution, disclosure, publication or other unauthorized use of the Confidential Information and/or Confidential Materials" and the former Exelis employees were required to "cooperate with Company in every reasonable way to help Company regain possession of the Confidential Information and/or Confidential Materials and to prevent the further unauthorized use or disclosure of such Confidential Information and/or Confidential Materials."  [Exhibit 1 at ¶3.1].

50.     The Agreements expressly provided that monetary damages may not be a sufficient remedy for "unauthorized sale, distribution, disclosure, publication or other use of Confidential Information or Confidential Materials," and acknowledged Exelis'

entitlement to injunctive or equitable relief for a violation of the Agreements [Exhibit 1 at ¶3.3].

51.     By executing the Agreements, the Individual Defendants agreed to use their "best efforts to promote the interests of Company" and to devote their "full business time, business energies, and skill to the business and affairs" of the Company [Exhibit 1 at ¶4.1].

52.     Importantly, the obligations of the Individual Defendants under the Agreements survived termination of employment [Exhibit 1 at ¶4.5].

## ITT PROPRIETARY AGREEMENT

53.     Although becoming employed at Exelis at the same time as the other former Northrup Grumman employees, Webb left Exelis' employment on or about April 11, 2008.  However, just over two years later, he became reemployed by Exelis, and in connection with that reemployment, he executed an ITT Advanced Engineering & Sciences Letter of Understanding, a copy of which is attached hereto as Exhibit 2 (hereinafter "Letter of Understanding").[2]

54.     Pursuant to the Letter of Understanding, Webb agreed that he would "have access to proprietary, trade secret and otherwise confidential information relating to the Company's business."  Webb agreed that this information was "a valuable asset of the Company's business, and if it were to be known or used by others engaged in a similar business, it would be harmful and detrimental to the Company's interests." Accordingly, Webb agreed as follows:

> "I will not at any time, without prior written consent of the Company or as necessary in fulfilling my duties to the Company, either directly or

---

[2]     Webb electronically signed the Letter of Understanding as reflected by the "Onboarding Report" also attached as Exhibit 2.

indirectly, either on my own behalf, or on behalf of any other person, firm or corporation, use, divulge or communicate to any unauthorized person, firm or corporation, any proprietary, trade secret or otherwise confidential information of any kind concerning any matters relating to the business of the Company, including but not limited to the names, contact persons, habits or practices of any of the Company's customers, clients or vendors; the business, financial and marketing strategies, forecasts, methods, procedures, techniques, practices and standards of the Company; financial and planning data, computer reports, compilations of business and financial data, price lists, studies, manuals, memoranda, files, documents, correspondence, salary information and other confidential business or financial information concerning the business of the Company; the machines, methods of manufacture, manner of operation, inventions or discoveries of the Company;  or other proprietary, trade secret or otherwise confidential information of any kind, nature or description if it is not generally available to the public."

[Exhibit 2 at ¶1].

55.     Pursuant to the Letter of Understanding, Webb also agreed that during his employment and for eighteen (18) months following termination of his employment, he would not solicit employees or customers of Exelis:

(a)     "during my employment with the Company and for eighteen months thereafter, I will not, directly or indirectly, either on my own behalf, or on behalf of any other person, firm or corporation, solicit or induce, or attempt to solicit or induce, any person who is employed as an employee by the Company, or was an employee of the Company while I was employed by the Company, to leave his or her employment with the Company and/or to perform services of any kind for any other person, firm or corporation"  [Exhibit 2 at ¶3]; and,

(b)     "during my employment with the Company and for eighteen months thereafter, I will not, for the purpose of engaging in competition with the Company in the provision of products and services similar to those provided by the Company with which I had direct involvement as an employee of the Company, directly or indirectly, either on my own behalf, or on behalf of any other person, firm or corporation, divert or take away, call on or solicit, or attempt to call on or solicit, any of the Company's current customers or clients who I called on, solicited or became acquainted with while engaged as an employee of the Company"  [Exhibit 2 at ¶4].

56.     Webb also made various covenants against disclosure pursuant to paragraph 5 of the Letter of Understanding agreeing to maintain the confidentiality of information, and he assigned to Exelis all rights to Intellectual Property [Exhibit 2 at ¶5].

57.     As with the Agreements, the obligations in the Letter of Understanding survived termination of employment [Exhibit 2 at ¶7].

## ORIGIN OF THE SCHEME

58.     Exelis has developed, at substantial investment and expense, a host of proprietary and trade secret information critical to Exelis' business operations and competitiveness, related to the ISSE and REDE-CDS contracts, the SAWES software, and other related projects and programs.   This information includes unreleased, planned and otherwise non-public information regarding Exelis' products, services, pricing, costs, profits, sales, marketing or business plans;  budgets, forecasts, customer requirements,   and   internally   developed   methods   of   customer   solicitation;   and processes, know-how, procedures, methods of operation, and technical developments. Exelis takes active steps to protect the confidentiality of these trade secrets.

59.     Belmont-Gwilt, Marcinkowski, Webb, Marceau, Casale, and Seakan have misappropriated Exelis' trade secrets and other confidential and proprietary information by sharing that information with SRC and LoSecco, and using that information to assist SRC and LoSecco in soliciting business from AFRL.  SRC and LoSecco have aided and abetted and otherwise assisted these wrongful misappropriations.

60.     Belmont-Gwilt, Marcinkowski, Webb, Marceau, Casale, and Seakan have breached their contractual and fiduciary obligations to Exelis, and SRC and LoSecco

with knowledge of those obligations, have aided and abetted and otherwise assisted these wrongful breaches.

61.    Defendants' wrongful conduct is causing serious and irreparable injury to Exelis.  Defendants have shared and are sharing trade secret, confidential, proprietary and highly sensitive Exelis business information with third parties to the detriment of Exelis and its business.  This conduct is in violation of common law and contractual obligations and threatens Exelis' trade secrets, proprietary information, and business operations.

62.    Although the Individual Defendants used electronic mail systems at their places of work to communicate as part of the scheme, it appears that most of the communications were directed between LoSecco using his SRC e-mail address (jlosecco@srcinc.com) and Belmont-Gwilt and Marcinkowski at their Google Mail or "gmail" addresses.  Indeed, LoSecco would alert Belmont-Gwilt or Marcinkowski that an e-mail had been sent to their "gmail" account, by e-mailing this information to Belmont-Gwilt or Marcinkowski at their Exelis work e-mails.  Cryptically, LoSecco would simply indicate, as he did in an e-mail to Marcinkowski at Jim.Marcinkowski@exelisinc.com, sent on November 7, 2011, at 12:30pm:  "I sent you an gmail."

63.    The frequency of the use of "gmail" was so prevalent that at one point, Marcinkowski emailed LoSecco from his Exelis e-mail and told him not to send anything to him for a day while he had a new android phone set up on his "gmail" account.

64.    The scheme to misappropriate trade secrets and other confidential and proprietary information from Exelis originated in November 2011, if not before.   On

November 1, 2011, LoSecco sent an e-mail to Belmont-Gwilt and Marcinkowski inviting them to a strategy meeting in Syracuse, New York, "to discuss future business opportunities" and "to develop a plan."

65.    On or about November 21, 2011, Belmont-Gwilt and Marcinkowski met with SRC for an apparent job interview.

66.    Upon information and belief, after that November 21, 2011 meeting, Belmont-Gwilt and Marcinkowski, with the assistance of LoSecco, helped recruit Marceau, Webb, Casale and Seakan to formulate a plan to leave their employment with Exelis and join SRC.  Indeed, it is believed that this plan was in effect for months before the employees abruptly announced their resignations.

67.    For instance, in an e-mail dated January 19, 2012, LoSecco expressed to Belmont-Gwilt his desire that she be employed by SRC as of March 17, 2012. Marcinkowski was copied on the e-mail, and Marcinkowski also expressed his desire to become employed by SRC.  LoSecco responded by e-mail the following day indicating: "We need to strategize."

68.    In an e-mail dated January 31, 2012 from Belmont-Gwilt to Marcinkowski, she referenced "our spots at src for growing Rome business!!".

69.    About one month later, and just one week before she announced to Exelis that she was leaving, Belmont-Gwilt scheduled a meeting among herself, Marcinkowski, and a key AFRL employee to take place on March 1, 2012.

70.    In other words, while employees of Exelis, Belmont-Gwilt, Marcinkowski, and the other Individual Defendants were plotting their move to SRC, performing work

for SRC, and soliciting business on behalf of SRC.  This is demonstrated by conduct engaged in with respect to a white paper that became known as "SORCERER."

## SORCERER

71.    The investigation of Defendants' actions to date through a review of their e-mails that remain within the Exelis electronic mail system, has revealed a disturbing effort by Belmont-Gwilt, Marcinkowski, SRC, LoSecco, and upon information and belief Webb, to compete on behalf of SRC against Exelis for work from AFRL, while Belmont-Gwilt, Marcinkowski, and Webb remained employed by Exelis.

72.    In November 2011, Belmont-Gwilt and Marcinkowski began collaborating with SRC on a white paper that was ultimately called Secure Orchestration for Cross-Domain Enterprise Review and Release ("SORCERER").  SORCERER was prepared and submitted in response to the BAA referenced above at paragraph 34 (Broad Area Announcement from AFRL 10-09-RIKA).

73.    The problems addressed by SORCERER were the same as those Exelis was working on with SCORE in response to the BAA.  Indeed, at the same time that Belmont-Gwilt, Marcinkowski and Webb authoring the SCORE white paper that was submitted on behalf of Exelis in response to the BAA, they were working with SRC to prepare SORCERER.

74.    As discussed above at paragraph 34, the information contained in Exelis' SCORE white paper and proposal is relevant to the bidding for the REDE-CDS contract.

75.    There was no approval by Exelis management for the work on the SRC white paper by Exelis employees, nor was a charge number created for this work.

Similarly, there is no contractual record of this effort by Exelis employees or any other type of written authorization.

76.     As part of this effort, on November 14, 2011, a telephone conference was held with Belmont-Gwilt, Marcinkowski, LoSecco, others with SRC, and possibly Webb, to discuss developing a response to the BAA on behalf of SRC.

77.     After the November 14th telephone conference, LoSecco asked Belmont-Gwilt to draft an outline of the white paper that SRC would be submitting in response to the BAA.  On November 17, 2011, Belmont-Gwilt sent Marcinkowski the draft outline of the white paper using her work e-mail.  Belmont-Gwilt initially titled the white paper "GMOOH" (i.e. "Get Me Out Of Here").

78.     The following Monday, November 21, 2011, Belmont-Gwilt and Marcinkowski met with LoSecco and others from either SRC or AFRL to discuss SRC's response to the BAA.

79.     On November 17, 2011, Belmont-Gwilt submitted a revised outline of the whitepaper to Marcinkowski and LoSecco, using her work e-mail.  Belmont-Gwilt was now titling the white paper "Sorcerer."

80.      In an exchange on November 22 and 23, 2011, between Belmont-Gwilt and Marcinkowski, they expressed concern that Dan Snell, the Exelis Rome Site Manager, may be suspicious of their activity, but they concluded that they were just being "paranoid."

81.     On November 29, 2011, LoSecco sent a revised draft of the white paper to Belmont-Gwilt and Marcinkowski, referring to them in the salutation of the e-mail as "TeamSRC."

82.     Marcinkowski assisted LoSecco in coming up with a price to include in the white paper for the proposal (even though Exelis was competing for the same work). This is reflected in an e-mail from Marcinkowski to LoSecco dated November 30, 2011.

83.     Upon information and belief, the white paper was finalized and submitted by SRC to AFRL on or about December 1, 2011.  The company submitting the white paper was identified as SRC with LoSecco as the technical contact.  In fact, the white paper included work performed by Marcinkowski, Belmont-Gwilt, and upon information and belief, Webb.

84.     The SCORE and SORCERER papers contain technical concepts and development approaches that are similar enough to conclude that they were authored by the same writers but submitted under separate companies.

<u>SYSTEMATIC TRANSFER OF EXELIS PROPRIETARY<br> AND CONFIDENTIAL DOCUMENTS</u>

85.     Exelis policy prohibits employees from sending confidential or proprietary company information to e-mail addresses outside of the Company's firewalled addresses and/or to non-Exelis computers.  Yet, beginning in early January 2012, the Individual Defendants engaged in an orchestrated scheme to transfer Exelis trade secrets and other confidential and proprietary information to non-Exelis e-mails and computers.

86.     On January 4, 2012, Belmont-Gwilt sent electronic files to herself.  These electronic files contained trade secrets and other confidential and proprietary information, including a file containing the ISSE Guard II winning proposal from 2009.  These documents are critical to preparing any response to the REDE-CDS solicitation.  By sending the documents to herself at <u>Andrea.Belmont-Gwilt@exelisinc.com</u>, Belmont-

Gwilt ensured that she could access the document from any non-Exelis computer via the Microsoft Office Outlook Web Access.  There was no legitimate business reason or justification for Belmont-Gwilt to send these electronic files to herself.  The conduct was engaged in by Belmont-Gwilt to misappropriate trade secrets and other confidential and proprietary information.

87.    Approximately two weeks later, on January 18, 2012, Belmont-Gwilt sent an electronic file containing trade secret, confidential and proprietary information to her "gmail" address (andreagwilt@gmail.com), and then on February 8, 2012, Belmont-Gwilt sent further confidential information to her "gmail" address.  There was no legitimate business justification for Belmont-Gwilt's transfer of these electronic files to her "gmail" address, and the transfer of these materials violated Exelis policies and procedures.

88.    Between February 20 through 29, 2012, Belmont-Gwilt continued her wrongful actions by sending numerous additional electronic files to andreagwilt@gmail.com.  These documents contained trade secret, confidential and proprietary sensitive information related to Exelis' efforts that were being developed by the REDE-CDS Capture Team.  There was no legitimate business reason or justification for Belmont-Gwilt to send these electronic files to her personal e-mail.  The conduct was engaged in by Belmont-Gwilt to misappropriate trade secrets and other confidential and proprietary information.  Indeed, it is now known that at the time Belmont-Gwilt sent these electronic files to her "gmail" address, she had already put into place plans to leave Exelis' employment and join SRC.

89.     Belmont-Gwilt continued this systematic transfer of proprietary confidential documents during the ensuing days, leading up to the termination of her employment on March 9, 2012. For instance, on March 6, 2012, Belmont-Gwilt sent trade secret, confidential and proprietary documents to her "gmail" account. These documents are relevant to the Exelis REDE-CDS Capture Team and represent highly confidential trade secret information pertinent to Exelis' planned response to the REDE-CDS solicitation.

90.     Then, after Belmont-Gwilt left Exelis' employment, Marcinkowski continued the systematic transfer of trade secret, confidential and proprietary information through electronic transfers. For instance, on March 22, 2012, and then again on March 26, 2012 (i.e. about one month before his announced resignation), Marcinkowski sent to his Exelis e-mail, electronic files containing trade secret, confidential and proprietary documents regarding SCORE. Again, this would allow access to these documents from any non-Exelis computer via the Microsoft Office Outlook Web Access.

### AS AND FOR A FIRST CAUSE OF ACTION
### AGAINT ALL DEFENDANTS
### (Misappropriation of Trade Secrets)

91.     Plaintiff repeats and realleges paragraphs 1 through 90 as though fully set forth herein.

92.     Exelis possessed and possesses substantial and valuable trade secrets, which it has adequately guarded against disclosure.

93.     Defendants have misappropriated Exelis' trade secrets by taking them, sharing them with unauthorized persons, and using them to unfairly compete with Exelis.

94.     Defendants have benefited from their misappropriation of Exelis' trade secrets.

95.     Exelis has been damaged and continues to be damaged by Defendants' misappropriation of its trade secrets in an amount in excess of one million dollars ($1,000,000).

96.     Defendants' misappropriation of Exelis' trade secrets is causing irreparable injury to Exelis and should be preliminarily and permanently enjoined.

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST THE INDIVIDUAL DEFENDANTS
## (Breach of Contract)

97.     Plaintiff repeats and realleges paragraphs 1 through 96 as though fully set forth herein.

98.     The Individual Defendants were bound to maintain the confidentiality of Exelis' trade secret, proprietary and confidential information, pursuant to the "Confidentiality and Proprietary Rights Agreements" executed on or about July 5, 2005, copies of which are attached hereto as Exhibit 1.

99.     The Individual Defendants have breached the terms of the Agreements by selling, distributing, disclosing, divulging, making public or otherwise revealing Exelis' confidential, proprietary and trade secret information.

100.    Exelis has been damaged by the Individual Defendants' contractual breaches in an amount in excess of one million dollars ($1,000,000).

101.    The Individual Defendants' contractual breaches are also causing irreparable injury to Exelis and should be preliminarily and permanently enjoined.

## AS AND FOR A THIRD CAUSE OF ACTION
## AGAINST DEFENDANT WEBB
## (Breach of Contract)

102.   Plaintiff repeats and realleges paragraphs 1 through 101 as though fully set forth herein.

103.   Webb was bound to maintain the confidentiality of Exelis' trade secret, proprietary and confidential information, pursuant to the "ITT Advanced Engineering & Sciences Letter of Understanding" executed on or about July 8, 2010, a copy of which is attached hereto as Exhibit 2.

104.   In addition, under the terms of the Letter of Understanding, Webb was bound not to solicit Exelis employees or customers pursuant to the terms of that Letter of Understanding.

105.   Webb has breached the terms of the Letter of Understanding by selling, distributing, disclosing, divulging, making public or otherwise revealing Exelis' confidential, proprietary and trade secret information, and by soliciting Exelis employees and customers.

106.   Exelis has been damaged by Webb's contractual breaches in an amount in excess of one million dollars ($1,000,000).

107.   Webb's contractual breaches are also causing irreparable injury to Exelis and should be preliminarily and permanently enjoined.

## AS AND FOR A FOURTH CAUSE OF ACTION
## AGAINST BELMONT-GWILT, MARCINKOWSKI, WEBB,
## MARCEAU, CASALE AND SEAKAN
## (Breach of Fiduciary Duty)

108.   Plaintiff repeats and realleges paragraphs 1 through 107 as though fully set forth herein.

109.    Belmont-Gwilt, Marcinkowski, Webb, Marceau, Casale and Seakan owed Exelis a fiduciary duty of loyalty, they were required to avoid self-dealing and diversion of Exelis property and assets, and they were required to perform faithfully and diligently their employment duties.

110.    As set forth herein, these Defendants have breached their fiduciary duties, failing to perform their duties in a skillful, careful, loyal, and diligent manner; but on the contrary, acted for their own personal benefit and use and the benefit and use of third parties, to the detriment of Exelis.

111.    By reason of the foregoing, these Defendants' breaches of their fiduciary duties have proximately caused damages to Exelis in an amount in excess of one million dollars ($1,000,000).

112.    Moreover, Exelis is entitled to recover all moneys paid to these Defendants as salary during their employment.

113.    The breaches of fiduciary duty are also causing irreparable injury to Exelis and should be preliminary and permanently enjoined.

### AS AND FOR A FIFTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
### (Tortious Interference)

114.    Plaintiff repeats and realleges paragraphs 1 through 113 as though fully set forth herein.

115.    Each of the Individual Defendants was employed by Exelis and contractually bound by certain agreements with Exelis, as reflected by the documents attached hereto as Exhibit 1 and Exhibit 2.

116.    Each of the Defendants knew or had reason to know of each of the other Defendants' contractual obligations to Exelis.

117.    Defendants tortiously interfered with these contractual obligations by actively and intentionally inducing or forcing each of the Individual Defendants to breach their contractual obligations to Exelis.

118.    Exelis has been damaged by this tortious interference in an amount in excess of one million dollars ($1,000,000).

119.    This tortious interference is also causing irreparable injury to Exelis and should be preliminary and permanently enjoined.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS**
**(Aiding and Abetting Breach of Fiduciary Duty)**

120.    Plaintiff repeats and realleges paragraphs 1 through 119 as though fully set forth herein.

121.    Defendants knowingly induced and participated in the breaches of fiduciary duty alleged herein, by providing substantial assistance to those Defendants with actual knowledge of the breaches of fiduciary duties.

122.    By reason of the foregoing, the aiding and abetting of the breaches of fiduciary duty has proximately caused damages to Exelis in an amount in excess of one million dollars ($1,000,000).

123.    This aiding and abetting of breaches of fiduciary duty is also causing irreparable injury to Exelis and should be preliminary and permanently enjoined.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
## (Conversion)

124.   Plaintiff repeats and realleges paragraphs 1 through 123 as though fully set forth herein.

125.   Plaintiff had exclusive ownership over its trade secret, confidential and proprietary information, as well as many documents and computer files containing such information.

126.   Defendants wrongfully obtained possession of and converted to their own use Exelis' documents, electronic communications, and computer files containing Exelis' trade secret, proprietary and confidential information through the fraudulent scheme detailed herein, and conspired to do so.

127.   By reason of the foregoing, Exelis has been damaged in an amount in excess of one million dollars ($1,000,000).

128.   This wrongful conversion is also causing irreparable injury to Exelis and should be preliminary and permanently enjoined.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
## (Unjust Enrichment)

129.   Plaintiff repeats and realleges paragraphs 1 through 128 as though fully set forth herein.

130.   Defendants have taken and continue to hold trade secret, confidential and otherwise proprietary information stolen from Exelis without any right thereto.

131.   Defendants have been unjustly enriched at Exelis' expense by such retention.

132.   By reason of the foregoing, Exelis has been damaged in an amount in excess of one million dollars ($1,000,000).

133.   This wrongful conduct is also causing irreparable injury to Exelis and should be preliminary and permanently enjoined.

**WHEREFORE**, Plaintiff Exelis, Inc. demands judgment against Defendants SRC, Inc., John F. LoSecco, Andrea M. Belmont-Gwilt, James M. Marcinkowski, Robert A. Marceau, Mark W. Webb, Anthony G. Casale, and Michael J. Seakan, and against each of them jointly and severally:

1.   Awarding compensatory damages in an amount to be proven at trial in excess of one million dollars ($1,000,000) plus interest, for each and every one of the causes of action in the Complaint;

2.   Awarding punitive damages for Defendants' wrongful and malicious conduct;

3.   Granting a permanent injunction prohibiting Defendants from unfairly competing with Exelis and prohibiting Defendants from using Exelis' trade secret, confidential and proprietary information, including but not limited to restricting SRC and the Individual Defendants from engaging in any activity that competes or will compete with Exelis for work from AFRL related to ISSE, REDE-CDS, SAWES, SORCERER or SCORE; and,

4.   Granting such other and further relief as the Court deems just and proper, together with the costs and disbursements of this action, including reasonable attorneys' fees.

Dated:       May 24, 2012

**THE WOLFORD LAW FIRM** LLP

By:   s/  Elizabeth A. Wolford
       Elizabeth A. Wolford (Bar Roll No. 2558146)

*Attorneys for Plaintiff Exelis, Inc.*
600 Reynolds Arcade Building
16 East Main Street
Rochester, New York 14614
Telephone:  (585) 325-8000
ewolford@wolfordfirm.com