UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

EXELIS, INC.,

        Plaintiff,

   -vs-

SRC, INC., JOHN F. LoSECCO, ANDREA M.
BELMONT-GWILT, JAMES M. MARCINKOWSKI,
ROBERT A. MARCEAU, MARK W. WEBB,
ANTHONY G. CASALE, and MICHAEL J. SEAKAN,

        Defendants.

_____

Civil Action No.
5:12-cv-0858 GTS/TWD

# PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR
## PRELIMINARY INJUNCTION AND
## TEMPORARY RESTRAINING ORDER

Dated:   October 4, 2012

Elizabeth A. Wolford, Esq. (Bar Roll No. 509085)
Sarah Snyder Merkel, Esq. (Bar Roll No. 517055)
James A. Hobbs, Esq. (Bar Roll No. 517585)
**THE WOLFORD LAW FIRM** LLP
*Attorneys for Plaintiff Exelis, Inc.*
600 Reynolds Arcade Building
Rochester, New York 14614
Telephone: (585) 325-8000
ewolford@wolfordfirm.com
smerkel@wolfordfirm.com
jhobbs@wolfordfirm.com

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

<u>TABLE OF AUTHORITIES</u> ...................................................................................iii

<u>PRELIMINARY STATEMENT</u> ............................................................................. 1

<u>STATEMENT OF FACTS</u> ................................................................................... 2

<u>ARGUMENT</u> ....................................................................................................... 3

<u>POINT I</u> .............................................................................................................. 5

    EXELIS IS LIKELY TO SUCCEED ON THE MERITS............................... 5

        A.    Exelis is Likely to Succeed in Showing that Defendants
              are Engaged in Unfair Competition ........................................... 5

        B.    Exelis is Likely to Succeed in Showing the Defendants
              Breached Their Fiduciary Duties and Aided and Abetted
              Such Breaches .......................................................................... 9

        C.    Exelis is Likely to Succeed on its Claim for
              Breach of Contract................................................................... 11

        D.    Exelis is Likely to Succeed on the Merits of its Claim for
              Misappropriation of Trade Secrets ......................................... 12

<u>POINT II</u> ........................................................................................................... 17

    EXELIS WILL SUFFER IRREPARABLE HARM IN THE
    ABSENCE OF AN INJUNCTION ........................................................... 17

        A.    Defendant's Use and Dissemination of Exelis' Confidential
              Information is Causing Irreparable Harm.............................. 17

        B.    The Individual Defendants Have Agreed that Injunctive Relief
              Is the Only Remedy for their Wrongdoing ............................ 19

        C.    Exelis Did Not Unduly Delay ................................................. 20

        D.    The Scope and Form of the Relief Requested is Necessary .............. 21

**PAGE**

**POINT III**...................................................................................................23

    **THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST
WEIGH IN FAVOR OF GRANTING INJUNCTIVE RELIEF**...............................23

**CONCLUSION** ............................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**<u>STATUTES</u>**                                                                                          **<u>PAGE</u>**

10 U.S.C. §§ 2302 ...................................................................................23

18 U.S.C. § 1905 ....................................................................................15

41 U.S.C. § 2102 ....................................................................................15

41 U.S.C. §§2101 ...................................................................................23

5 U.S.C. § 552(b)(4) ...............................................................................15

Fed. R. Civ. P. 65 .....................................................................................2

**<u>CASES</u>**

<u>American Bldg. Maint. Co. v. Acme Prop. Servs., Inc.</u>
    515 F. Supp. 2d 298 (N.D.N.Y. 2007) ................................................16

<u>American Fed. Group v. Rothenberg</u>
    136 F.3d 897 (2d Cir. 1998)................................................................10

<u>Ashland Mgmt., Inc. v. Janien</u>
    82 N.Y.2d 395 (1993)........................................................................13

<u>Chrysler Corp. v. Brown</u>
    441 U.S. 281 (1979)..........................................................................15

<u>Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.</u>
    598 F.3d 30 (2d Cir. 2010)...................................................................3

<u>Clifford Ross Co. v. Nelvana, Ltd.</u>
    710 F. Supp. 517 (S.D.N.Y. 1989),
    <u>aff'd</u>, 883 F.2d 1022 (2d Cir. 1989) ...................................................20

<u>Compliance Corp. v. United States</u>
    22 Cl. Ct. 193 (1990),
    <u>aff'd</u> 1992 U.S. App. LEXIS 5550 (Fed. Cir. Mar. 26, 1992)................24

<u>Ecolab, Inc. v. Paolo</u>
    753 F. Supp. 1100 (E.D.N.Y. 1991) ............................................17, 21

**CASES**                                                               **PAGE**

Equity Now, Inc. v Wall St. Mtge. Bankers, Ltd.
    2012 N.Y. App. Div. LEXIS 6282 (1st Dep't Sept. 27, 2012).............................10

Estee Lauder Cos. v. Batra
    430 F. Supp. 2d 158 (S.D.N.Y. 2006) .................................................................22

Fairfield Fin. Mortg. Grp., Inc. v. Luca
    584 F. Supp. 2d 479 (E.D.N.Y. 2008) ...................................................................6

Fisher-Price Inc. v. Well-Made Toy Mfg. Corp.
    25 F.3d 119 (2d Cir. 1994) .................................................................................20

Freedom Mortg. Corp. v. Platinum Home Mortg. Corp.
    11-cv-1357, 2012 U.S. Dist. LEXIS 129244 (N.D.N.Y Sept. 12, 2012) ..............11

Harris v. Fairweather
    11-cv-2152, 2012 U.S. Dist. LEXIS 128409 (S.D.N.Y. Sept. 10, 2012) .............22

Harsco Corp. v. Segui
    91 F.3d 337 (2d Cir. 1996) .................................................................................11

IDG USA, LLC v. Schupp
    416 F. App'x 86 (2d Cir. 2011) ...........................................................................17

Innoviant Pharmacy, Inc. v. Morganstern
    390 F. Supp. 2d 179 (N.D.N.Y 2005)....................................................5, 17, 19, 22

Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)
    574 F.3d 129 (2d Cir. 2009) ...............................................................................14

Jay's Custom Stringing, Inc. v. Jonghwan Yu
    01-cv-1690, 2001 U.S. Dist. LEXIS 9298 (S.D.N.Y. July 6, 2001) .....................16

Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.
    323 F. Supp. 2d 525 (S.D.N.Y. 2004) ............................................................6, 17

King v. Innovation Books
    976 F.2d 824 (2d Cir. 1992) ...............................................................................20

Kuklachev v. Gelfman
    629 F. Supp. 2d 236 (E.D.N.Y. 2008),
    aff'd 361 F. App'x 161 (2d Cir. 2009) .................................................................20

**CASES**            **PAGE**

Leo Silfen, Inc. v. Cream
    29 N.Y.2d 387 (1972)............................................................5, 10, 22

Marcone APW, LLC v. Servall Co.
    85 A.D.3d 1693 (4th Dep't 2011) ......................................... 10

Monovis, Inc. v. Aquino
    905 F. Supp. 1205 (W.D.N.Y. 1994) ....................................22

Nat'l Elevator Cab & Door Corp v. H & B, Inc.
    282 F. App'x 885 (2d Cir. 2008)........................................... 18

Norbrook Labs, Ltd. v. G.C. Hanford Mft. Co.
    297 F. Supp. 2d 463 (N.D.N.Y 2003),
    aff'd 126 F. App'x 507 (2d Cir. 2005) .............................5, 18

North Atl. Instruments, Inc. v. Haber
    188 F.3d 38 (2d Cir. 1999)............................................12, 19

Phansalkar v. Andersen Weinroth & Co., L.P.
    344 F.3d 184 (2d Cir. 2003) ..................................................9

Salinger v. Colting
    607 F.3d 68 (2d Cir. 2010)..............................................3, 23

South Nassua Control Corp. v. Innovative Control Mgmt. Corp.
    95-cv-3724, 1996 U.S. Dist. LEXIS 22603 (E.D.N.Y. June 17, 1996)................17

The Ayco Co. v. Frisch
    795 F. Supp. 2d 193 (N.D.N.Y. 2011) ..........................16, 19, 21

Tom Doherty Assocs. v. Saban Entm't, Inc.
    60 F.3d 27 (2d Cir. 1995).............................................18, 20

Webcraft Tech., Inc. v. McCaw
    674 F. Supp. 1039 (S.D.N.Y. 1987) .......................................16

## PRELIMINARY STATEMENT

This motion arises from a scheme of deceit and corporate espionage, led by John LoSecco ("LoSecco") and SRC, Inc. ("SRC") against Exelis, Inc. ("Exelis"), a defense contractor to Air Force Research Lab in Rome, NY ("AFRL"). LoSecco, together with Andrea Belmont-Gwilt ("Belmont-Gwilt") and Jim Marcinkowski ("Marcinkowski"), then-employees of Exelis, attempted to manipulate the government procurement process to ensure their own financial security through employment at SRC. Not content to compete fairly for government funding, LoSecco, Belmont-Gwilt, and Marcinkowski executed a scheme in which they would steal and copy the work product and insight of employees of Exelis in order to respond to AFRL solicitations on behalf of SRC. Even worse, the tainted SRC solicitations, prepared by unfaithful Exelis employees using Exelis' intellectual property, were submitted in direct competition with Exelis.

When this effort failed to generate the funding that SRC needed to hire Belmont-Gwilt and Marcinkowski, Defendants doubled down and executed a plan to steal and use Exelis' information in order to compete for AFRL's fifty million dollar "REDE-CDS" contract. Belmont-Gwilt and Marcinkowski, who were part of the six-person team tasked with competing for the REDE-CDS contract on behalf of Exelis, used their positions to feed SRC confidential information about Exelis' plans, to take and copy documents outlining Exelis' strategy, and to recruit other Exelis employees to join SRC. To maintain this valuable "insider" connection, LoSecco intentionally delayed hiring Belmont-Gwilt and Marcinkowski, and by their own admission they in turn misled their supervisors and colleagues at Exelis in order to hide their scheme. Ultimately, though,

Belmont-Gwilt, Marcinkowski, and four other Exelis employees left for SRC, where they continue to use misappropriated Exelis information to prepare SRC's response to AFRL's imminent request for proposals for the REDE-CDS contract.

Simply put, Defendants' conduct, as revealed in recently produced email communications, is shocking.   It taints the government procurement process and causes irreparable harm to Exelis.   It is respectfully submitted that a temporary restraining order and preliminary injunctive relief is fully justified pursuant to Fed. R. Civ. P. 65.

## STATEMENT OF FACTS

Exelis filed this action on May 24, 2012 [Wolford Aff.[1] ¶ 6].   The allegations in the original Complaint were based primarily upon a review of Exelis internal emails, which showed that six former Exelis employees – Belmont-Gwilt, Marcinkowski, Robert Marceau ("Marceau"), Mark Webb ("Webb"), Anthony Casale ("Casale"), and Michael Seakan ("Seakan") – had breached their obligations to Exelis by collaborating with a competitor, SRC, prior to their resignations in March/April 2012, and by taking Exelis' proprietary, confidential, and trade secret information [Id. ¶ 6].   At the time, Exelis had access only to emails and records within its own system, and it was clear that these records did not provide a complete picture of the scheme between these former employees, SRC, and SRC's vice-president and former Exelis employee LoSecco [Id.].

Through ongoing discovery, and particularly through thousands of pages of documents produced by Defendants within the past two weeks, Exelis has learned that Defendants' previously-known acts were part of a pre-meditated, wrongful scheme that

---

[1]    "Wolford Aff." refers to the Attorney Affidavit of Elizabeth A. Wolford, sworn to October 4, 2012.

is further-reaching and much more egregious than Exelis suspected.  As a result, Exelis seeks a temporary restraining order and preliminary injunctive relief preventing the individual defendants from being involved with SRC's proposal in response to an upcoming AFRL contract solicitation entitled Research, Enhancement and Development of Enterprise Cross Domain Solutions ("REDE-CDS"); preventing SRC from using the information stolen from Exelis in connection with its bid for REDE-CDS;  requiring any member of the SRC proposal team for REDE-CDS to certify that they have not been exposed to any Exelis bid or proposal information concerning REDE-CDS; and requiring Defendants to return to Exelis all documents, information and materials that have been misappropriated, taken or obtained from Exelis related to any of its work or programs, including but not limited to its capture strategy and bid information related to REDE-CDS.

## **ARGUMENT**

The Second Circuit requires "a party seeking a preliminary injunction to show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd., 598 F.3d 30, 35 (2d Cir. 2010).[2]

---

[2]    Although the issue appears to be unsettled, there is some recent authority suggesting that federal courts in the Second Circuit should also consider the balance of hardships and the public interest on any motion for injunctive relief.  See Salinger v. Colting, 607 F.3d 68, 77-78 & n.7 (2d Cir. 2010) (noting a split of authority and stating that "although our holding [requiring such consideration] is limited to preliminary injunctions in the context of copyright cases . . . we see no reason that [this requirement] would not apply with equal force to an injunction in any type of case.").  These factors are considered below at Point III.

There is no question that Exelis will succeed on the merits.  The evidence shows that Defendants engaged in a concerted effort to spy on Exelis, steal its confidential and trade secret information, and use that information to compete against Exelis for valuable government contracts.  Defendants have shown no compunction about deceiving their colleagues, their employer, and their government customer.

Emails produced within the past couple of weeks by Defendants demonstrate that while accepting a salary from Exelis, and ostensibly leading Exelis' efforts to win contracts worth tens of millions of dollars, Belmont-Gwilt and Marcinkowski were secretly feeding Exelis' confidential technical information and bidding strategy to LoSecco and SRC.  In private email exchanges, the three explicitly discuss Belmont-Gwilt's and Marcinkowski's value as SRC moles at Exelis, they shamelessly plot to use Exelis' information to undercut Exelis and win contracts for SRC, and they directly admit deceit in order to keep Exelis, their colleagues, and AFRL in the dark.  The record developed thus far leaves no doubt that Exelis will prevail in showing unfair competition, misappropriation of trade secrets, breaches of contract and fiduciary duty, and the aiding and abetting of such breaches.

Further, Defendants' scheme has caused and is continuing to cause irreparable harm.  Defendants have copied and stolen vast amounts of valuable, confidential, and trade secret information from Exelis.  Their express purpose in doing so was to take it to SRC, to incorporate it into SRC's proposals, and to use it to compete directly against Exelis for a number of contracts with AFRL.  Exelis is threatened with imminent harm in the REDE-CDS competition, but the harm to Exelis is not limited to the potential loss of this contract.  It includes the permanent loss of trade secret information and goodwill

4

that gives Exelis a competitive advantage in a wide range of contract competitions. Defendants' ability to use this information gives them an unfair advantage not only in the imminent REDE-CDS competition, but in every contract competition against Exelis for the foreseeable future.  Further, each day that Defendants are permitted to keep and use this information increases the risk of its irreversible integration into SRC's own information.  Because an after-the-fact award of monetary damages cannot adequately compensate for the harm that Exelis is suffering, Exelis is entitled to a temporary restraining order and preliminary injunction.

**POINT I**

**EXELIS IS LIKELY TO SUCCEED ON THE MERITS.**

**A.      Exelis is likely to succeed in showing that Defendants are engaged in unfair competition.**

"Under New York law, the gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another . . . by exploitation of proprietary information or trade secrets." Norbrook Labs, Ltd. v. G.C. Hanford Mft. Co., 297 F. Supp. 2d 463, 491 (N.D.N.Y 2003), aff'd 126 F. App'x 507 (2d Cir. 2005).   Unfair competition occurs where a defendant has taken or copied an employer's confidential information in order to use it in competition against that employer, regardless of whether that information is a trade secret or subject to a confidentiality agreement.  See Innoviant Pharmacy, Inc. v. Morganstern, 390 F. Supp. 2d 179, 194 (N.D.N.Y 2005) ("The New York law of unfair competition does, however, prohibit the unauthorized taking and exploitation of internal, proprietary information to assist an employee in competing with a former employer."); see also Leo Silfen, Inc. v. Cream, 29 N.Y.2d 387, 391-92 (1972) (holding that theft or intentional copying of an

5

employer's confidential information may be enjoined "as an egregious breach of trust and confidence," and that use of such information may be enjoined as unfair competition); Fairfield Fin. Mortg. Grp., Inc. v. Luca, 584 F. Supp. 2d 479, 487 (E.D.N.Y. 2008) ("where the information taken would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents for use in a competitor's business constitutes unfair competition."); Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc., 323 F. Supp. 2d 525, 537 (S.D.N.Y. 2004) ("even where the information would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents . . . for use in his future business or employment is to be enjoined as unfair competition.").

Here, the evidence leaves no question that Defendants have taken Exelis' confidential information by improper means in order to compete against Exelis. In February and March alone, Belmont-Gwilt sent at least ten highly confidential Exelis documents to her personal Gmail account [Payne Aff.[3] ¶¶ 14-28]. In addition, a forensic review of Belmont-Gwilt's computer reveals that during the weeks leading up to her resignation, she accessed a number of highly confidential documents and inserted a number of "USB" drives into that computer [Snell Aff.[4] ¶ 6; Clingerman Aff.[5] ¶¶ 4-5]. Each of these documents contained highly confidential and sensitive information relating to Exelis' plans, strategies, and capacities to compete for the REDE-CDS contract and other solicitations [Payne Aff. ¶¶ 14-28;   Snell Aff. ¶ 6].   Each of these

---

[3]    "Payne Aff." refers to the Affidavit of Thomas J. Payne, sworn to October 3, 2012.
[4]    "Snell Aff." refers to the Affidavit of Daniel J. Snell, sworn to October 4, 2012.
[5]    "Clingerman Aff." refers to the Affidavit of John R. Clingerman, sworn to October 4, 2012.

documents would be highly valuable to a competitor, such as SRC, who was seeking to compete with Exelis [Id.].

There was no authorization and no legitimate business purpose for this activity. To the contrary, Belmont-Gwilt sent these documents to herself so that she and SRC could use them to compete against Exelis. At the time of this unauthorized copying, Belmont-Gwilt had been working surreptitiously for SRC for months [Wolford Aff., ¶¶ 24-41]. She had already secretly fed SRC information about Exelis' SCORE proposal and helped SRC to author its competing SORCERER proposal [Id.]. She had long since been acting as SRC's spy providing what LoSecco referred to as "intel" and "inside information" on Exelis' plans and strategies [Id. at ¶ 51]. Apparently enjoying the feeling of a Cold War era le Carré novel, LoSecco repeatedly referred to Belmont-Gwilt as his "Svetlana" or "Svetty" inside Exelis [Id.; see also Exs. 27, 46].

In fact, emails conclusively show that Belmont-Gwilt, LoSecco, and SRC intended to use all of the information Belmont-Gwilt could gather to help SRC compete against Exelis for any contracts they could, including but not limited to the REDE-CDS contract [Id.; Exs. 27, 46]. The extent of Belmont-Gwilt's corporate espionage is astounding.

The other Individual Defendants engaged in similar thefts of Exelis' information. In email communications, LoSecco, Belmont-Gwilt, and Marcinkowski all acknowledged that after Belmont-Gwilt left Exelis, Marcinkowski would be SRC's primary spy at Exelis, a role that he willingly assumed [Id. at 34]. By that time, he had already provided confidential information about Exelis' SCORE proposal and helped to author SRC's SORCERER proposal [Wolford Aff., ¶¶ 25-41]; he had repeatedly disclosed internal

Exelis communications about AFRL and the upcoming contract competitions [Exs. 11, 22, 23, 24, 41]; at the time he was supposed to be working to obtain AFPAK OCO funding on behalf of Exelis he was undermining those efforts and helping LoSecco secure that funding for SRC [Wolford Aff., ¶¶ 42-50]; and he was already making his own plans to begin work at SRC [Id. at Ex. 8]. Shortly before leaving Exelis, Marcinkowski emailed a copy of AFRL's feedback on Exelis' SCORE proposal to his personal email account [Wolford Aff., ¶ 78]. The AFRL feedback was highly confidential and would not have been available to any competitors of Exelis except by means of theft. Moreover, it would be highly valuable to companies hoping to compete for REDE-CDS and other related contract work. Marcinkowski had no legitimate business reason to send this document outside the Exelis system, and he had no authorization to do so. In fact, emails among the Defendants expressly reveal that the purpose in taking this document was to utilize AFRL's feedback to improve SRC's related future proposals [Exs. 45, 46, 49].

LoSecco, Marcinkowski, and Belmont-Gwilt recruited the other Individual Defendants to join in their scheme of unfair competition. Webb was, and continues to be, intimately involved in the efforts to take Exelis' SCORE proposal and resubmit the work on behalf of SRC [Exs. 46, 49], and Marceau was actively feeding information to LoSecco for work to take from Exelis [Ex. 35].

Similarly, just before leaving their positions at Exelis, and after having made plans to begin work at SRC, Seakan and Casale made copies of entire hard drives of Exelis computers, stealing huge amounts of confidential and proprietary information [Wolford Aff., ¶ 84]. The information taken includes SAWES material, a program

8

developed and currently serviced by Exelis as part of the ISSE contract, and which is expected to become part of the REDE-CDS contract.  Email communications among the Defendants make clear that they intend to compete to take over the contract to service SAWES whether it is included in REDE-CDS or broken out into a separate contract [Exs. 26, 32].  By taking this information, SRC can continue to work on the program and can present itself as having not just the technical know-how, but the materials to take over the contract immediately.  This is an advantage that no Exelis competitor could fairly obtain.

The foregoing thefts were not simply independent bad acts.  They were part of a pre-meditated scheme, plotted by LoSecco, Belmont-Gwilt, and Marcinkowski in 2011 and carried out for months.  LoSecco obtained approval for his plans from his supervisors at SRC, and acting on behalf of SRC, he actively encouraged the other individual defendants to provide him with confidential Exelis information.  Thus, Plaintiffs will prevail on their claim for unfair competition not only against the Individual Defendants but against SRC as well.

**B.    Exelis is Likely to Succeed in Showing the Defendants Breached Their Fiduciary Duties and Aided and Abetted Such Breaches.**

The evidence and acts just discussed also amply show that the Individual Defendants breached their fiduciary duties to Exelis.  Further, in the case of those who recruited and encouraged the Individual Defendants to steal confidential information – a group that includes not only LoSecco and SRC, but also Belmont-Gwilt and Marcinkowski – their conduct constituted aiding and abetting such breaches.

"Under New York law, an agent is obligated to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 200 (2d Cir. 2003) (quotation omitted).  An employee's theft of her employer's confidential information for purposes of competing against that employer is an "egregious breach" of these fiduciary obligations.  See, e.g., Leo Silfen, Inc., 29 N.Y.2d at 391-392 ("If there has been a physical taking or studied copying, the court may in a proper case enjoin solicitation, not necessarily as a violation of a trade secret, but as an egregious breach of trust and confidence while in plaintiffs' service."); Equity Now, Inc. v Wall St. Mtge. Bankers, Ltd., 2012 N.Y. App. Div. LEXIS 6282, *1 (1st Dep't Sept. 27, 2012) (evidence established that a former employee, aided and abetted by defendant, "breach[ed] his fiduciary duty to his former employer by physically taking the lists that were plaintiff's property, refusing to return them in response to plaintiff's demands, and using plaintiff's proprietary information on behalf of Power Express"); Marcone APW, LLC v. Servall Co., 85 A.D.3d 1693, 1696 (4th Dep't 2011) ("even assuming, arguendo, that the misappropriated information is not entitled to trade secret protection, we conclude that . . . injunctive relief is warranted on the alternative ground of breach of trust by the individual defendants in misappropriating plaintiff's proprietary information"); American Fed. Group v. Rothenberg, 136 F.3d 897, 906 (2d Cir. 1998) ("even former employees may not misappropriate and utilize confidential information, such as customer lists and other confidential information not generally known to the public, but available only to employees in their endeavors for the company").

Further, "[t]he elements of a claim for aiding and abetting a breach of fiduciary duty in New York are (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damaged as a result of the breach." Freedom Mortg. Corp. v. Platinum Home Mortg. Corp., 11-cv-1357, 2012 U.S. Dist. LEXIS 129244, *13-14, n.8 (N.D.N.Y Sept. 12, 2012) (quotation omitted; holding that an aiding and abetting claim was supported by allegations that defendant "encourag[ed] [plaintiff's employee], through the prospect of employment with Platinum, to email him Plaintiff's confidential pricing sheets during the meeting").

Based on the acts and evidence discussed above, the Individual Defendants breached their fiduciary duties to Exelis, and they were aided and abetted in doing so by LoSecco, SRC, Belmont-Gwilt and Marcinkowski.

**C.      Exelis is Likely to Succeed on its Claim for Breach of Contract.**

The conduct described above is made only more egregious by the fact that it blatantly violated contractual obligations that each of the Individual Defendants, including LoSecco, owed to Exelis.  To prevail on its claim for breach of contract, Exelis must show (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.  See, e.g., Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).

As a condition of their employment at Dolphin Technology, a predecessor to Exelis [Snell Aff., ¶ 2], each of the Individual Defendants executed a "Confidentiality and Proprietary Rights Agreement" (hereinafter "Agreement") [Snell Aff., ¶ 4, Ex. 1 (Agreements)].  These Agreements are enforceable by Exelis, [id., Agreement § 4.3],

11

and they remained binding upon the Individual Defendants [id. § 4.4].  In exchange for the promises contained in these Agreements, Exelis and its predecessors employed each of the Individual Defendants until they chose to resign.  Thus, the first two elements of Exelis' claim for breach of contract are satisfied.

Exelis can also show the third element, that the Individual Defendants breached their obligations by violating the provisions concerning the protection of confidential information [Id. §§ 1.1, 1.2, 1.3, 3.1, 3.2].  The evidence discussed above demonstrates that the Individual Defendants have breached each and every one of these confidentiality obligations.  As described below, Exelis is suffering damages in the form of irreparable harm as a result.  Therefore, Exelis is likely to prevail in establishing each of the elements of its claim for breach of contract.[6]

**D.    Exelis is Likely to Succeed on the Merits of its Claim for Misappropriation of Trade Secrets.**

"To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate:  (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999).  The conduct described above shows that Defendants took and used Exelis' information by improper means and in violation of

---

[6]    In addition to the Confidentiality and Proprietary Rights Agreement, Webb also executed a Letter of Understanding with ITT (hereinafter the "LOU"), another predecessor of Exelis, when he was rehired by ITT in 2010 [Snell Aff., ¶5, Ex. 2 (LOU)]. The LOU is enforceable by Exelis [see LOU § 9] and survives the termination of Webb's employment [LOU § 7].  Webb has breached and continues to breach the LOU's requirements that he not use or divulge, and that he return, Exelis' confidential information [see LOU §§ 1, 5(a), (b), & (g)].

their duties to Exelis.   Thus, all that remains to be shown is that at least some of that stolen information is trade secret.

"A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it."   Id. at 44 (internal quotation marks and brackets omitted).   In determining whether information constitutes a trade secret, New York courts have considered:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Id. (quoting Ashland Mgmt., Inc. v. Janien, 82 N.Y.2d 395, 407 (1993)).

The documents copied and stolen by Belmont-Gwilt and Marcinkowski contained trade secret information.   The characteristics of these documents are described in detail in the Payne Affidavit, and can be further demonstrated at a hearing, but a few common features of these documents can be highlighted here [Payne Aff., ¶¶ 14-32].

The information contained in documents sent by Belmont-Gwilt, such as the "Capture Plan Review" and the "REDE Milestone 1" presentations, includes Exelis' strategy and plan for bidding for the REDE-CDS contract [Id. at ¶¶ 17, 20-22].   These documents include candid analysis of Exelis' strengths and weaknesses, and they outline plans to utilize the strengths and to address the weaknesses.   The documents also detail the financial commitment that Exelis was making to win the contract, and the

13

profit percentages it would use to calculate the price of its bid.   Naturally, this highly confidential information would be shared only with the handful of Exelis employees who are actively involved in the efforts to win those specific contracts [Id.; see also Snell Aff., ¶¶ 17-21].   It would never be shared with or accessible to anyone outside of Exelis.   As confidential internal information, Exelis' policies and its contractual agreements with its employees prohibit the distribution of this information to persons outside Exelis or to computer systems outside Exelis' secure network [Payne Aff., ¶ 14].   Thus, but for the employees' theft, there would be no way for SRC or any other competitor to develop or gain access to this information.

The information in these documents would be immensely valuable to anyone planning to compete against Exelis for the REDE-CDS contract or any similar contract. It provides direct insight to Exelis' strategy for REDE-CDS, and by inference, Exelis' likely approach to other related contract bids.   Using this information, a competitor could – and in fact SRC did -- determine that they needed to commit greater resources to match Exelis' effort.   A competitor could – and in fact SRC did -- exploit information about Exelis' strategy and its internal analysis of weaknesses and risks by emphasizing the alleged weaknesses to AFRL and tailoring its approach to contrast with Exelis.   A competitor could – and SRC surely will -- also use the profit percentage information to help determine an advantageous price for its own bid.

The case law clearly establishes that this internal strategic and pricing information is trade secret.  See, e.g., Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.), 574 F.3d 129, 152 (2d Cir. 2009) ("Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law."); Freedom

14

Mortg. Corp., 11-cv-1357, 2012 U.S. Dist. LEXIS 129244, *13 (holding that alleged theft of pricing sheets stated claim for misappropriation of trade secrets).

Other documents sent by Belmont-Gwilt also contain confidential, internal analysis of Exelis' technical capacities related to AFRL's needs, strengths and weaknesses, and past performance under AFRL contracts, as well as confidential product development information revealing Exelis' approach to projects that will be the subject matter of REDE-CDS and other future AFRL contracts [Payne Aff., ¶¶ 18-19, 23-28]. These documents had extremely limited distribution within Exelis, and would not be distributed outside Exelis, except in some cases to AFRL. Even where they would be shared with AFRL, they would remain unavailable to competitors and to the public. See, e.g., 18 U.S.C. § 1905 (making it a crime for a federal employee to disclose trade secrets received in the course of his duties); 41 U.S.C. § 2102 (prohibiting disclosure of "contractor bid or proposal information" submitted to a federal procurement officer); 5 U.S.C. § 552(b)(4) (exempting "trade secrets and commercial or financial information obtained from a person" from FOIA disclosure); Chrysler Corp. v. Brown, 441 U.S. 281, 317-18 (1979) (finding jurisdiction for a suit by a government contractor to enjoin release of trade secrets by a federal agency). The information in these documents, like the information above, is highly valuable to competitors as it gives them otherwise unavailable insight into Exelis' strategies, processes, and capacities for solving problems that will be presented in imminent and future AFRL contract proposals.

Finally, the SCORE proposal and the AFRL's feedback on that proposal, stolen by Marcinkowski, is also trade secret information [Payne Aff., ¶¶ 29-32]. The feedback

15

was disclosed by AFRL exclusively to Exelis, and it would not have been shared with anyone outside of the handful of Exelis' employees involved in the SCORE proposal and the directly related REDE-CDS contract competition.  It could not be obtained by a competitor except by theft.  As the Defendants' own email communications show, this feedback is highly valuable to SRC, as they are using it to gain insight into AFRL's preferences and to improve their own proposals to AFRL [Wolford Aff., ¶¶ 73-78].  It is well-established that secret customer preference information of this sort is entitled to trade secret protection. See American Bldg. Maint. Co. v. Acme Prop. Servs., Inc., 515 F. Supp. 2d 298, 308 (N.D.N.Y. 2007) (trade secrets include confidential information "related to [a] clients' preferences and the customization of its services undertaken to address those preferences . . . ."); Jay's Custom Stringing, Inc. v. Jonghwan Yu, 01-cv-1690, 2001 U.S. Dist. LEXIS 9298, *15 (S.D.N.Y. July 6, 2001) ("information detailing the characteristics and nature of customer specifications and preferences may be eligible for trade secret protection"); Webcraft Tech., Inc. v. McCaw, 674 F. Supp. 1039, 1046-47 (S.D.N.Y. 1987) (contentions that customer preferences and pricing information was not trade secret "border[ed] on the frivolous").

Because the evidence clearly demonstrates that Defendants have stolen trade secret information, Exelis is likely to prevail on this claim.

## POINT II

### EXELIS WILL SUFFER IRREPARABLE HARM
### IN THE ABSENCE OF AN INJUNCTION.

**A.**   **Defendants' Use and Dissemination of Exelis' Confidential Information is Causing Irreparable Harm.**

Defendants' distribution of stolen information throughout SRC and its integration into SRC's own documents and information threatens Exelis with the permanent loss of trade secrets and other confidential information, which constitutes irreparable harm. "[T]he loss of an employer's confidential customer information . . . constitutes irreparable harm." The Ayco Co. v. Frisch, 795 F. Supp. 2d 193, 205 (N.D.N.Y. 2011). "Irreparable harm to an employer may also result where an employee has misappropriated trade secrets or confidential customer information, including pricing methods, customer lists and customer preferences." Innoviant Pharm., Inc. v. Morganstern, 390 F. Supp. 2d 179, 189 (N.D.N.Y. 2005) (emphasis added) (quoting Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc., 323 F. Supp. 2d 525, 532-33 (S.D.N.Y. 2004)); see also IDG USA, LLC v. Schupp, 416 F. App'x 86, 88 (2d Cir. 2011) ("[T]hreatened dissemination of trade secrets generally creates a presumption of irreparable harm.").

Irreparable harm also arises where confidential competitive information is stolen because of "the difficulty in calculating monetary damages resulting from the loss of a business relationship with a customer or client which could in the future generate an unknown amount of business and corresponding profits." Innoviant, 390 F. Supp. 2d at 189; Johnson Controls, 323 F. Supp. 2d at 532. This is true here, as Defendants have demonstrated their intent to utilize Exelis' information not only in the imminent REDE-

17

CDS competition, but in all other related competitions.  Defendants have already used stolen Exelis information to compete against Exelis' SCORE proposal and to compete successfully for AFPAK OCO funding, and their communications show a willingness and intent to use Exelis' information in any future competitions that arise.

In the absence of injunctive relief, Exelis will be left to litigate each contract competition after the fact.  "[I]f a plaintiff can secure legal relief only through a multiplicity of lawsuits, plaintiff has suffered irreparable harm sufficient to warrant a preliminary injunction." South Nassua Control Corp. v. Innovative Control Mgmt. Corp., 95-cv-3724, 1996 U.S. Dist. LEXIS 22603, *14 (E.D.N.Y. June 17, 1996) (rejecting the "notion that plaintiffs have an adequate remedy at law insofar as they could sue for damages on each occasion that another customer is pirated"); Ecolab, Inc. v. Paolo, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991) (same).  Further, as SRC adapts their strategies in response to the stolen information, as they integrate that information into their own, and as they develop goodwill through improved bids or through the performance of any contracts unfairly obtained, it will gradually become difficult or impossible to determine the extent to which Exelis has been unjustly harmed.  Thus, the only appropriate way to address the harm is to prevent it from occurring in the first place.

Moreover, case law similarly recognizes that the loss of goodwill, market standing, and their associated advantages constitute irreparable harm.  See, e.g., Nat'l Elevator Cab & Door Corp v. H & B, Inc., 282 F. App'x 885, 887 (2d Cir. 2008) (affirming grant of a preliminary injunction based on finding that solicitation of plaintiff's customers "would likely harm National's good will because it would affect National's general

18

reputation in the market" thereby causing irreparable harm); <u>Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.</u>, 126 F. App'x 507, 509 (2d Cir. 2005) ("the potential loss of an industry leader's present market and loss of the advantage of being the pioneer in the field and the market leader, may constitute irreparable harm" (quotation omitted)); <u>Tom Doherty Assocs. v. Saban Entm't, Inc.</u>, 60 F.3d 27, 37-38 (2d Cir. 1995) (holding that a loss of goodwill can constitute irreparable harm where the loss would be difficult to quantify).  Here, Exelis has been providing AFRL with cross domain security technology under the ISSE Guard contracts for years.  The imminent REDE-CDS competition is essentially a competition for the next generation of work in that same field.  Through its unique experience in this field, Exelis has earned certain unique advantages in competing for this work.  Furthermore, the record shows that LoSecco, Belmont-Gwilt, and others on behalf of SRC have repeatedly approached AFRL to tout SRC's new capabilities and diminish Exelis' reputation.  Through their theft and unfair competition, Defendants seek to diminish Exelis' goodwill with AFRL, enhance their own standing, and rob Exelis of its market advantages.  This harm cannot be calculated or remedied with an award of monetary damages.  Thus, Exelis is entitled to preliminary injunctive relief.

### B.    The Individual Defendants Have Agreed that Injunctive Relief is the Only Remedy for their Wrongdoing.

A finding of irreparable harm is buttressed by the fact that each of the individual defendants, including LoSecco, executed a "Confidentiality and Proprietary Rights Agreement" in which they agreed that Exelis' loss of confidential and proprietary information may not be remedied by monetary damages and that Exelis "shall be entitled, without waiving any other rights or remedies to which it may be entitled, to such

injunctive relief as may be deemed appropriate by a court of competent jurisdiction" Confidentiality Agreement § 3.3. See North Atl. Instruments, 188 F.3d at 49; The Ayco Co., 795 F. Supp. 2d at 205; Innoviant Pharm., 390 F. Supp. 2d at 189 (holding that such provisions "buttress the conclusion that [defendants'] actions, if unchecked, will give rise to a likelihood of irreparable injury to [plaintiff], and indeed could be construed as representing his acknowledgment of this fact.").

### C.   Exelis Did Not Unduly Delay.

Defendants may argue that Exelis has waited too long to seek injunctive relief - having sought the relief four months after commencement of this litigation.  However, the Second Circuit has held that a delay in seeking relief will not rebut a showing of irreparable harm, particularly when the plaintiff was unaware of the severity of the wrongdoing.  See Tom Doherty Assocs., 60 F.3d at 39 (citing Clifford Ross Co. v. Nelvana, Ltd., 710 F. Supp. 517, 521 (S.D.N.Y. 1989), aff'd, 883 F.2d 1022 (2d Cir. 1989)).  "Similarly, a delay caused by a plaintiff's good faith efforts to investigate an infringement does not rebut the presumption of irreparable harm."  Tom Doherty Assocs., 60 F.3d at 39-40 (four month investigation delay did not undercut finding of irreparable harm); see Fisher-Price Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 125 (2d Cir. 1994) (same for five month delay); King v. Innovation Books, 976 F.2d 824, 831 (2d Cir. 1992) (same for eight month delay); Kuklachev v. Gelfman, 629 F. Supp. 2d 236, 250 (E.D.N.Y. 2008), aff'd 361 F. App'x 161, 163 (2d Cir. 2009) (same for 15 to 20 month delay); Clifford Ross Co. v. Nelvana, Ltd., 710 F. Supp. 517, 521 (S.D.N.Y.), aff'd 883 F.2d 1022 (2d Cir. 1989) (same for seven month delay).

Here, Exelis filed this action promptly after its internal investigation indicated that its former employees may have breached their duties and misappropriated Exelis' confidential information.   However, because much of the conduct took place using Defendants' personal and SRC email accounts, Exelis could not determine whether its former employees had shared Exelis' information with SRC or planned to use it in further competition.   Thus, Exelis made an emergency motion for expedited discovery, clearly stating that it sought that information to determine whether to seek a preliminary injunction [Wolford Aff., ¶¶ 6-7; Docket No. 5].

Unfortunately, the Motion was not decided until August 30, 2012 [Id. at ¶ 11]. When Defendants claimed to be equally interested in expedited discovery, Exelis agreed to begin voluntary discovery, but it was not until September 17, 2012, that Exelis received the critical discovery.   Upon reviewing that material and learning the extent of the Defendants' deceit, Exelis filed the instant motion as quickly as possible.   These steps confirm rather than undercut Exelis' urgent need for injunctive relief.

**D.      The Scope and Form of the Relief Requested is Necessary.**

The injunctive relief requested by Exelis is appropriately tailored to address the wrongdoing and the potential harm.   Exelis does not ask the Court to prevent SRC from competing or prohibit the Individual Defendants from working at SRC.   The requested relief would merely require that they compete fairly and within the bounds of the law.

In summary, Exelis requests an injunction:

  1.      prohibiting Defendants from using any Exelis trade secret, proprietary or confidential information in preparing its response to the REDE-CDS RFP;

21

2.      prohibiting any of the individual defendants from being involved directly or indirectly with SRC's proposal in response to the REDE-CDS RFP;

3.      requiring members of the SRC proposal team for REDE-CDS (including any team members or subcontractors) to certify that they have not been exposed to any Exelis bid or proposal information concerning REDE-CDS; and

4.      requiring Defendants to return all confidential Exelis documents and files taken by them.

Each aspect of this requested relief is supported by the circumstances and the law.

In cases involving the theft of confidential and trade secret information for purposes of unfair competition, preliminary injunctions routinely require defendants to return all misappropriated documents and to avoid their use. See, e.g., The Ayco Co., 795 F. Supp. 2d at 211; Ecolab, Inc., 753 F. Supp. at 1115.

In addition, where former employees have engaged in such egregious theft and unfair competition, they are properly enjoined not only from using and having access to the stolen information, but from participating in related competition even once they have returned such information. See, e.g., Harris v. Fairweather, 11-cv-2152, 2012 U.S. Dist. LEXIS 128409, *46 (S.D.N.Y. Sept. 10, 2012) (issuing permanent injunction based on unfair competition: "Fairweather cannot misappropriate PPH's files and computers and use that information to solicit business. Fairweather should be enjoined from using PPH's customer information to solicit business and she should be ordered to return to Harris any PPH files . . . ."); Innoviant Pharm., 390 F. Supp. 2d at 196 (enjoining former employee from contacting any of the referral sources listed in information stolen from his former employer); see also Leo Silfen, Inc., 29 N.Y.2d at 391-392 (stating that an injunction against competitive solicitation is an appropriate remedy for theft of an

22

employer's confidential information). This is particularly true where the former employees have gained intimate knowledge of the confidential information and could not be expected to segregate that knowledge. See Estee Lauder Cos. v. Batra, 430 F. Supp. 2d 158, 176 (S.D.N.Y. 2006) ("even assuming the best of good faith, it is doubtful whether the defendant could completely divorce his knowledge of the trade secrets from any . . . work he might engage in"); Monovis, Inc. v. Aquino, 905 F. Supp. 1205, 1234 (W.D.N.Y. 1994) ("An injunction against use and disclosure alone would be insufficient to achieve the requisite equity in this case . . . [because] even assuming the best of good faith, it is doubtful whether Aquino could completely divorce his knowledge of the trade secrets from any single-screw compressor work in which he might engage."). Here, the Individual Defendants, including LoSecco, have become intimately familiar with Exelis' plans and strategies for the REDE-CDS bid, and there is no prospect that they could ignore their ill-gotten knowledge in preparing SRC's competing bid.

Finally, the purpose of this injunction would be easily frustrated if SRC could staff its REDE-CDS team with others who were made privy to the stolen Exelis information. Thus, it is necessary and appropriate to require that each member of SRC's team certify that it has not had access to the stolen Exelis information.

## POINT III

### THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING INJUNCTIVE RELIEF.

Consideration of the balance of hardships and the public interest – whether required or not, see Salinger, 607 F.3d at 77-78 & n.7 – strengthens the case for injunctive relief.

First, the balance of hardships tips decidedly in favor of Exelis.  The requested relief would not prohibit SRC from competing for any contract, and it would not prohibit the Individual Defendants from continuing in SRC's employ.  The Defendants remain free to compete provided only that they do so fairly, without relying on information stolen from Exelis. Given the clear showing that they intend to compete unfairly, Defendants can claim no legitimate harm in being required to comply with the law.

Second, an injunction may issue provided only that "the public interest would not be disserved."  Salinger, 607 F.3d at 77 (quotation omitted).  Here, an injunction would actually further the public interest.  If Defendants are permitted to proceed with their plans to rely on Exelis' stolen information in their bid for the REDE-CDS and other federal contracts, the federal procurement process will be tainted.  See generally Procurement Integrity Act, 41 U.S.C. §§2101 et seq.; 10 U.S.C. §§ 2302 et seq. (governing Armed Forces procurement); Compliance Corp. v. United States, 22 Cl. Ct. 193, 204 (1990), aff'd 1992 U.S. App. LEXIS 5550, *5 (Fed. Cir. Mar. 26, 1992) ("A bidder who may have formulated its proposal using proprietary information from a competitor compromises the system of full, fair, and open competition.").  It does not serve any public interest to have critical national defense contracts awarded on the basis of unlawful competition.  Instead, the public interest is served by an injunction that will ensure a fair and lawful procurement process.

24

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that Plaintiff's motion for a preliminary injunction and temporary retraining order should be granted.

Dated:   October 4, 2012

s/ Elizabeth A. Wolford

Elizabeth A. Wolford, Esq. (Bar Roll No. 509085)
Sarah Snyder Merkel, Esq. (Bar Roll No. 517055)
James A. Hobbs, Esq. (Bar Roll No. 517585)
**THE WOLFORD LAW FIRM** LLP
*Attorneys for Plaintiff Exelis, Inc.*
600 Reynolds Arcade Building
Rochester, New York 14614
Telephone: (585) 325-8000
ewolford@wolfordfirm.com
smerkel@wolfordfirm.com
jhobbs@wolfordfirm.com

# APPENDIX OF UNREPORTED DECISIONS



**COMPLIANCE CORPORATION, Plaintiff-Appellant, v. THE UNITED STATES, Defendant-Appellee.**

91-5048

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

*1992 U.S. App. LEXIS 5550; 37 Cont. Cas. Fed. (CCH) P76,296*

March 26, 1992, Decided

**NOTICE:** [*1] RULE 47.8. OPINIONS AND ORDERS DESIGNATED AS UNPUBLISHED SHALL NOT BE EMPLOYED AS PRECEDENT BY THIS COURT, AND MAY NOT BE CITED BY COUNSEL, EXCEPT IN SUPPORT OF A CLAIM OF RES JUDICATA, COLLATERAL ESTOPPEL, OR LAW OF THE CASE. ANY PERSON MAY REQUEST THAT AN UNPUBLISHED OPINION OR ORDER BE REPREPARED AND REISSUED FOR PUBLICATION, CITING REASONS THEREFOR. SUCH REQUEST WILL BE GRANTED OR DENIED BY THE PANEL THAT RENDERED THE DECISION.

**SUBSEQUENT HISTORY:** Reported as Table case at *1992 U.S. App. LEXIS 15208*

**PRIOR HISTORY:** Appeal from the United States Claims Court. No. 90-3896C.

**JUDGES:** Before NIES, Chief Judge, MICHEL and LOURIE, Circuit Judges.

**OPINION BY:** MICHEL

**OPINION**

DECISION

Compliance Corporation appeals from the December 12, 1990, decision of the United States Claims Court, No. 90-3896C, granting summary judgment to the United States and dismissing Compliance's complaint under the Competition in Contracting Act of 1984 (CICA), Public Law 98-369 (partly codified at *10 U.S.C. §§ 2301-2305 (1988)*). The Claims Court found an appearance of impropriety affecting the integrity of the procurement process which provided a reasonable basis for the contracting officer's decision to disqualify Compliance from bidding, and a rational basis for the decision of the General Accounting Office (GAO) upholding the [*2] disqualification. We *affirm.*

DISCUSSION

Although the agency awarded the contract after the Claims Court's decision, this appeal is not moot. *See F. Alderete General Contractors, Inc. v. United States, 715 F.2d 1476, 1481 (Fed. Cir. 1983)* (awarding of contract after filing of complaint does not in itself defeat jurisdiction that has properly vested in the Claims Court). The Claims Court can still fashion the requested equitable remedy. [1] *Cf. Porter v. Lee, 328 U.S. 246, 251 (1946)* (case not moot where court can restore *status quo* by injunction).

> 1   Appellant seeks an injunction forbidding the agency from exercising any options in the current contract and requiring it to permit Compliance to participate in the reprocurement. Appellant's br. at 32.

We review a grant of summary judgment by the Claims Court *de novo. Turner v. United States, 901 F.2d 1093, 1095 (Fed. Cir. 1990)*; *Prineville Sawmill Co., Inc. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988)*. [*3] Summary judgment is appropriate if the record shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. RUSCC 56(c).

To justify judicial intervention in the procurement process, a bid protester must demonstrate that the contracting officer's action was arbitrary or capricious. *CACI, Inc.-Federal v. United States, 719 F.2d 1567,*

1992 U.S. App. LEXIS 5550, *; 37 Cont. Cas. Fed. (CCH) P76,296

*1573 (Fed. Cir. 1983)*. Moreover, where the GAO has denied a bid protest, the Claims Court may not act unless the GAO's decision lacks a rational basis. *Honeywell, Inc. v. United States, 870 F.2d 644, 647 (Fed. Cir. 1989)*.

As the parties have pointed to no material and genuine factual dispute, and we have seen none, our task in determining if the government is entitled to judgment as a matter of law is limited to deciding whether the contracting officer had a reasonable basis to disqualify Compliance from the bidding process, or the GAO had a rational basis for denying the bid protest.

I.

Under Federal Acquisition Regulation (FAR) 1.602-2, a contracting officer is "allowed wide latitude to exercise business judgment" when "safeguarding the interests of the United [*4] States in its contractual relationships." *48 C.F.R. § 1.602-2 (1991)*. Specifically, the contracting officer may disqualify a bidder because of an appearance of improper conduct in order to preserve the integrity of the procurement system. *NKF Engineering, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986)*.

Compliance argues that any apparent impropriety must involve a governmental conflict of interest or a violation of statute or regulation that affects the integrity of the procurement process. Since neither appears here, and since the alleged misconduct directly involved only private parties, Compliance contends that there was no impropriety which could provide the contracting officer with a reasonable basis for disqualification.

Although it is ultimately the government that awards the contract, the integrity of the bidding process also implicates actions of individual bidders. If bidders do not compete fairly among themselves, even when their conduct neither involves governmental conflict of interest nor rises to the level of a statutory or regulatory violation, the government cannot overlook the impropriety, or it would not be promoting fairness and full [*5] and open competition as required by CICA. *See 10 U.S.C. § 2301(b)(1)*. The integrity of the government's selection of the winning bid depends on the integrity of the submitted bids.

In the present case, the contracting officer disqualified Compliance based on the results of the Naval Investigative Service's (NIS) investigation into a competing contractor's allegations that Compliance had obtained or had attempted to obtain proprietary proposal information. A bidder who may have formulated its proposal using proprietary information from a competitor compromises the system of full, fair, and open competition. Whether Compliance was proven to have obtained proprietary information is not dispositive; all that is necessary to justify disqualification is an appearance of improper

conduct. *NKF, 805 F.2d at 377*. The contracting officer's decision, based on review of the NIS report, was not arbitrary or unreasonable.

II.

Compliance's reliance on numerous GAO decisions denying a bid protest forum to purely private disputes, appellant's br. at 15-16, is misplaced. First, GAO decisions are not binding on us. Second, no GAO (or Claims Court or Federal Circuit) decision holds [*6] that the type of conduct Compliance apparently engaged in cannot affect the integrity of the procurement process. Instead, the GAO has merely construed its bid protest jurisdiction as limited to review of government action. *See 31 U.S.C. §§ 3553(a), 3551 (1988); Honeywell, 870 F.2d 647-48*.

Here, the government has acted by its disqualification of Compliance, and it is this action which Compliance requested the GAO to review, arguing that the disqualification was unreasonable. *See* Joint Appendix at A29. Moreover, Compliance's own brief points to the fallacy of its argument. In its parenthetical describing the GAO decision in *Radio TV Reports, Inc. -- Request for Reconsideration*, B-224173.2, Oct. 7, 1986, 86-2 CPD P403, Compliance states, "where the procuring agency has not engaged in any conduct that is . . . unreasonable . . . the protest does *not* relate to the propriety of the procurement by the agency." Appellant's br. at 16 (emphasis in original). But throughout this dispute, Compliance's argument has been that the contracting officer's disqualification action was unreasonable. Thus, the GAO properly provided an adjudicative forum [*7] to review the action of the procuring agency, and given the record, its two decisions in support of the disqualification were not irrational. Moreover, Compliance voluntarily sought a bid protest review by the GAO and thus should not now be allowed to disown the resulting adverse decisions. Therefore, the Claims Court was correct in ruling that the contracting officer's decision to disqualify Compliance was reasonable. And we would be justified, in upholding the summary judgment, in considering either the GAO decisions or the Claims Court's finding.

III.

Appellant argues, however, that to the extent an agency might otherwise lawfully disqualify a bidder absent a conflict of interest or a statutory or regulatory violation, there is an impermissible absence of standards for conduct of competing bidders. As we explained in *NKF*, whether the agency may disqualify a bidder based on an appearance of impropriety "would depend upon the circumstances in each case." *805 F.2d at 376*. Appellant shows no legal defect in such an approach, but rather relies on general arguments about statutory policy. How-

ever, it would directly contravene the primary policy expressed in the CICA [*8] if we were to limit the contracting officer's power to promote fair and full competition and preserve the integrity of the procurement process as the appellant requests. We see no reason of law or policy to relieve competitors of the consequences of their misconduct during the bidding process. Moreover, the industry standard is clear enough that a bidder may not attempt to obtain proprietary proposal information from another bidder.

IV.

Compliance also equates its disqualification with a "nonresponsibility" determination which the procuring agency must first refer to the Small Business Administration, a referral not made here. *48 C.F.R. § 19.602-1 (1991)*. Even if we agreed with the appellant that its integrity is drawn into question, the FAR does not make a nonresponsibility determination the exclusive basis for disqualification. The contracting officer may properly disqualify Compliance because its conduct jeopardized the integrity of the procurement process. *See 48 C.F.R. § 1.602-2; NKF, 805 F.2d at 377*. Therefore, doing so does not constitute a nonresponsibility determination as a matter of law.

V.

Finally, Compliance complains that its procedural due process [*9] rights have been violated. FAR, Part 33, permitted Compliance to protest its disqualification directly to the contracting officer. 48 C.F.R. pt. 33 (1991). Compliance did not avail itself of this opportunity but instead filed a bid protest with the GAO, which has issued two adverse decisions. The appellant then litigated but lost on the merits in the Claims Court. Only after the Claims Court decision did the agency proceed with its procurement. More pre-award process was not due Compliance.



**FREEDOM MORTGAGE CORP., Plaintiff, v. PLATINUM HOME MORTGAGE CORP.; WILLIAM GIAMBRONE; LEE GROSS; JANE KING; MICHAEL YOUNG; KARLA KELLY; KIMBERLY CURTIN; WENDY DICKSON; LYNN SPANY; TERESA SHADICK; SHARON JONES-OTTO, and MICHAEL LINSNER, Defendants.**

1:11-CV-1357 (GTS/DRH)

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

*2012 U.S. Dist. LEXIS 129244*

**September 12, 2012, Decided
September 11, 2012, Filed**

**COUNSEL:** [*1] For Plaintiff: ERIC A. SAVAGE, ESQ., SARAH E. MOSS, ESQ., OF COUNSEL, LITTLER MENDELSON, P.C., New York, NY.

For Defendants: JONATHON H. STOLER, ESQ., ROBERT S. FRIEDMAN, ESQ., OF COUNSEL, SHEPPARD MULLIN RICHTER & HAMPTON, LLP, New York, NY.

**JUDGES:** Hon. Glenn T. Suddaby, U.S. District Judge.

**OPINION BY:** Glenn T. Suddaby

**OPINION**

<u>**MEMORANDUM-DECISION and ORDER**</u>

Currently before the Court, in this business tort action filed by Freedom Mortgage Corporation ("Plaintiff") against the above-captioned corporation and eleven individuals, is a motion to dismiss for lack of personal jurisdiction pursuant to *Fed. R. Civ. P. 12(b)(2)* filed by William Giambrone ("Defendant"). (Dkt. No. 28, Attach. 4.) For the reasons set forth below, Defendant's motion is denied without prejudice, with leave to renew after discovery is completed.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Claims Against Defendant**

Generally, liberally construed, Plaintiff's Amended Complaint asserts the following six claims against Defendant: (1) a claim that Defendant violated Plaintiff's contractual rights by aiding and abetting eight of Plaintiff's former employees in their breach of their confidentiality agreements; (2) a claim that Defendant violated Plaintiff's rights [*2] under the Illinois Trade Secrets Act by coordinating the misappropriation of Plaintiff's trade secrets in order to solicit business away from Plaintiff; (3) a claim that Defendant violated Plaintiff's rights under *18 U.S.C. § 1030* by conspiring to commit fraud with Plaintiff's former employees; (4) a claim that Defendant violated Plaintiff's property rights under New York State common law by encouraging and assisting Plaintiff's former employees to forego returning Plaintiff's wrongfully obtained trade secrets, and thus commit the tort of conversion; (5) a claim that Defendant violated Plaintiff's rights under New York State common law by interfering with Plaintiff's business advantage; and (6) a claim that Defendant violated Plaintiff's property rights by unjustly enriching himself at Plaintiff's expense. (*See generally* Dkt. No. 26, at ¶¶ 55-130 [Plf.'s Amend. Compl.].)

Generally, these six claims are based on the following allegations: (1) Plaintiff and Platinum Home Mortgage Corporation ("Platinum") are both mortgage lenders, Plaintiff being based in Clifton Park, New York, and Defendant being based in Illinois; (2) on or before May 1, 2011, Defendant, as president of Platinum, traveled [*3] to New York City for the National Mortgage Bankers Association Secondary Market Conference and Expo

at the Marriott Marquis Hotel on Broadway; (3) while attending the conference over the course of the next three days, Defendant, Lee Gross, and another Platinum employee met at the Marriott with Jane King and another employee of Plaintiff for the purpose of discussing their leaving Plaintiff and bringing to Platinum one of Plaintiff's entire loan programs ("the Section 203(k) business"), in violation of confidentiality agreements executed between those employees and Plaintiff; and (4) during the following five months, Defendant and other Platinum employees successfully persuaded numerous employees to leave Plaintiff, join Platinum, and bring to Platinum Plaintiff's Section 203(k) business, in violation of those confidentiality agreements. (*Id.* at ¶¶ 1-54.)

Familiarity with Plaintiff's precise claims against Defendant, and the precise factual allegations supporting those claims, is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id.*)

**B. Parties' Briefing on Defendant's Motion**

Generally, in support of his motion to dismiss, Defendant argues that [*4] all of Plaintiff's claims against Defendant should be dismissed under *Fed. R. Civ. P. 12(b)(2)*, because Plaintiff's Amended Complaint has failed to allege facts plausibly suggesting that the Defendant--a non-resident of New York who has no real estate, bank account or offices in New York--had sufficient contacts with New York State under New York's Civil Practice Law and Rules ("NY CPLR") §§ *301* and *302(a)* and the *Due Process Clause* to confer on the Court personal jurisdiction over him. (*See generally* Dkt. No. 28, Attach. 4 [Def.'s. Memo. of Law].)

Generally, in Plaintiff's response to Defendant's motion, asserts the following three arguments: (1) based on the allegations contained in Plaintiff's Amended Complaint, and the sworn assertions contained in declarations presented by the parties (including the declaration of Sue Mintzer, who was present at the meeting at the Marriott in early-May 2011, as well as two declarations of Defendant himself), Defendant transacted business within New York State for purposes of *NY CPLR § 302(a)(1)*, because during the meeting Defendant attempted to convince Plaintiff's employees to breach their confidentiality agreements with Plaintiff, violate their [*5] duties of loyalty owed to Plaintiff, and misappropriate Plaintiff's trade secrets in order to unjustly enrich Platinum;[1] (2) in any event, based on the allegations contained in Plaintiff's Amended Complaint, and the sworn assertions contained in declarations presented by the parties, Defendant committed a tort within New York State for purposes of *NY CPLR § 302(a)(2)*; and (3) under the circumstances, exercising personal jurisdiction over Defendant comports

with the *Due Process Clause*. (*See generally* Dkt. No. 16 [Plf.'s Opp'n Memo. of Law].)

> 1   Plaintiff also argues that Platinum's acts in New York State can be imputed to Defendant, who was Platinum's president at the time. (Dkt. No. 34, at 11 [attaching page "7" of Plf.'s Opp'n Memo. of Law].)

Generally, in his reply, Defendant asserts the following four arguments: (1) Plaintiff cites the incorrect standard of review in its opposition memorandum of law, citing the standard governing a motion filed pursuant to *Fed. R. Civ. 12(b)(6)*, rather than a motion filed pursuant to *Fed. R. Civ. P. 12(b)(2)*; (2) Plaintiff fails to allege facts plausibly suggesting, and/or adduce evidence establishing, that Defendant transacted business within New York [*6] State for purposes of *NY CPLR § 302(a)(1)*, through the single, 30-45 minute meeting in question, the purpose of which has not been established;[2] (3) Plaintiff fails to allege facts plausibly suggesting, and/or adduce evidence establishing, that Defendant committed a tort within New York State for purposes of *NY CPLR § 302(a)(2)*; and (4) Plaintiff fails to allege facts plausibly suggesting, and/or adduce evidence establishing, that exercising personal jurisdiction over Defendant comports with the *Due Process Clause*. (*See generally* Dkt. No. 36 [Def.'s Reply Memo. of Law].)

> 2   In response to the imputation argument described in note 1 of this Decision and Order, Defendant argues that such imputation can occur only when the plaintiff shows that the corporation was acting as the agent for the defendant, which Plaintiff has not done in this action. (Dkt. No. 36, at 6-7 [attaching pages "5" and "6" of Def.'s Reply Memo. of Law].)

**II. RELEVANT LEGAL STANDARD**

"When a defendant moves to dismiss a complaint under *Rule 12(b)(2)* for want of personal jurisdiction, courts must perform a two-part analysis." *Harris v. Ware, 04-CV-1120, 2005 U.S. Dist. LEXIS 3302, 2005 WL 503935, at \*1 (E.D.N.Y. Mar. 4, 2005)*. "First, personal jurisdiction [*7] over a defendant must be established under the law of the state where the federal court sits." *Harris, 2005 U.S. Dist. LEXIS 3302, 2005 WL 503935, at \*1 (citing Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 [2d Cir.1999])*. "Under *Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure*, the service of a summons establishes personal jurisdiction over a defendant 'who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located.'" *Id.* (citation omitted). "Second, if jurisdiction is established

2012 U.S. Dist. LEXIS 129244, *

under the governing statute, courts must determine whether the exercise of jurisdiction under the relevant state law would violate the defendant's due process rights." *Id.* (citation omitted)

The plaintiff "bears the burden of establishing that the court has jurisdiction over the defendant, since Defendant has served the *Rule 12(b)(2)* motion." *Aldinger v. Segler, 04-CV-4405, 2005 U.S. Dist. LEXIS 23818, 2005 WL 2591958, at *2 (S.D.N.Y. Oct. 13, 2005)* (internal quotation marks and citation omitted). Unless a court conducts "a full-blown evidentiary hearing," the plaintiff only needs to make "a prima facie showing of jurisdiction through its own affidavits and supporting [*8] materials to survive a motion to dismiss under *Rule 12(b)(2)*." *Harris, 2005 U.S. Dist. LEXIS 3302, 2005 WL 503935, at *1* (internal quotation marks and citations omitted). "In other words, prior to discovery, a plaintiff may defeat a jurisdiction-testing motion by pleading in good faith, ... legally sufficient allegations of jurisdiction." *Harris, 2005 U.S. Dist. LEXIS 3302, 2005 WL 503935, at *1* (internal quotation marks and citations omitted). However, "[o]nce discovery regarding a defendant's contacts with the forum is conducted," the plaintiff's burden is heightened, with the requirement that the "prima facie showing ... include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id.* (internal quotation marks and citations omitted).

"If the plaintiff fails to make the requisite showing, [the Court] may dismiss the complaint pursuant to *Rule 12(b)(2)*." *Id.* In the alternative, the Court may "transfer venue[,] even it if lacks personal jurisdiction over defendants, if the requirements of the governing statute, *28 U.S.C. § 1404(a)*, are met." *Id.* (internal quotation marks and citations omitted). "When evaluating the parties' submissions, the Court will read the [*9] Complaint and submissions in the light most favorable to Plaintiff." *Daou v. Early Advantage, LLC, 410 F.Supp.2d 82, 88-89 (N.D.N.Y.2006)* (Scullin, J.) (citations omitted).

## III. ANALYSIS

### A. Whether Defendant Transacted Business Within New York State for Purposes of *NY CPLR § 302(a)(1)*

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Plaintiff's opposition memorandum of law. (Dkt. No. 34, at 9-13 [attaching pages "5" through "9" of Plf.'s Opp'n Memo. of Law].) The Court would only add only two brief points.

First, Defendant understates the significance of the early-May meeting in the Marriott. For example, based on the factual allegations asserted and evidence adduced thus far, the purpose of the meeting was to persuade employees of Plaintiff to breach their confidentiality agreements with Plaintiff, violate their duty of loyalty owed to Plaintiff, and misappropriate Plaintiff's trade secrets.[3] Moreover, during that 30- to 45-minute meeting, Defendant successfully encouraged a ninth employee of Plaintiff--Sue Mintzer--to breach her confidentiality agreement with Plaintiff, violate her duty of loyalty owed to Plaintiff, and [*10] misappropriate Plaintiff's trade secrets by emailing him Plaintiff's confidential pricing sheets.[4]

> 3   (Dkt. No. 1, at ¶¶ 33-34 [Plf.'s Am. Compl.]; Dkt. No. 34, Attach. 1, at 4-5 [attaching ¶¶ 2-6 of Mintzer Decl.]; Dkt. No. 34, Attach. 1, at 10 [attaching ¶ 7 of First Giambrone Decl.].)
>
> 4   (*Id.*)

Second, regarding Plaintiff's imputation argument (referenced above in notes 1 and 2 of this Decision and Order), the Court finds that Platinum's acts in New York State include the following: (1) causing a classified ad to be published in the *Albany Times Union* on or about July 10, 2011, in order to create a ruse that Platinum did not poach Plaintiff's employees; and (2) through two of its high-level employees, (a) meeting with at least four of Plaintiff's employees in New York State on May 22 and 23, 2011, (b) sending an email message to one of Plaintiff's employees in New York State on June 7, 2011, (c) purchasing three airline tickets for flights from New York State on or before June 19 and 20, 2011, and (d) encouraging two of Plaintiff's employees to surreptitiously take from Plaintiff and transfer to Platinum commercial and proprietary data on or before May 12, 2011, July 15, 2011, and early-October [*11] 2011, in New York State.[5] In addition, during the time in question, Defendant was president of Platinum.[6]

> 5   (Dkt. No. 1, at ¶¶ 7, 8, 35, 36, 38-42.)
>
> 6   (Dkt. No. 1, at ¶ 6 [Plf.'s Am. Compl.]; Dkt. No. 34, Attach. 1, at 4 [attaching ¶ 3 of Mintzer Decl.]; Dkt. No. 34, Attach. 1, at 9 [attaching ¶ 1 of First Giambrone Decl.]; Dkt. No. 34, Attach. 1, at 12 [attaching ¶ 1 of Second Giambrone Decl.].)

Under the circumstances, the conclusion that Platinum was acting as the agent of Defendant is entirely plausible (if not inescapable), especially given that (1) all of the above-described events were preceded by the early-May meeting in the Marriott, at which Defendant--in the presence of one of the two above-referenced high-ranking employees of Platinum--encouraged Sue Mintzer to email him Plaintiff's confidential pricing sheets, and (2) Defendant--again, in the presence of the two above-described high-ranking employees of Platinum--met with

three of Plaintiff's employees in Platinum's headquarters on June 20, 2011, to discuss moving from Plaintiff to Platinum.[7]

> 7   (Dkt. No. 1, at ¶¶ 33-34 [Plf.'s Am. Compl.]; Dkt. No. 34, Attach. 1, at 4-5 [attaching ¶¶ 2-6 and 8 of Mintzer Decl.]; Dkt. No. 34, Attach. [*12] 1, at 10 [attaching ¶ 7 of First Giambrone Decl.].)

For all of these reasons, the Court finds that, based on the factual allegations asserted and evidence adduced thus far, Defendant transacted business within New York State for purposes of *NY CPLR § 302(a)(1)*. However, because the Court's finding is based on the above-described factual allegations and preliminary evidence, the Court denies this part of Defendant's motion only without prejudice, with leave to renew after discovery is completed.

## B. Whether, in the Alternative, Defendant Committed a Tortious Act Within New York State for Purposes of *NY CPLR § 302(a)(2)*

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Plaintiff's opposition memorandum of law. (Dkt. No. 34, at 9-13 [attaching pages "5" through "9" of Plf.'s Opp'n Memo. of Law].) The Court would add only two brief points.

First, based on the factual allegations asserted and evidence adduced thus far, the Court finds that, setting aside several torts initiated by Defendant during the meeting in early-May 2011 in the Marriott in New York and consummated later, the following two torts were initiated and completed [*13] by Defendant during that meeting: (1) aiding and abetting Sue Mintzer's breach of fiduciary duty by encouraging her, through the prospect of employment with Platinum, to email him Plaintiff's confidential pricing sheets during the meeting;[8] and (2) misappropriation of trade secrets, through receiving the pricing sheets from Ms. Mintzer during the meeting, and using them evaluate the profitability of Plaintiff's Section 203K loan product (toward the end of further encouraging Ms. Mintzer, and others, to harm Plaintiff to Platinum's benefit).[9] The Court finds that the causes of action asserted against Defendant (described above in Part I.A. of this Decision and Order) sufficiently "aris[e]" from the above-described two torts, for purposes of *NY CPLR § 302(a)(2)*, especially given that Platinum's senior vice president (who subsequently followed Defendant's lead in soliciting Plaintiff's employees) and Jane King (who eventually left Plaintiff's employment) were present at the time.

> 8   The elements of a claim for aiding and abetting a breach of fiduciary duty in New York are "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the [*14] breach, and (3) that plaintiff suffered damages as a result of the breach." *Kaufman v. Cohen, 760 N.Y.S.2d 157, 307 A.D.2d 113 (N.Y. App. Div., 1st Dep't 2003)*.
> 9   "The elements of a cause of action for misappropriation of trade secrets are that 1) plaintiff possesses a trade secret and 2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *DoubleClick Inc. v. Henderson, No. 116914/97, 1997 N.Y. Misc. LEXIS 577, 1997 WL 731413, at *3 (N.Y. Sup. Ct., New York Cnty. Nov. 5, 1997)*.

Second, even if the Court were not to find that Defendant *personally* committed a tortious act within New York State during the meeting in early-May 2011 in the Marriott in New York, the Court would find, based on the factual allegations asserted and evidence adduced thus far, that he subsequently committed tortious acts in New York State *through an agent*--namely, Platinum-- for the reasons stated above in Part III.A. of this Decision and Order.

For these reasons, the Court alternatively finds that, based on the factual allegations asserted and evidence adduced thus far, Defendant committed a tortious act within New York State for purposes of *NY CPLR § 302(a)(2)*. However, again, [*15] because the Court's finding is based on the above-described factual allegations and preliminary evidence, the Court denies this part of Defendant's motion only without prejudice, with leave to renew after discovery is completed.

## C. Whether Exercising Personal Jurisdiction over Defendant Comports with the Due Process Clause

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Plaintiff's opposition memorandum of law. (Dkt. No. 34, at 13-14 [attaching pages "9" and "10" of Plf.'s Opp'n Memo. of Law].) The Court would add only the following two brief points.

First, the Court's finding with regard to this issue is based also on the points made above in Parts III.A. and III.B. of this Decision and Order, and the fact that Defendant has not, in his two declarations, sufficiently countered the factual allegations asserted, and declaration adduced, by Plaintiff.

Second, again, because the Court's finding is based on the above-described factual allegations and preliminary evidence, the Court denies this part of Defendant's

2012 U.S. Dist. LEXIS 129244, *

motion only without prejudice, with leave to renew after discovery is completed.

**ACCORDINGLY**, it is

**ORDERED** that  [*16] Defendant's motion to dismiss (Dkt. No. 28) is **DENIED without prejudice**, with leave to renew after discovery is completed.

Dated: September 12, 2012

Syracuse, New York

/s/ Glenn T. Suddaby

Glenn T. Suddaby

U.S. District Judge



PATRICIA JUDAH HARRIS, d/b/a PPH TAX & ACCOUNTING, Plaintiff, - against- LESMINE FAIRWEATHER, d/b/a PPH TAX & ACCOUNTING, INC., et al., Defendants.

11 Civ. 2152 (PKC) (AJP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2012 U.S. Dist. LEXIS 128409*

September 10, 2012, Decided

**PRIOR HISTORY:** *Harris v. Fairweather, 2012 U.S. Dist. LEXIS 61641 (S.D.N.Y., May 2, 2012)*

**COUNSEL:** [*1] For Patricia Judah Harris, doing business as PPH Tax & Accounting, Plaintiff: Eugene Gerald Eisner, Eisner & Associates, P.C., New York, NY; Jeanne Ellen Mirer, Eisner & Mirer, P.C., New York, NY.

Lesmine Fairweather, doing business as PPH Tax & Accounting, Inc., Defendant, Pro se.

For Lesmine Fairweather, doing business as PPH Tax & Accounting, Inc., Defendant: Jacqueline McMickens, LEAD ATTORNEY, Office of Robert E. Martinez, Jamaica, NY.

**JUDGES:** Andrew J. Peck, United States Magistrate Judge. Honorable P. Kevin Castel, United States District Judge.

**OPINION BY:** Andrew J. Peck

**OPINION**

**REPORT AND RECOMMENDATION**

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable P. Kevin Castel, United States District Judge:**

Plaintiff Patricia Judah Harris sued defendant Lesmine Fairweather for "Trademark Infringement, Conversion and Unfair Competition" and false advertising pursuant to the Lanham Act, *15. U.S.C. §§ 1114(1), 1125(a)*, as well as for injury to business reputation, use of name or address with intent to deceive, tortious interference, prima facie tort, and unjust enrichment under New York law. (Dkt. No. 1: Compl. ¶¶ 48-74.) After several months of discovery, because of Fairweather's "attempt to evade discovery [*2] obligations" and "non-compliance with the Court's order," Judge Castel "conclude[d] that the sanction of dismissal [wa]s warranted, and direct[ed] the Clerk to strike the Answer and to [issue a] Certificate of Default against defendant." (Dkt. No. 74: 5/2/12 Default Judgment at 9.) Judge Castel referred this matter to me for an inquest as to damages. (Id.; see also Dkt. No. 73: 5/2/12 Referral Order.) Harris submitted papers seeking Fairweather's profits, Harris' lost profits, treble damages, attorneys' fees, costs, and future damages, as well as various forms of equitable relief. (See Dkt. No. 81-6: Harris Br. at 13; Dkt. No. 90: Harris Reply Br. at 9; Dkt. No. 98: Harris Supp. Br. at 12.) Fairweather submitted opposition papers asking the Court to deny Harris' request in its entirety. (Dkt. No. 85: Fairweather Opp. Br. at 5.)[1]

---

1   Fairweather also "asks the court to consider the fact that on two separate occasion in August 2008, defendant gave plaintiff two checks totaling $39,100.50 which was to be used in renovating PPH. Renovations were never done and plaintiff did not provide an accounting for these funds." (Fairweather Opp. Br. at 5.) It is unclear what relief Fairweather seeks because [*3] she cites no authority in support of her request. Moreover, while Fairweather includes copies of the two checks, the drawer is "The United Meth-

2012 U.S. Dist. LEXIS 128409, *

odist Development Fund" (Fairweather Opp. Br. at 6-7) and Fairweather has not established any relationship to the Fund.

For the reasons discussed below, the Court should award Harris $261,866.98 and injunctive relief as described in Point IV below.

## FACTS[2]

> 2 Where, as here, "'the court determines that defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.'" *Chen v. Jenna Lane, Inc., 30 F. Supp. 2d 622, 623 (S.D.N.Y. 1998)* (Carter, D.J. & Peck, M.J.) (quoting 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure: Civil 3d § 2688 at 58-59 (3d ed. 1998)).

### The Complaint

In 1986, Herbert Williams, Margaret Penny Hall and Harris entered a partnership establishing PPH Tax & Accounting ("PPH"). (Dkt. No. 1: Compl. ¶ 11.) In 2004, Williams married Fairweather, who had worked part-time at PPH during the height of tax seasons. (Compl. ¶ 21.) As Williams' health declined, Fairweather took on more responsibility at PPH, eventually becoming PPH's primary tax preparer. (Compl. [*4] ¶ 22.) When Williams died in 2008, "Harris filed an Amended Business Certificate . . . , removing Williams' and Hall's names from the partnership certificate," and operated PPH as a sole proprietorship. (Compl. ¶ 19.)

During the 2009 tax season, although Harris was registered to sign tax returns, she handled administrative tasks while Fairweather and others prepared tax returns. (Compl. ¶ 26.) In May 2010, Fairweather demanded ninety-five percent of PPH's profit. (Compl. ¶¶ 27-28.) Harris rejected the proposal but continued to negotiate with Fairweather. (Compl. ¶ 28.) Unbeknownst to Harris, Fairweather secured a new five-year lease in her name only on PPH's office space, 2002 Cross Bronx Expressway. (Compl. ¶ 30.) When Harris discovered that Fairweather improperly signed a new lease, she talked to MP Management's agent who said that he would remedy the error. (Compl. ¶ 31.) Negotiations between Harris and Fairweather continued. (Compl. ¶¶ 32-33.) Fairweather wrote a letter to Harris stating that PPH was Fairweather's practice, and the Cross Bronx Express property was in Fairweather's name. (Compl. ¶ 34 & Ex. F: 11/9/10 Letter from Fairweather to Harris.) Harris later discovered that [*5] Fairweather had incorporated PPH Tax & Accounting, Inc. ("PPH, Inc.") on January 27, 2010, listing Fairweather as sole incorporator. (Compl. ¶ 40 & Ex. J: PPH Inc. Incorporation Document.) Without

authorization, Fairweather took client files from PPH and changed to PPH, Inc.'s name the phone number that had been associated with PPH for twenty-five years. (Compl. ¶¶ 43-44.)

Harris' complaint asserts claims for "Trademark Infringement, Conversion and Unfair Competition" and false advertising pursuant to the Lanham Act, *15. U.S.C. §§ 1114(1), 1125(a)*, as well as for injury to business reputation, use of name or address with intent to deceive, tortious interference, prima facie tort, and unjust enrichment under New York law. (Compl. ¶¶ 48-74.) The complaint asserts that Fairweather's conduct was willful. (Compl. ¶¶ 49, 69.) Harris's complaint seeks various forms of equitable relief. (Compl. Wherefore Clause ¶¶ A-C.)

### Procedural History

On April 28, 2011, Judge Castel granted Harris' motion to preliminarily enjoin Fairweather from conducting business as PPH Tax & Accounting, Inc. and required Harris to post a bond for $6,000. (Dkt. No. 12: 4/28/11 Opinion at 1, 8.) On September 29, 2011, Judge [*6] Castel further clarified the injunction to enjoin Fairweather from operating any business out of the 2002 Cross Bronx Expressway property and ordering Fairweather to return to Harris the phone number associated with PPH. (Dkt. No. 33: 9/29/11 Order.) On May 2, 2012, Judge Castel "conclude[d] that the sanction of dismissal [wa]s warranted" due to Fairweather's "attempt to evade discovery obligations" and her "noncompliance with the Court's order" which prejudiced Harris. (Dkt. No. 74: 5/2/12 Default Judgment at 9.) Judge Castel "direct[ed] the Clerk to strike the Answer and to [issue a] Certificate of Default against defendant" (5/2/12 Default Judgment at 9), and referred this matter to me for an inquest as to damages (Dkt. No. 73: 5/2/12 Order).

Harris and Fairweather filed briefs and affidavits on the inquest. (Dkt. No. 81-1: Harris 6/8/12 Aff.; Dkt. No. 81-5: Mirer 6/8/12 Aff.; Dkt. No. 81-6: Harris Br.; Dkt. No. 85: Fairweather Opp. Br.; Dkt. No. 86: Fairweather Aff.; Dkt. No. 90: Harris Reply Br.; Dkt. No. 91: Harris 7/10/12 Aff.; Dkt. No. 92: Mirer 7/10/12 Aff.) "After further review of the parties briefs, affidavits and exhibits, the Court [found] that the inquest submissions [*7] [were] woefully inadequate," and ordered "both parties submit simultaneous supplemental briefs, including affidavits and exhibits, to the Court by Monday, August 27, 2012." (Dkt. No. 95: 8/16/12 Order.) Harris filed a supplemental brief and affidavit. (Dkt. No. 96: Mirer 8/27/12 Aff.; Dkt. No. 97: S. Harris 8/27/12 Aff.; Dkt. No. 98: Harris Supp. Br.) Fairweather failed to file any supplemental papers.

### ANALYSIS[3]

3   The Second Circuit has approved the holding of an inquest by affidavit, without an in-person court hearing, "'as long as [the Court has] ensured that there was a basis for the damages specified in the default judgment.'" *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997) (quoting *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989)).

## I. MONETARY RELIEF PURSUANT TO THE LANHAM ACT

Pursuant to the Lanham Act,

the plaintiff shall be entitled, . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the  [*8] plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

*15 U.S.C. § 1117(a).*

Harris seeks both Fairweather's profits and Harris' damages, i.e., her lost profits.

### A. Defendant's Profits

Under the Lanham act, "[t]o recover  [*9] an infringer's profits plaintiffs must show that an infringer acted with willful deception, in addition to showing (1) the defendant's unjust enrichment; (2) the plaintiff's damages, if any, from the infringement; or (3) that an accounting for profits is necessary to deter future willful

infringement." *Chloe v. Zarafshan*, 06 Civ. 3140, 2009 U.S. Dist. LEXIS 84255, 2009 WL 2956827 at *5 (S.D.N.Y. Sept. 15, 2009) (citing *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir.), cert. denied, 506 U.S. 991, 113 S. Ct. 510, 121 L. Ed. 2d 445 (1992)).[4] If a plaintiff has successfully made such a showing, a plaintiff is "entitled, . . . subject to the principles of equity, to recover (1) defendant's profits." 15 U.S.C. § 1117(a); accord, e.g., *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 500 (2d Cir.), cert. denied, 530 U.S. 1262, 120 S. Ct. 2719, 147 L. Ed. 2d 984 (2000); *Chloe v. Zarafshan*, 2009 U.S. Dist. LEXIS 84255, 2009 WL 2956827 at *5.

4   See also, e.g., *Banff, Ltd. v. Colberts, Inc.*, 996 F.2d 33, 35 (2d Cir.), cert. denied, 510 U.S. 1010, 114 S. Ct. 599, 126 L. Ed. 2d 565 (1993); *Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 82 F. Supp. 2d 136, 141 (S.D.N.Y. 2000); 5 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 30:59 (2012 ed.) ("Under the modern  [*10] view, three rationales can support an award of defendant's profits in cases of trademark infringement, false advertising or unfair competition: (1) as a measure of plaintiff's damages; (2) if the infringer is unjustly enriched; or (3) if necessary to deter a willful infringer from doing so again.").

"In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." *15 U.S.C. § 1117(a)*.[5]

5   Accord, e.g., *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995); *Am. Honda Motor Co. v. Two Wheel Corp.*, 918 F.2d 1060, 1063 (2d Cir. 1990); *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir. 1985); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading Co.*, No. 07-CV-2568, 2012 U.S. Dist. LEXIS 68117, 2012 WL 1414872 at *6 (E.D.N.Y. Jan. 20, 2012); *Dor Yeshurim, Inc. v. A Torah Infertility Medium of Exch.*, No. CV 10-2837, 2011 U.S. Dist. LEXIS 153153, 2011 WL 7285038 at *5 (E.D.N.Y. Aug. 10, 2011), report & rec. adopted, 2012 U.S. Dist. LEXIS 17655, 2012 WL 464000 (E.D.N.Y. Feb. 10, 2012); *Chloe v. Zarafshan*, 2009 U.S. Dist. LEXIS 84255, 2009 WL 2956827 at *5; *GAKM Res. LLC v. Jaylyn Sales Inc.*, 08 Civ. 6030, 2009 U.S. Dist. LEXIS 61608, 2009 WL 2150891 at *4 (S.D.N.Y. July 20, 2009); *AW Indus., Inc. v. Sleep Well Mattress, Inc.*, No. 07-CV-3969, 2009 U.S. Dist. LEXIS 15567, 2009 WL 485186 at *3 (E.D.N.Y. Feb. 26, 2009).

Case 5:12-cv-00858-GTS-TWD   Document 40   Filed 10/04/12   Page 44 of 66

Page 4
2012 U.S. Dist. LEXIS 128409, *

Where [*11] the court finds defendant's "profits [are] either inadequate or excessive[,] the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." *15 U.S.C. § 1117(a).*[6] Furthermore,

> if "the actual sales cannot be precisely determined, the court may resolve any doubts against the defendant in calculating profits, particularly if the uncertainty is due to the defendant's inadequate record-keeping or failure to produce documentary evidence." It bears noting, however, that some reasonable basis for computation has to be used, even though the calculation may only be approximate.

*Chloe v. Zarafshan, 2009 U.S. Dist. LEXIS 84255, 2009 WL 2956827 at *5* (citation omitted).[7]

6   Accord, e.g., *George Basch Co. v. Blue Coral, Inc., 968 F.2d at 1537* ("[T]he statute's invocation of equitable principles as guideposts in the assessment of monetary relief vests the district court with some degree of discretion in shaping that relief. Nevertheless, that discretion must operate within legally defined parameters." (citation omitted)); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading Co., 2012 U.S. Dist. LEXIS 68117, 2012 WL 1414872 at *6*; *BeautyBank, Inc. v. Harvey Prince LLP, 10 Civ. 0955, 2011 U.S. Dist. LEXIS 17932, 2011 WL 671749 at *4 (S.D.N.Y. Feb. 23, 2011)* [*12] , report & rec. adopted, *2011 U.S. Dist. LEXIS 41732, 2011 WL 1483969 (S.D.N.Y. Apr. 18, 2011)*; *GAKM Res. LLC v. Jaylyn Sales Inc., 2009 U.S. Dist. LEXIS 61608, 2009 WL 2150891 at *4*; *AW Indus., Inc. v. Sleep Well Mattress, Inc., 2009 U.S. Dist. LEXIS 15567, 2009 WL 485186 at *3.*

7   See, e.g., *U.S.A. Famous Original Ray's Licensing Corp. v. Tisi's Pizza & Pasta Inc., 09 Civ. 5517, 2009 U.S. Dist. LEXIS 111141, 2009 WL 4351962 at *4 (S.D.N.Y. Dec. 1, 2009)* (Peck, M.J.) ("Although this method of calculating damages is somewhat speculative, [the court finds] it to be reasonable and appropriate . . . ."), report & rec. adopted, *2009 U.S. Dist. LEXIS 121325, 2009 WL 5178023 (S.D.N.Y. Dec. 31, 2009)*; *GAKM Res. LLC v. Jaylyn Sales Inc., 2009 U.S. Dist. LEXIS 61608, 2009 WL 2150891 at *6* (Plaintiff's estimates of Defendant's profits "are reasonable and have some evidentiary support. Any imprecision in calculating Defendants' prof-

its is the fault of Defendants, who failed to participate in this litigation."); *AW Indus., Inc. v. Sleep Well Mattress, Inc., 2009 U.S. Dist. LEXIS 15567, 2009 WL 485186 at *4* ("The amount requested is not excessive and, moreover, it is defendant who is to blame for the inability to calculate an exact figure."); *Century 21 Real Estate LLC v. Paramount Home Sales, Inc., No. 06-CV-2861, 2007 U.S. Dist. LEXIS 60945, 2007 WL 2403397 at *4 (E.D.N.Y. Aug. 20, 2007)* [*13] (finding plaintiff's "speculative" method of calculating an award pursuant to *15 U.S.C. § 1117(b)* "reasonable and appropriate" because "[t]he amount requested is not excessive and it is defendants who are to blame for the inability to calculate an exact figure"); *Phat Fashions LLC v. Blue Max Corp., 01 Civ. 3933, 2005 U.S. Dist. LEXIS 9689, 2005 WL 1221838 at *2 (S.D.N.Y. May 2, 2005)* ("In the absence of any information from [defendant] on costs, and because [defendant] has not cooperated in discovery, the Court finds that these estimated sales are a fair indicator of profits.").

Fairweather has defaulted and is deemed to be a willful infringer by virtue of her default. E.g., *CJ Prods. LLC v. Your Store Online LLC, 11 Civ. 9513, 2012 U.S. Dist. LEXIS 96450, 2012 WL 2856068 at *3 (S.D.N.Y. July 12, 2012)* (Peck, M.J.) ("Defendant has defaulted and is deemed to be a willful infringer by virtue of its default."); *Coach, Inc. v. O'Brien, 10 Civ. 6071, 2012 U.S. Dist. LEXIS 52565, 2012 WL 1255276 at *14 (S.D.N.Y. Apr. 13, 2012)* ("[T]his Court has already found that . . . [defendant's] conduct was willful '[b]y virtue of [her] default' . . . ."); *All-Star Mktg. Grp., LLC v. Media Brands Co., 775 F. Supp. 2d 613, 621 (S.D.N.Y. 2011)* (Berman, D.J. & Peck, M.J.) ("Defendants have [*14] defaulted . . . and by virtue of their default are deemed to be willful infringers.").[8]

8   See also, e.g., *AW Indus., Inc. v. Sleep Well Mattress, Inc., 2009 U.S. Dist. LEXIS 15567, 2009 WL 485186 at *4* (Defendant "has defaulted in this case, which deems it a willful infringer."); *Rodgers v. Anderson, 04 Civ. 1149, 2005 U.S. Dist. LEXIS 7054, 2005 WL 950021 at *2 (S.D.N.Y. Apr. 26, 2005)* (Peck, M.J.) ("In this case, defendants have defaulted and by virtue of their default, are deemed to be willful infringers."); *Tiffany (NJ) Inc. v. Luban, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003)* ("By virtue of the default, the [defendant]s' infringement is deemed willful, . . . .").

Harris seeks Fairweather's profits of $138,675 for 2011 and 2012. (Dkt. No. 90: Harris Reply Br. at 9; Dkt.

No. 98: Harris Supp. Br. at 12.) Harris asserts, through use of subpoenaed records from Drake Software,[9] that Fairweather serviced 995 clients in 2011 and 752 clients in 2012. (Harris Reply Br. at 5-6; Dkt. No. 91: Harris 7/10/12 Aff. ¶¶ 11-12 & Ex. F: Fairweather's 2011 Customers; Harris 7/10/12 Aff. Ex. G: Fairweather's 2012 Customers.) Harris further asserts that in 2011 Fairweather serviced at least forty-five clients through her brother's account, if not 102 clients through [*15] his account due to an increase of 102 customers. (Harris Reply Br. at 5; Harris 7/10/12 Aff. ¶ 11; see also Dkt. No. 74: 5/2/12 Order at 6-7.) The Court[10] finds that Harris has only proved the additional forty-five clients. Based on her knowledge of the tax preparation business and on PPH's own rates, Harris approximates that each client was charged an average of seventy-five dollars. (Harris Reply Br. at 5; Harris 7/10/12 Aff. ¶ 10.)

> 9   "Drake provides the computer software on which we prepare taxes and provides the e-filing service to the IRS and other taxing authorities." (Dkt. No. 81-1: Harris 6/8/12 Aff. ¶ 6.)
> 10  While Harris has established that Fairweather filed taxes for at least forty-five clients under her brother's account, Harris has not adequately established that Fairweather filed taxes for the additional fifty-seven clients under her brother's account. (See pages 8-9 above.) Harris did not provide any evidence to support this assertion, such as cross-checking names from PPH's and Fairweather's customer lists. Thus, the Court only will consider the additional forty-five clients as attributable to Fairweather.

Accordingly, Harris should be awarded Fairweather's 2011 profits [*16] of $78,000 ($75 times 995 clients plus 45 clients) and 2012 profits of $56,400 ($75 times 752 clients), for a total of $134,400. Although this method of calculating damages is not exact, I find it to be reasonable and appropriate under the circumstances. (See cases cited on page 7 fn.7 above.)

While Fairweather submitted opposition papers asking the Court to deny Harris' request for damages in its entirety (see page 2 above), she failed to provide any documentation regarding her costs or expenses to calculate her net revenue, as opposed to her gross revenue.[11] Because the "defendant must prove all elements of cost or deduction claimed," 15 U.S.C. § 1117(a), Harris is entitled to an award of Fairweather's gross revenue of $134,400 ($78,000 for 2011 and $56,400 for 2012), without reduction for Fairweather's expenses.[12]

> 11  In her opposition brief, Fairweather stated: "First, [Fairweather] is an employee of 1950X and the net profit from that entity should have no

bearing on plaintiff's calculation. Never the less on information and belief, the year to date net profit for 1950 X is approximately $9,000.00." (Dkt. No. 85: Fairweather Opp. Br. at 5.) Fairweather failed, however, to provide any [*17] records to support this.

> 12  See, e.g., Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading Co., 2012 U.S. Dist. LEXIS 68117, 2012 WL 1414872 at *7 ("[A]lthough the inventory reports contain some information about defendants' costs, [the Court] decline[d] to consider it here because defendants have defaulted and failed to participate in the inquest proceedings."); BeautyBank, Inc. v. Harvey Prince LLP, 2011 U.S. Dist. LEXIS 17932, 2011 WL 671749 at *5 ("Because [defendant] has not provided any information regarding its costs or deductions, [plaintiff] is entitled to the presumption that the total amount of sales alleged . . . reflects its profits."); Chloe v. Zarafshan, 2009 U.S. Dist. LEXIS 84255, 2009 WL 2956827 at *6 ("Since defendant chose to default and has not appeared in this proceeding, he has necessarily failed to carry his burden to demonstrate deductible expenses.").

## B. Plaintiff's Damages

Pursuant to the Lanham Act, a plaintiff is entitled to an award of plaintiff's damages in addition to defendant's profits. 15 U.S.C. § 1117(a). Plaintiff's damages may include plaintiff's lost profits. See, e.g., Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc., 80 F.3d 749, 753 (2d Cir. 1996) ("Such damages may include compensation for (1) [*18] lost sales or revenue; (2) sales at lower prices; (3) harm to market reputation; or (4) expenditures to prevent, correct, or mitigate consumer confusion."); Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc., 628 F. Supp. 2d 312, 320 (E.D.N.Y. 2009) ("A calculation of plaintiff's damages may include its lost profits."); Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co., 630 F. Supp. 2d 255, 261 (E.D.N.Y. 2008) ("Pursuant to section 1117(a)(2), plaintiff's damages 'may include compensation for lost sales or revenue.'"); Nabisco, Inc. v. Sloan's Supermarkets, Inc., 96 Civ. 7614, 1998 U.S. Dist. LEXIS 10969, 1998 WL 405044 at *2 (S.D.N.Y. July 20, 1998) ("'Such damages may include compensation for . . . lost sales or revenue.'").

Harris seeks her lost revenue, i.e., what PPH would have made in gross revenue for 2011 and 2012, which Harris estimates as $118,624.57 and $80,044.77, respectively. (Dkt. No. 98: Harris Supp. Br. at 12.) Harris submitted proof of PPH's gross revenue for 2009 of $133,161.04 and for 2010 of $104,148.10. (Dkt. No. 81-

1: Harris 6/8/12 Aff. ¶ 3; Dkt. No. 81-2: Report Totals & 2009 PPH Revenue Report; Dkt. No. 81-3: 2010 & 2011 PPH Revenue Reports; Dkt. No. 97: [*19] S. Harris Supp. Aff. ¶ 5.) Harris[13] estimated PPH gross revenue for 2011 of $118,624.57 from the average of 2009 and 2010 gross revenue. (Harris 6/8/12 Aff. ¶ 15.)[14] Harris' estimated PPH gross revenue for 2012 of $80,044.77 from the average of gross revenue from 2009 and 2010 ($118,624.57), less Harris' 2012 actual gross revenue of $38,579.80. (Harris 6/8/12 Aff. ¶¶ 5, 16; Dkt. No. 81-4: 2012 PPH Revenue Report.)[15]

> 13   Harris states that she believes the "numbers for PPH Tax & Accounting for 2009 and 2010 are correct, but because Ms. Fairweather converted about five years of individual files from the office I cannot say if the numbers are 100% accurate but they are close." (Harris 6/8/12 Aff. ¶ 13.)
> 14   The actual average is $118,654.57, not $118,624.57, but the Court will use Harris' lesser figure.
> 15   Harris claims that PPH's actual gross revenue for 2011 was $720, but she did not deduct this from the estimated gross revenue for 2011. (Harris 6/8/12 Aff. ¶ 4; Ex. 81-3: 2010 & 2011 PPH Revenue Reports.)

Fairweather correctly asserts that Harris is only entitled to her net revenue, not gross revenue. (Dkt. No. 85: Fairweather Opp. Br. at 5.) "[T]he accepted method of calculating lost profits [*20] is to deduct overhead expenses and costs to calculate net profits." *Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co.,* 630 F. Supp. 2d at 262, 263 ("Lost profits are calculated by estimating the revenue lost due to the infringing conduct and subtracting what it would have cost to generate that revenue.").[16] The Court advised Harris that "Harris incorrectly uses gross, not net, revenue in her damage calculations," and directed the parties to file supplemental papers. (Dkt. No. 95: 8/16/12 Order.) In supplemental papers, Harris' daughter Sonja Harris (who also worked for PPH) asserts that "PPH's costs of doing business, i.e. rent, utilities, supplies, tax preparer wages etc., accounted for approximately two thirds of the gross receipts on a yearly basis." (Harris Supp. Br. at 9; S. Harris Supp. Aff. ¶¶ 3-4, 6-10.) Harris thus claims the net revenue would be $39,558.31. (Harris Supp. Br. at 9.)

> 16   See also, e.g., *Apollo Theater Found., Inc. v. W. Int'l Syndication,* 02 Civ. 10037, 2005 U.S. Dist. LEXIS 7955, 2005 WL 1041141 at *11 (S.D.N.Y. May 5, 2005) ("Calculating a plaintiff's lost profits also means 'net profits,' although the calculation of lost profits necessarily requires an approximation 'by estimating [*21] revenue lost

due to the infringing conduct and subtracting what it would have cost to generate that revenue.'"); *GTFM, Inc. v. Solid Clothing, Inc.,* 215 F. Supp. 2d 273, 305 (S.D.N.Y. 2002) ("Lost profits are calculated by estimating revenue lost due to the infringing conduct and subtracting what it would have cost to generate that revenue.").

In an effort to maintain the six figure number regardless, Harris further asserts that "[e]ven if the Court determines that the basis for calculation of plaintiff's damages should be based on her monetary damages, which would be net proceeds, the Court may enhance that award by three times. . . . If [net receipts] were enhanced three times as the Court may in egregious cases such as this, the amount would be the same as the gross revenues: $118,654.57." (Harris Supp. Br. at 8-9.)

The Lanham Act provides in pertinent part, that "the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." *15 U.S.C. § 1117(a).* Harris claims that the court may treble profits "in egregious cases such as this." (Harris Supp. Br. at 9.) To the extent § 1117(a) allows [*22] the Court to "in its discretion enter judgment for such sum as the court shall find to be just," the Court may do so only if it "find[s] that the amount of the recovery based on profits is either inadequate or excessive." *15 U.S.C. § 1117(a).* There is no evidence that the award of Harris' lost profits, particularly when Harris also is awarded Fairweather's profits, is in any way inadequate as compensation. The statute makes clear that an enhancement of actual damages must be for "compensation and not a penalty." *15 U.S.C. § 1117(a).* There is no compensatory basis for trebling PPH's lost profits here. See, e.g., *Ramada Franchise Sys., Inc. v. Boychuk,* 283 F. Supp. 2d 777, 792 (N.D.N.Y. 2003) ("Therefore, even assuming the infringing conduct was 'malicious, fraudulent, willful, and deliberate,' there is simply no compensatory, non-punitive basis for enhancing the actual damages awarded" to plaintiff.), aff'd, 124 F. App'x 28 (2d Cir. 2005); 3 Anne Gilson Lalonde & Jerome Gilson, Gilson on Trademarks § 14.03(3)(c) (2012 ed.) ("If the assessment of actual damages is sufficient to compensate the plaintiff for its loss, the court should not enhance the damage award.").[17]

> 17   Cf. *U.S.A. Famous Original Ray's Licensing Corp. v. Tisi's Pizza & Pasta Inc.,* 09 Civ. 5517, 2009 U.S. Dist. LEXIS 111141, 2009 WL 4351962 at *5 (S.D.N.Y. Dec. 1, 2009) [*23] (Peck, M.J.) (declining to award enhanced damages where plaintiff failed to establish that defendant's profits were inadequate), report & rec.

adopted, *2009 U.S. Dist. LEXIS 121325, 2009 WL 5178023 (S.D.N.Y. Dec. 31, 2009).*

Accordingly, Harris should be awarded lost profits of $39,301.52 for 2011 and $26,681.59 for 2012, totaling $65,983.11.[18]

18   For 2011, this represents PPH's estimated gross revenue of $118,624.57, less PPH's actual gross revenue of $720 ($117,904.57), reduced by two-thirds to reflect PPH's net revenue after expenses. For 2012, this represents PPH's estimated gross revenue of $118,624.57, less PPH's actual gross revenue of $38,579.80 ($80,044.77) reduced by two-thirds to reflect PPH's net revenue after expenses.

## II. ATTORNEYS' FEES UNDER THE LANHAM ACT

Harris seeks $74,890 in attorneys' fees. (No. 92: Mirer 7/10/12 Aff. ¶¶ 5-7 & Ex. A: Billing Records; see also Dkt. No. 81-5: Mirer 6/8/12 Aff. ¶¶ 6-9; Dkt. No. 81-6: Harris Br. at 13; Dkt. No. 90: Harris Reply Br. at 9.)

### A. The Legal Standard For Determining Attorney's Fees In Trademark Infringement Cases

The Court may award attorneys' [*24] fees to the prevailing party in "exceptional" cases under *15 U.S.C. § 1117(a)*. The allegations in the complaint of willful infringement, along with defendants' default, are sufficient to justify the award of attorneys' fees to plaintiff Harris here. See, e.g., *15 U.S.C. § 1117(a); Yahoo! Inc. v. XYZ Cos., 08 Civ. 4581,   F. Supp. 2d   , 2011 U.S. Dist. LEXIS 139848, 2011 WL 6072263 at *8 (S.D.N.Y. Dec. 5, 2011)* (finding that plaintiff was entitled to reasonable attorneys' fees because the defaulted defendants acted willfully); *U.S.A. Famous Original Ray's Licensing Corp. v. Tisi's Pizza & Pasta Inc., 09 Civ. 5517, 2009 U.S. Dist. LEXIS 111141, 2009 WL 4351962 at *5 (S.D.N.Y. Dec. 1, 2009)* (Peck, M.J.) (citing cases), report & rec. adopted, *2009 U.S. Dist. LEXIS 121325, 2009 WL 5178023 (S.D.N.Y. Dec. 31, 2009); Chloe v. Zarafshan, 06 Civ. 3140, 2009 U.S. Dist. LEXIS 84255, 2009 WL 2956827 at *7 (S.D.N.Y. Sept. 15, 2009)* ("Deliberate and willful infringement can render a case 'exceptional' and thus support an award of attorney's fees.").[19]

19   See also, e.g., *GAKM Res. LLC v. Jaylyn Sales Inc., 08 Civ. 6030, 2009 U.S. Dist. LEXIS 61608, 2009 WL 2150891 at *7 (S.D.N.Y. July 20, 2009)* ("Because Defendants willfully infringed Plaintiffs' trademarks, Plaintiffs are entitled to reasonable attorneys' fees."); *AW Indus., Inc. v. Sleep Well Mattress, Inc., No. 08-CV-*

*3969, 2009 U.S. Dist. LEXIS 15567, 2009 WL 485186 at *4 (E.D.N.Y. Feb. 26, 2009)* [*25] ("The allegations in the instant complaint, along with [defendant]'s default, are sufficient to justify an award of attorneys' fees in this case."); *Guardian Life Ins. Co. of Am. v. Does, 05 Civ. 6606, 2006 U.S. Dist. LEXIS 76762, 2006 WL 3008078 at *2 (S.D.N.Y. Oct. 23, 2006)* (Peck, M.J.), report & rec. adopted, *2007 U.S. Dist. LEXIS 5199, 2007 WL 103022 (S.D.N.Y. Jan. 11, 2007); Kenneth Jay Lane, Inc. v. Heavenly Apparel, Inc., 03 Civ. 2132, 2006 U.S. Dist. LEXIS 23462, 2006 WL 728407 at *7 (S.D.N.Y. Mar. 21, 2006)* ("[T]he defendant's [trademark] infringement has been deemed willful by virtue of its default in this action," thus justifying awarding reasonable attorneys' fees under *15 U.S.C. § 1117(a)*.); *Phat Fashions LLC v. Blue Max Corp., 01 Civ. 3933, 2005 U.S. Dist. LEXIS 9689, 2005 WL 1221838 at *2 (S.D.N.Y. May 2, 2005)* (Defendant "has failed to present any evidence [on the inquest] to contradict the assertions in the complaint [of deliberate and willful infringement], and it has used marks with similarities to plaintiff's mark. . . . I find that its willful conduct justifies an award of attorney's fees."); *Christian Dior Couture, S.A. v. Fred's Int'l Handbags, 95 Civ. 6265, 2002 U.S. Dist. LEXIS 778 at *14 (S.D.N.Y. Jan. 17, 2002)* ("[P]erforce of [defendant]'s failure to appear and defend [*26] this action, a finding of willfulness by the Court is permitted. . . . Therefore, an award to [plaintiff] of the attorney's fees it incurred in prosecuting this action against [defendant] is justified."); 3 Anne Gilson Lalonde & Jerome Gilson, Gilson on Trademarks § 14.03[9][a][ii][B], [G] (2012 ed.).

Traditionally, "[i]n determining a fee award, the typical starting point is the so-called lodestar amount, that is 'the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'" *Healey v. Leavitt, 485 F.3d 63, 71 (2d Cir. 2007)* (citing *Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939, 76 L. Ed. 2d 40 (1983))*.[20] Particularly in awarding statutory attorneys' fees, "[t]he product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward . . . ." *Hensley v. Eckerhart, 461 U.S. at 434, 103 S. Ct. at 1940*; see also, e.g., *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, 522 F.3d 182, 186 (2d Cir. 2008)* ("[T]he lodestar method involved two steps: (1) the lodestar calculation; and (2) adjustment of the lodestar based on case-specific [*27] considerations.").

20   The Second Circuit requires contemporane-ous time records as a prerequisite for awarding attorneys' fees. E.g., *N.Y.S. Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1147 (2d Cir. 1983)*.

In April 2010, the Supreme Court revisited the issue of attorneys' fees and approved of the "lodestar" ap-proach over the more discretionary approach of *Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974)*, holding:

> Although the lodestar method is not per-fect, it has several important virtues. First, in accordance with our understanding of the aim of fee-shifting statutes, the lode-star looks to "the prevailing market rates in the relevant community." Developed after the practice of hourly billing had be-come widespread, the lodestar method produces an award that roughly approxi-mates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case. Second, the lodestar method is readily administrable, and unlike the Johnson ap-proach, the lodestar calculation is "objec-tive," and thus cabins the discretion of trial judges, permits meaningful judicial review, and [*28] produces reasonably predictable results.

III

Our prior decisions concerning the federal fee-shifting statutes have estab-lished six important rules that lead to our decision in this case.

First, a "reasonable" fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meri-torious civil rights case. . . .

Second, the lodestar method yields a fee that is presumptively sufficient to achieve this objective. Indeed, we have said that the presumption is a "strong" one.

Third, although we have never sus-tained an enhancement of a lodestar amount for performance, we have repeat-edly said that enhancements may be awarded in "'rare'" and "'exceptional'" cir-cumstances.

Fourth, we have noted that "the lode-star figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee," and have held that an en-hancement may not be awarded based on a factor that is subsumed in the lodestar calculation. We have thus held that the novelty and complexity of a case gener-ally may not be used as a ground for an enhancement because these factors "pre-sumably [are] fully reflected in the num-ber of billable hours recorded by coun-sel." We have also held [*29] that the quality of an attorney's performance gen-erally should not be used to adjust the lodestar "[b]ecause considerations con-cerning the quality of a prevailing party's counsel's representation normally are re-flected in the reasonable hourly rate."

Fifth, the burden of proving that an enhancement is necessary must be borne by the fee applicant.

Finally, a fee applicant seeking an enhancement must produce "specific evi-dence" that supports the award. This re-quirement is essential if the lodestar method is to realize one of its chief vir-tues, i.e., providing a calculation that is objective and capable of being reviewed on appeal.

*Perdue v. Kenny A., 130 S. Ct. 1662, 1672-73, 176 L. Ed. 2d 494 (2010)* (citations omitted).[21]

21   The Supreme Court's Perdue opinion appears to cast doubt on the viability of the Second Cir-cuit's 2008 opinion in *Arbor Hill*, which relied on the Johnson factors. In any event, the result would not differ here even if the Court used the Arbor Hill approach.

## B. Application Of The Legal Standard To Harris' Attorneys' Fee Request

Harris seeks $74,890 in attorneys' fees. (Dkt. No. 92: Mirer 7/10/12 Aff. Ex. A: Billing Records; Dkt. No. 96: Mirer 8/27/12 Supp. Aff.) As required by caselaw, Har-ris' [*30] request is supported by the affidavit of her attorney Jeanne E. Mirer, who has been practicing law since 1971. (Mirer 7/10/12 Aff. ¶ 5.) "While plaintiff's counsel submitted detailed billing records . . . , counsel failed to provide any information regarding the individu-als who worked on the case to justify their hourly rate." (Dkt. No. 93: 8/14/12 Order.) Thus, the Court ordered

2012 U.S. Dist. LEXIS 128409, *

"Plaintiff's counsel file an affidavit for each attorney and paralegal for whom it seeks to recoup attorney's fees" and to "detail whether the individual is an attorney, when he or she graduated from law school, and his or her relevant experience to enable the Court to determine the reasonableness of the hourly rates claimed." (8/14/12 Order.) As to the hourly rates charged, Mirer's supplemental affidavit states:

> while my normal billing rate is $500 per hour, because of the exigencies of this case we charged Ms. Harris a flat rate of $250.00 per hour for all hours worked by anyone in the firm. Thus, while we typically charge for law clerk or law graduates at $150 per hour, we billed Ms. Harris for $250.00 for all hours of work.

(Mirer 8/27/12 Supp. Aff. ¶ 3.) Despite this assertion, Mirer continues to rely on [*31] the previously submitted billing records which used the rate of $125 per hour for some attorneys and clerks (e.g., for Benjamin Dictor, see Mirer 7/10/12 Aff. Ex. A: Billing Records at 5).[22]

> 22   There are other discrepancies in Mirer's affidavit and the billing records. For example, Mirer failed to identify TF, including TF's name, position, and qualifications in her supplemental affidavit. (Mirer 8/27/12 Supp. Aff.) In her affidavit, Mirer asserts that Kristina Mazzocchi worked 15.20 hours, but the billing records reflect only 0.2 hours for Mazzocchi. (Compare Mirer 8/27/12 Supp. Aff. ¶ 16 with Mirer 7/10/12 Aff. Ex. A: Billing Records at 28.) Mirer also asserts that Steve Skelly worked 19.50 hours. (Mirer 8/27/12 Supp. Aff. ¶ 11.) While the total number of hours aligns with the billing records, the billing records indicate that Harris was only charged for 6.5 of the 19.5 hours. (Mirer 7/10/12 Aff. Ex. A: Billing Records at 1-2.)

In determining the reasonableness of the requested attorneys' fees, the Court considers the quality of the work done by the attorneys. The documents that counsel submitted in connection with the inquest were mediocre, included numerous errors, and failed to cite [*32] to authority for much of the relief requested.[23] The poor quality of counsel's work justifies a reduction in the fee award. Moreover, the Court has reviewed the time entries and finds that many of the billing entries were vague or reflected excessive time spent on tasks. See *Ryan v. Allied Interstate, Inc., 12 Civ. 0526, 12 Civ. 1719,   F. Supp. 2d   , 2012 U.S. Dist. LEXIS 112044, 2012 WL 3217853 at *7 (S.D.N.Y. Aug. 9, 2012)* (Peck, M.J.) (& cases cited therein); see also, e.g., *Gordon v.*

*Site 16/17 Dev., LLC, 11 Civ. 0427, 2011 U.S. Dist. LEXIS 82367, 2011 WL 3251520 at *6 (S.D.N.Y. July 28, 2011)* (reducing attorneys' fees by twenty percent in "light of the vague and duplicative billing, attorney billing for performing paralegal tasks, and the mediocre attorney performance"); *Gesualdi v. Cirillo, No. 09-CV-4570, 2011 U.S. Dist. LEXIS 14288, 2011 WL 666196 at *5 (E.D.N.Y. Jan. 3, 2011)* ("[I]n light [*33] of the many calculation errors throughout plaintiffs' affidavit, and the considerable time this Court had to spend rectifying them, I find that the 26.1 total hours billed on this matter do not reflect the quality of work submitted to the Court. Therefore, pursuant to the Court's ability to exclude those hours which it finds 'are excessive, redundant, or otherwise unnecessary,'" the Court further reduces hours billed.), report & rec. adopted, *2011 U.S. Dist. LEXIS 14291, 2011 WL 666197 (E.D.N.Y. Feb. 14, 2011)*; *Poparic v. European Music & Video Store, No. CV 08-2081, 2009 U.S. Dist. LEXIS 131298, 2009 WL 6318212 at *9 (E.D.N.Y. Dec. 16, 2009)* ("[W]hile attorneys with similar numbers of years experience as [attorney seeking fees] may occasionally garner higher fees, the sub-par quality of the legal work in this case warrants a lower hourly rate.").

> 23   For example, the Court found the inquest submissions to be "woefully inadequate" and ordered the parties to "submit simultaneous supplemental briefs, including affidavits and exhibits." (Dkt. No. 95: 8/16/12 Order at 1-2.) Defects in the submissions included: "(1) the briefs fail to cite to controlling legal authority or any legal authority at all; (2) Harris incorrectly uses gross, not net, revenue [*34] in her damage calculations; (3) Harris uses inconsistent figures; (4) Harris' mathematical calculations are incorrect; (5) Harris' future damages request fails to include evidentiary or legal support; (6) the costs of the litigation are not substantiated as required by the case law." (8/16/12 Order at 1, fns. omitted.)

In light of the mediocre attorney performance, the vague billing entries and excessive time spent on certain tasks, the Court should reduce the total attorneys' fees sought by twenty percent, resulting in an attorneys' fee award of $59,912. See, e.g., *Kirsch v. Fleet St. Ltd., 148 F.3d 149, 173 (2d Cir. 1998)* (affirming district court's fee reduction of twenty percent "for vagueness, inconsistencies, and other deficiencies in the billing records"); *Trs. of N.Y. Oil Heating Ins. Fund v. Anchor Tank Lines Corp., 09 Civ. 9997, 2011 U.S. Dist. LEXIS 22041, 2011 WL 767162 at *4-5 (S.D.N.Y. March 4, 2011)* (Peck, M.J.) (twenty percent fee reduction), report & rec. adopted as modified on other grounds, *2011 U.S. Dist. LEXIS 46625, 2011 WL 1641981 (S.D.N.Y. Apr. 29, 2011)*; *All-Star Mktg. Grp., LLC v. Media Brands Co.,*

*775 F. Supp. 2d 613, 617, 629 (S.D.N.Y. 2011)* (Berman, D.J. & Peck, M.J.) (over twenty percent fee reduction for vague [*35] entries and attorneys performing paralegal work); *Grievson v. Rochester Psychiatric Ctr., 746 F. Supp. 2d 454, 469, 471 (W.D.N.Y. 2010)* (twenty percent reduction for "excessive, vague, unrelated entries"); *Auscape Int'l v. Nat'l Geographic Soc'y, 02 Civ. 6441, 2003 U.S. Dist. LEXIS 13846, 2003 WL 21976400 at *5 (S.D.N.Y. Aug. 8, 2003)* (twenty percent reduction for "inefficiencies due to over-staffing and excessive time expenditures"), adopted, *2003 U.S. Dist. LEXIS 17020, 2003 WL 22244953 (S.D.N.Y. Sept. 29, 2003).*

## C. Costs

"The Lanham Act allows prevailing parties to recover the costs of the action. See *15 U.S.C. 1117(a)*. Generally '[o]ut of pocket litigation costs are . . . recoverable if they are necessary for the representation of the client.'" *GAKM Res. LLC v. Jaylyn Sales Inc., 08 Civ. 6030, 2009 U.S. Dist. LEXIS 61608, 2009 WL 2150891 at *10 (S.D.N.Y. July 20, 2009)* (quoting *Tri-Star Pictures, Inc. v. Unger, 42 F. Supp. 2d 296, 306 (S.D.N.Y. 1999)* (Lynch, D.J. & Katz, M.J.)). Harris should be awarded $1,571.87 in costs for those costs she documented. (Dkt. No. 98: Harris Supp. Br. Ex. 1: Transcript Invoice; Harris Supp. Br. Ex. 2: Deposition Invoice; Harris Supp. Br. Ex. 3: Filing Fee Invoice; see also Dkt. No. 90: Harris Reply Br. at 9; Dkt. No. 92: Mirer 7/10/12 [*36] Aff. ¶ 8 & Ex. B: Deposition Invoice; Mirer 7/10/12 Aff. Ex. C: Costs.)[24]

> 24  Harris originally sought $2,356.86 in costs. (Harris Reply Br. at 9; see also Mirer 7/10/12 Aff. ¶¶ 3-8 & Ex. B: Deposition Invoice; Mirer 7/10/12 Aff. Ex. C: Costs.) In its August 16, 2012 Order, the Court noted that "the costs of the litigation are not substantiated as required by the case law" and ordered the parties to "submit simultaneous supplemental briefs, including affidavits and exhibits." (Dkt. No. 95: 8/16/12 Order at 1-2.) In her supplemental papers, Harris only provided documentation for $1,571.87 in costs.

## III. FUTURE DAMAGES PURSUANT TO NEW YORK LAW

Harris seeks future damages of $120,000 under New York law for unfair competition. (Dkt. No. 81-1: Harris 6/8/12 Aff. ¶ 19; Dkt. No. 81-6: Harris Br. at 8, 13; Dkt. No. 90: Harris Reply Br. at 9; Dkt. No. 98: Harris Supp. Br. at 3, 12.) Harris claims that Fairweather damaged Harris' reputation and "it will take at least three years before [she is] able to rebuild the business to where it had been before." (Harris 6/8/12 Aff. ¶ 19.) Harris quotes *Suburban Graphics Supply Corp. v. Nagle, 5 A.D.3d*

663, 666, 774 N.Y.S.2d 160, 163 (2d Dep't 2004): "Future [*37] lost profits, although 'often an approximation,' may be awarded 'based upon known reliable factors without undue speculation.'" (Harris Br. at 8.) Yet, Harris baldly asserts that she should be awarded future damages of $120,000 representing $50,000 for 2013, $40,000 for 2014, and $30,000 for 2015. (Harris 6/8/12 Aff. ¶ 19.) Harris provides no basis for these figures. Harris' claim for future damage is too speculative, and, thus, Harris should not be entitled to future damages.[25] See, e.g., *AMC Film Holdings LLC v. Rosenberg, No. 03-CV-3835, 2006 U.S. Dist. LEXIS 70976, 2006 WL 2827860 at *7 (E.D.N.Y. Sept. 29, 2006)* (Defendant "seeks an award of future damages . . . for any monies it may have to expend in the future to defend itself in this lawsuit. [Defendant's] evidence in this regard -- based on the amount of time counsel foresees spending in order to prepare to try this case -- is clearly too speculative to warrant recovery." (quotations omitted)); *ATC Healthcare Servs., Inc. v. Personnel Solutions, Inc., No. 01 CV 762, 2006 U.S. Dist. LEXIS 91567, 2006 WL 3758618 at *12 (E.D.N.Y. Dec. 19, 2006)* ("Even if the Court was to decide that plaintiff was entitled to lost future profits under the circumstances present in this case, plaintiff has [*38] failed to submit documentation estimating those lost profits with reasonable certainty. . . . [P]laintiff [should] be denied recovery for lost future royalties").

> 25  While the Court noted that "Harris' future damages request fails to include evidentiary or legal support" in its August 16, 2012 Order (Dkt. No. 95: 8/16/12 Order), counsel failed to provide evidentiary or legal support in its supplemental submissions and merely copied the section from her previous brief (compare Harris Br. at 8 with Harris Supp. Br. at 3).

> The Court also notes that Harris is getting three to four months of "future" damages because of the award of damages for all of 2012. (See Point II above.)

## IV. INJUNCTIVE RELIEF

"'A court may issue an injunction on a motion for default judgment provided that the moving party shows that (1) it is entitled to injunctive relief under the applicable statute and (2) it meets the prerequisites for the issuance of an injunction.'" *Pitbull Prods., Inc. v. Universal Netmedia, Inc., 07 Civ. 1784, 2007 U.S. Dist. LEXIS 82201, 2007 WL 3287368 at *5 (S.D.N.Y. Nov. 7, 2007).*[26]

> 26  Accord, e.g., *Gucci Am., Inc. v. Curveal Fashion, 09 Civ. 8458, 2010 U.S. Dist. LEXIS 5831, 2010 WL 308303 at *2 (S.D.N.Y. Jan. 20,*

*2010); Gucci Am., Inc. v. Tyrrell-Miller, 678 F. Supp. 2d 117, 120 (S.D.N.Y. Nov. 19, 2008);* [*39] *Virgin Enters. Ltd. v. Enom, Inc., 08 Civ. 0328, 2008 U.S. Dist. LEXIS 66404, 2008 WL 4054418 at *2 (S.D.N.Y. Aug. 18, 2008).*

## A. Harris' Request For Injunctive Relief Pursuant To The Lanham Act Should Be Granted

Harris seeks to permanently enjoin Fairweather or anyone associated with her "from conducting any business in the name of PPH Tax and Accounting, Inc. or PPH Tax and Accounting or engaging in any other conduct designed to cause confusion in the public as to her connection to PPH." (Dkt. No. 81-6: Harris Br. at 12; Dkt. No. 90: Harris Reply Br. at 6-8; Dkt. No. 98: Harris Supp. Br. at 11.) The first prong is satisfied because the Lanham Act gives courts the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable." *15 U.S.C. § 1116(a).*[27]

27    Accord, e.g., *Gucci Am., Inc. v. Curveal Fashion, 09 Civ. 8458, 2010 U.S. Dist. LEXIS 5831, 2010 WL 308303 at *2 (S.D.N.Y. Jan. 20, 2010); Gucci Am., Inc. v. Tyrrell-Miller, 678 F. Supp. 2d 117, 120 (S.D.N.Y. Nov. 19, 2008); Pitbull Prods., Inc. v. Universal Netmedia, Inc., 07 Civ. 1784, 2007 U.S. Dist. LEXIS 82201, 2007 WL 3287368 at *6 (S.D.N.Y. Nov. 7, 2007).*

Under the second prong, "[t]o obtain a permanent injunction, [plaintiff] must demonstrate (1) actual success [*40] on the merits and (2) irreparable harm." *Gucci Am., Inc. v. Duty Free Apparel, Ltd., 286 F. Supp. 2d 284, 290 (S.D.N.Y. 2003).*[28] Harris has established success on the merits due to Fairweather's default, which constitutes an admission of liability. See, e.g., *Dweck v. Amadi, 2011 U.S. Dist. LEXIS 96442, 2011 WL 3809907 at *8* ("Plaintiff has established success on the merits; defendants' default constitutes an admission of liability."); *Gucci Am., Inc. v. Curveal Fashion, 2010 U.S. Dist. LEXIS 5831, 2010 WL 308303 at *2* ("'[P]laintiffs have established success on the merits because the defendants' default constitutes an admission of liability.'"); *Gucci Am., Inc. v. Tyrrell-Miller, 678 F. Supp. 2d at 120* (same); *Virgin Enters. Ltd. v. Enom, Inc., 2008 U.S. Dist. LEXIS 66404, 2008 WL 4054418 at *2* ("As a result of Defendants' default, the following facts in the Complaint are deemed admitted and establish Defendants' liability for trademark infringement."); *Pitbull Prods., Inc. v. Universal Netmedia, Inc., 2007 U.S. Dist. LEXIS 82201, 2007 WL 3287368 at *5* ("Because the defendants' default constitutes an admission of liability, [plaintiff] has established success on the merits."). Moreover, obviously the name PPH Tax and Accounting, Inc. is almost identical and certainly confusingly similar to Harris' [*41] PPH Tax and Accounting.

28    Accord, e.g., *Dweck v. Amadi, 10 Civ. 2577, 2011 U.S. Dist. LEXIS 96442, 2011 WL 3809907 at *8 (S.D.N.Y. July 26, 2011),* report & rec. adopted, *2011 U.S. Dist. LEXIS 96403, 2011 WL 3809891 (S.D.N.Y. Aug. 29, 2011); Gucci Am., Inc. v. Curveal Fashion, 2010 U.S. Dist. LEXIS 5831, 2010 WL 308303 at *2; Gucci Am., Inc. v. Tyrrell-Miller, 678 F. Supp. 2d at 120; Virgin Enters. Ltd. v. Enom, Inc., 08 Civ. 0328, 2008 U.S. Dist. LEXIS 66404, 2008 WL 4054418 at *2 (S.D.N.Y. Aug. 18, 2008).*

"In a trademark case, irreparable injury is established where 'there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused . . . .'" *Lobo Enters., Inc. v. Tunnel, Inc., 822 F.2d 331, 333 (1987).*[29] Accepting the complaint's allegations as true, there is a likelihood that PPH's customers have been misled or confused, satisfying the irreparable injury requirement. See, e.g., *Gucci Am., Inc. v. Curveal Fashion, 2010 U.S. Dist. LEXIS 5831, 2010 WL 308303 at *2; Gucci Am., Inc. v. Tyrrell-Miller, 678 F. Supp. 2d at 120; Johnson & Johnson Consumer Cos. v. Aini, 540 F. Supp. 2d 374, 395 (E.D.N.Y. 2008)* (granting permanent injunction where "Violating Defendants will otherwise continue purchasing and selling goods bearing Plaintiff's infringed trademark"); *Virgin Enters. Ltd. v. Enom, Inc., 2008 U.S. Dist. LEXIS 66404, 2008 WL 4054418 at *3;* [*42] *Pitbull Prods., Inc. v. Universal Netmedia, Inc., 2007 U.S. Dist. LEXIS 82201, 2007 WL 3287368 at *6* ("Accepting its allegations as true, Pitbull has alleged likelihood of confusion and thus also established irreparable injury.").

29    Accord, e.g., *Gucci Am., Inc. v. Curveal Fashion, 2010 U.S. Dist. LEXIS 5831, 2010 WL 308303 at *2; Gucci Am., Inc. v. Tyrrell-Miller, 678 F. Supp. 2d at 120; Virgin Enters. Ltd. v. Enom, Inc., 2008 U.S. Dist. LEXIS 66404, 2008 WL 4054418 at *2; Pitbull Prods., Inc. v. Universal Netmedia, Inc., 2007 U.S. Dist. LEXIS 82201, 2007 WL 3287368 at *5.*

Accordingly, Fairweather should be permanently enjoined from conducting business in the name of PPH Tax and Accounting or PPH Tax and Accounting, Inc. (or any other confusingly similar name), and Harris should be released from her preliminary injunction bond. See, e.g., *Johnson & Johnson Consumer Cos. v. Aini, 540 F. Supp. 2d at 396.*

2012 U.S. Dist. LEXIS 128409, *

## B. Harris' Request For Injunctive Relief Pursuant To New York Unfair Competition Law Should Be Granted

Harris seeks to permanently enjoin Fairweather or anyone associated with her from "continuing to solicit any business based on customer lists or customer information which [Fairweather] obtained during the course of her association with PPH and which she continued to use during the year she operated  [*43] as part of Tax Express," as well as the return of "all files taken from the PPH offices, as well as all hard copies of files" and PPH's computer. (Dkt. No. 81-6: Harris Br. at 9, 12-13; Dkt. No. 90: Harris Reply Br. at 6-8; Dkt. No. 98: Harris Supp. Br. at 4-5, 11.)

"Under New York law, 'the gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another by infringement or dilution of a trademark or trade name or by exploitation of proprietary information or trade secrets.'" *Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.*, 297 F. Supp. 2d 463, 491 (N.D.N.Y. 2003), aff'd, 126 F. App'x 507 (2d Cir. 2005).[30] "Absent a written agreement precluding or restricting such activities, New York law does not prohibit an employee from engaging in head to head competition with a former employer, provided that the employee does not unfairly compete such as through the use of proprietary information misappropriated from the former employer." *Innoviant Pharmacy, Inc. v. Morganstern*, 390 F. Supp. 2d at 194.[31] "The New York law of unfair competition does, however, prohibit the unauthorized taking and exploitation of internal, proprietary information [*44] to assist an employee in competing with a former employer." *Innoviant Pharmacy, Inc. v. Morganstern*, 390 F. Supp. 2d at 194.[32] "The misappropriation of detailed internal customer information . . . can give rise to a claim of unfair competition and, in the event of the finding of irreparable harm, injunctive relief." *Innoviant Pharmacy, Inc. v. Morganstern*, 390 F. Supp. 2d at 194.[33]

30  Accord, e.g., *Derven v. PH Consulting, Inc.*, 427 F. Supp. 2d 360, 372 (S.D.N.Y. 2006); *Innoviant Pharmacy, Inc. v. Morganstern*, 390 F. Supp. 2d 179, 194 (N.D.N.Y. 2005); *Major League Baseball Props., Inc. v. Opening Day Prods., Inc.*, 385 F. Supp. 2d 256, 268-69 (S.D.N.Y. 2005).

31  See, e.g., *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 395, 278 N.E.2d 636, 328 N.Y.S.2d 423, 430 (N.Y. 1972).

32  See, e.g., *Fairfield Fin. Mortg. Grp., Inc. v. Luca*, 584 F. Supp. 2d 479, 487 (E.D.N.Y. 2008) ("Courts in this circuit have held that 'where the information taken would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents for use in a competitor's business constitutes unfair competition.'"); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 537 (S.D.N.Y. 2004) [*45] (same); *McSpadden v. Caron*, No. 03-CV-6285, 2004 U.S. Dist. LEXIS 28673, 2004 WL 2108394 at *17 (W.D.N.Y. Sept. 20, 2004) ("Where the defendant is a former employee of the plaintiff who actually copied the employer's confidential records, the employee may be held liable even though the information taken does not qualify as a 'trade secret.'"); *Winner Int'l v. Kryptonite Corp.*, 95 Civ. 0247, 1996 U.S. Dist. LEXIS 2182, 1996 WL 84476 at *3 (S.D.N.Y. Feb. 27, 1996) ("[O]ne element deemed essential to the type of unfair competition claim set forth here is that the defendant has misappropriated the benefit or property right of another for its own commercial advantage.").

33  Accord, e.g., *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d at 532-33 ("Irreparable harm to an employer may also result where an employee has misappropriated trade secrets or confidential customer information, including pricing methods, customer lists and customer preferences."); *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d at 395, 328 N.Y.S.2d at 430 (a court may enjoin an ex-employee from using customer information if "appropriated by copying, [or] studied memory"); *Metal & Salvage Ass'n v. Siegel*, 121 A.D.2d 200, 202, 503 N.Y.S.2d 26, 28 (1st Dep't 1986).

While [*46] the customer information at issue is not a trade secret, it qualifies for protection if Fairweather misappropriated PPH files and computer. Harris asserts that Fairweather took PPH's files and computer and used this information to solicit customers. (Dkt. No. 81-1: Harris 6/8/12 Aff. ¶¶ 20-21; Harris Br. at 9; Harris Reply Br. at 8; Harris Supp. Br. at 4.) While Fairweather denies stealing "files from the cabinets" because she has "been operating paperless for some time," she does not address the PPH computer. (Dkt. No. 86: Fairweather Aff. ¶ 23.) Harris has offered evidence that a PPH customer obtained a copy of his prior tax documents, prepared at PPH, from Fairweather. (Harris Reply Br. at 7; Dkt. No. 60: Smith Aff. ¶¶ 5-9.) Fairweather cannot misappropriate PPH's files and computers and use that information to solicit business. Fairweather should be enjoined from using PPH's customer information to solicit business and she should be ordered to return to Harris any PPH files (paper or electronically stored) and computer that Fairweather has, within fourteen days of entry of the injunction. See, e.g., *Innoviant Pharmacy, Inc. v. Morganstern*, 390 F. Supp. 2d at 195 (where defendant [*47] took

2012 U.S. Dist. LEXIS 128409, *

customer information, "including a list of approximately 1900 potential referral sources, provided to him by management . . . , as well as a collection of business cards accumulated by him regarding existing referral sources," plaintiff showed likelihood of success on merits); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d at 537; *Metal & Salvage Ass'n v. Siegel*, 121 A.D.2d at 202, 503 N.Y.S.2d at 28 (while customer lists were not found to be trade secrets, enjoining "defendants' utilization of trade secrets and confidential information contained in such files and to require return of these business records to plaintiff").

**C. Harris' Request To Enjoin Fairweather From Making Disparaging Remarks Should Be Denied**

Harris seeks to permanently enjoin Fairweather or anyone associated with her from "making disparaging or otherwise negative statements regarding" Harris or PPH. (Dkt. No. 81-6: Harris Br. at 13; Dkt. No. 90: Harris Reply Br. at 8; Dkt. No. 98: Harris Supp. Br. at 11.) Despite the Court's Order that Harris submit supplemental briefs with controlling legal authority for any relief sought (Dkt. No. 95: 8/16/12 Order at 2), Harris failed to support this [*48] request with any legal authority. An injunction against disparagement would be vague, might well violate Fairweather's *First Amendment* rights, and would interfere with legitimate competition. Accordingly, the Court should deem this request abandoned and in any event without merit.

**D. Harris' Request To Enjoin Fairweather From Conducting Business Within Seven Miles Should Be Denied**

Harris seeks to permanently enjoin Fairweather or anyone associated with her from "conduct[ing] business of tax preparation within seven miles of the PPH offices." (Dkt. No. 81-6: Harris Br. at 10-11, 13; Dkt. No. 90: Harris Reply Br. at 7-8; Dkt. No. 98: Harris Supp. Br. at 5, 12.) In support of this argument, Harris refers to the "'safe distance' rule," citing to *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 220 (2d Cir. 2003). (Harris Br. at 10; Harris Supp. Br. at 5.) The "safe distance rule," however, does not refer to geographical distance, but to the requirement that a trademark infringer choose a new mark that is sufficiently "distant" from the infringed-upon mark. See *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109, 117 (2d Cir. 2008);

*Espinoza v. Allen Imps. & Trade Corp.*, No. 95-7531, 100 F.3d 942 (table), 1996 WL 19142 at *2 (2d Cir. Jan. 17, 1996) [*49] ; *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 345 (S.D.N.Y. 2010). In his September 29, 2011 Order, Judge Castel acknowledged that "the safe-distance doctrine is generally applied to the design of a mark" and reasoned that as "a small business with a longtime presence at 2002 Cross Bronx Expressway, Fairweather's presence will likely promote customer confusion as to PPH." (Dkt. No. 33: 9/29/11 Order at 3-4.) Judge Castel concluded that Fairweather's "appropriation of the PPH mark, her continued use of the PPH phone number and her ongoing presence in the PPH business weigh in favor of an injunction expressly excluding Fairweather from the premises." (9/29/11 Order at 3-4, emphasis added.) This reasoning, however, does not extend to enjoin Fairweather from preparing taxes within seven miles of PPH, which would effectively preclude Fairweather from working in her community.[34] Under the law, Fairweather is free to engage in fair competition with PPH. While Harris concedes that the "'safe distance' rule pertains to similarly looking marks," she uses the rule to support her motion that Harris should be enjoined [*50] from conducting business within seven miles of PPH without providing any legal authority supporting an injunction for geographical distance. (Harris Br. at 11; Harris Supp. Br. at 5.) The Court warned plaintiff to provide authority to support any relief requested (Dkt. No. 95: 8/16/12 Order), but Harris has not cited any authority applying the safe distance rule to geographic distance as opposed to the similarity of the mark. Indeed, in her Supplemental Brief she merely "cuts and pastes" from her prior brief which the Court had found inadequate. (Compare Harris Supp. Br. at 5 with Harris Br. at 10-11.) The Court should not enjoin Fairweather from preparing taxes within seven miles of PPH.

34   Even if any geographic restitution were appropriate, which it is not, Harris offers no basis for seeking a seven mile ban, which is way overbroad.

**CONCLUSION**

For the reasons set forth above, the Court should grant injunctive relief as described above and award Harris monetary relief as follows:

| | |
|---|---:|
| Defendant's Profits | $134,400.00 |
| Plaintiff's Damages | $65,983.11 |
| Future Damages | $0.00 |
| Attorneys' Fees | $59,912.00 |

2012 U.S. Dist. LEXIS 128409, *

| Costs | $1,571.87 |
|---|---|
| Total | $261,866.98 |

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to *28 U.S.C. § 636(b)(1)* [*51] and *Rule 72(b) of the Federal Rules of Civil Procedure*, the parties shall have fourteen (14) days from service of this Report to file written objections. See also *Fed. R. Civ. P. 6*. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable P. Kevin Castel, 500 Pearl Street, Room 2260, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Castel (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993),* cert. denied, *513 U.S. 822, 115 S. Ct. 86, 130 L. Ed. 2d 38 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.),* cert. denied, *506 U.S. 1038, 113 S. Ct. 825, 121 L. Ed. 2d 696 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).*

DATED: New York, New York

September [*52] 10, 2012

/s/ Andrew J. Peck

**Andrew J. Peck**

United States Magistrate Judge



**JAY'S CUSTOM STRINGING, INC., Plaintiff, -against- RON JONGHWAN YU, Defendant.**

**01 Civ. 1690 (WHP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 9298; 144 Lab. Cas. (CCH) P59,393*

**July 5, 2001, Decided**
**July 6, 2001, Filed**

**DISPOSITION:** [*1] Plaintiff's motion for preliminary injunction denied.

**COUNSEL:** For Plaintiff: Anthony J. Ferrara, Esq., Polstein, Ferrara, Dwyer & Speed, P.C., New York, New York.

For Defendant: Deborah DeHart Cannavino, Esq., Tyler Cooper & Alcorn, LLP, Stamford, Connecticut.

**JUDGES:** WILLIAM H. PAULEY III, U.S.D.J.

**OPINION BY:** WILLIAM H. PAULEY III

**OPINION**

*MEMORANDUM AND ORDER*

   WILLIAM H. PAULEY III, District Judge:

   This diversity action involves claims of breach of contract, breach of fiduciary duty and misappropriation of trade secrets in the milieu of tennis racket customizing and stringing. Plaintiff Jay's Custom Stringing, Inc. ("JCS") moves for a preliminary injunction that prohibits its former employee, defendant Ron Jonghwan Yu ("Yu"), from violating the restrictive covenant in his employment agreement by working with his new employer, disclosing any trade secrets or proprietary information, and soliciting JCS's customers and employees.

   JCS commenced this action on February 26, 2001. The next day, JCS filed an order to show cause and an application for a temporary restraining order and preliminary injunction prohibiting, *inter alia*, Yu from violating the terms of his employment agreement and [*2] an agreement concerning confidentiality. After hearing argument from both parties, this Court denied the application for a temporary restraining order; in light of the fact that Yu terminated his employment with JCS in September 2000, JCS's delay in seeking provisional relief showed a lack of exigent circumstances requiring extraordinary relief. *See Fed. R. Civ. P. 65(b)*. Having denied the temporary restraining order, this Court granted expedited discovery and set an accelerated briefing schedule on JCS's motion for a preliminary injunction. Disputed factual issues raised in the parties' submissions prompted this Court to conduct an evidentiary hearing pursuant to *Rule 43(e) of the Federal Rules of Civil Procedure*. During this hearing, Jay Schweid, the founder and president of JCS, and defendant Yu testified and were subject to cross-examination. Following the hearing, the Court solicited supplemental letter briefs from the parties.

   For the reasons discussed below, plaintiff's preliminary injunction is denied.

*Factual Background*

   Since 1980, JCS has been providing specialized tennis racket customizing and stringing services to tennis professionals, including many of the top-ranked [*3] players in the world. (Reply Affidavit of Jay Schweid ("Schweid Aff.") P 3 & Ex. 16.) JCS offers its clients trained personnel who provide on-site racket services at major tennis tournaments in the United States, Europe and Australia as well as support before and after tournaments. (*See* Transcript of Hearing dated May 15, 2001 ("Tr.") at 17-20.)

Case 5:12-cv-00858-GTS-TWD   Document 40   Filed 10/04/12   Page 56 of 66

Page 2

2001 U.S. Dist. LEXIS 9298, *; 144 Lab. Cas. (CCH) P59,393

JCS customizes tennis rackets through a number of proprietary techniques for molding, gripping, and weighting. (See Tr. at 8-11.) One of the unique features of JCS's business is the JART, a patented computerized device invented in part by Schweid. (See Schweid Aff. P 13; Tr. at 51, 61.) The JART enables the weight, balance point, and swing weight of a tennis racket to be duplicated automatically through a computer program that uses data supplied by the device's measuring unit and a JCS database. (See Schweid Aff. Ex. 15; Tr. at 10-11.) Although it is common in the industry to customize a racket by adjusting its weight or balance point, the JART uses its own internal scale to produce a swing weight value. (Tr. at 11, 44, 59, 71-72.) Thus, because the swing weight value derived by JCS is not relevant to any other customized method [*4] that does not use the JART, rackets customized by JCS cannot be duplicated except with great difficulty through a time-consuming process of trial and error. (Schweid Aff. PP 13, 25; Tr. at 20-21, 44, 60-61, 71.) The racket specifications recorded by JCS generally are not known to the player. (See Tr. at 20-21.)

In comparison to customizing, racket stringing is a relatively non-technical process. Players typically know their preferences in terms of string-type and tension and understand their other penchants such as when they like to have their racket strung (morning or evening) and whether they prefer pre-stretched string. (See Tr. at 69, 84-85, 88.) As Schweid testified: "An experienced stringer is going to be able to string a professional player's racket." (Tr. at 33.) Indeed, JCS clients participate in smaller tournaments throughout the world not serviced by JCS, but nonetheless are able to have their rackets strung. (Tr. at 87-88.)

JCS records a player's customizing specifications and stringing preferences on a computer database in an individual profile. (Schweid Aff. P 24.) JCS's player-by-player profiles also include historical information about various tournaments [*5] attended by a player such as surface condition, weather and ball-type. (Tr. at 15.) This information allows JCS to provide a player with performance-related information useful at future engagements at the same tournament and may offer guidance as to how a player's racket is to be customized for a particular event. (Tr. at 15.) Certain of the information stored on the JCS database is posted on the company's website. For example, the website lists most, if not all, of JCS's clients. (See Affidavit of Ron Yu ("Yu Aff.") Ex. D (showing the results of clicking the "Players" icon at www.jcsnyc.com).) In addition, the website publishes the stringing preferences of many of JCS's clients, reflecting the information recorded on the company's database. (See, e.g., Tr. at 37 (Karim Alami); Tr. at 38-39 (Jonas Bjorkman).)

Yu has been stringing rackets since 1987. (Tr. at 68.) Yu first worked for JCS as an on-site stringer at the Lipton Championship tennis tournament in 1995 and 1998. (Yu Aff. PP 8, 14.) As an on-site stringer, Yu was given access to, among other things, the names of JCS's clients, players' stringing preferences and pricing information without being required to sign any [*6] confidentiality agreement. (Yu Aff. PP 10-16.)

Following the 1998 Lipton Championship, JCS hired Yu as an independent contractor, and later as an employee, and trained him in the craft of customizing and stringing tennis rackets. (Yu Aff. PP 18-20.) As part of his employment, Yu was provided with a laptop computer that contained the JCS database with players' profiles, price lists and other business information of JCS. (Schweid Aff. P 16; Yu Aff. P 26.) In late 1999 or early 2000, Yu accidentally stepped on the laptop and broke the screen. (Yu Aff. P 33.) After Yu paid JCS $ 400 to replace the computer, Schweid agreed to allow Yu to keep the damaged laptop. (Yu Aff. P 33.)

At the time JCS engaged Yu as an independent contractor, the parties executed a Confidentiality Agreement dated April 22, 1998. (Yu Aff. Ex. B.) In substance, the Confidentiality Agreement obligated Yu to maintain as confidential "certain tennis racquet stringing and customizing skills, techniques, concepts, procedures and methods and information" relating to JCS's business. (See Yu Aff. Ex. B P 1.)

With the offer of full-time employment, JCS presented Yu with an Employment Agreement dated as of August 13, 1998, which [*7] the parties executed. (Yu Aff. Ex. C.) Upon the termination or expiration of the Employment Agreement, Yu was subject to a broad restrictive covenant that effectively barred him from working as a tennis racket technician anywhere in the world for a period of two years. Specifically, the Employment Agreement provided that:

> (a) For a period of two (2) years following the termination or expiration hereof, [Yu] agrees and covenants as follows, all of which shall be applicable in the territory herein defined as being anywhere on earth ("the Territory"):
>
> (b) [Yu] shall not directly or indirectly, as a proprietor, director, officer, shareholder, employee, partner, co-venturer, consultant or in any other capacity conduct or participate in a business which engages in tennis racquet stringing and/or customizing, and/or any other business in which JCS engages during the Term.

2001 U.S. Dist. LEXIS 9298, *; 144 Lab. Cas. (CCH) P59,393

(c) [Yu] shall not solicit or accept any business from any competitor of JCS or from any individual or entity which is, during the Term, a client of JCS.

(d) [Yu] shall not at any time directly or indirectly request or advise any individual or entity which is, during the Term, a client or which [*8] may become a client of JCS to withdraw, curtail or cancel its business with JCS.

(e) [Yu] agrees not to directly or indirectly induce or attempt to influence any employee of JCS to curtail or terminate her or his employment with JCS.

(Yu Aff. Ex. C P 2(a) - (e).)

As part of the restrictive covenant, JCS secured from Yu the representation that he previously had been "gainfully employed in several industries unrelated to the business conducted by JCS" and that he had "no training as, and had never before been employed as a tennis racquet technician, or customizer." (Yu Aff. Ex. C. P 2(f).) This representation, evidently presented to Yu on a take it or leave it basis, proved to be false, as Yu previously had been employed as a tennis racket technician for a number of years. (Yu Aff. PP 21-22; Tr. at 85.) It is apparent that JCS extracted this representation so that, in the event Yu left on unfavorable terms, the company could argue, as it did in its moving papers, that Yu "admitted his past experience in industries unrelated to JCS's business" and, thus, "is capable of earning a living in other areas." (Pl.'s Mem. Of Law at 7.)

In January 2000, while working at the Australian [*9] Open, Yu discussed going into business with Nathan Ferguson of Priority One, a JCS competitor. (See Affidavit of Bianca Van Asselt ("Van Asselt Aff.") PP 7-8.) Ferguson is the exclusive tournament stringer for Pete Sampras, one of the top-ranked men's players in the world (Schweid Aff. PP 18-19), and hiring Yu would permit Priority One to service other players at major tournaments (see Van Asselt Aff. PP 7-8). In May 2000, Yu notified JCS of his intent to resign, but agreed to remain with the company through September 2000 in order to work the U.S. Open. (Yu Aff. P 37.) In January 2001, Yu joined Priority One as a racket stringer. (Yu Aff. P 38.) The instant litigation then ensued some two months later.

In its verified complaint, JCS sets out four claims for relief: (i) an injunction based on the restrictive covenant in the Employment Agreement and the provisions of the Confidentiality Agreement; (ii) breach of contract; (iii) breach of fiduciary duty; and (iv) misappropriation of

trade secrets. JCS argues that Yu is violating the reasonable terms of the Employment Agreement and Confidentiality Agreement by engaging in the business of racket customizing and stringing, disclosing [*10] JCS's business information claimed to be trade secrets, and soliciting JCS's clients and employees. Yu responds that the restrictive covenant is not directed to protect any legitimate interest, that the restrictive covenant in the Employment Agreement is unreasonable in scope and duration and therefore not enforceable, and that he has not misappropriated any trade secrets or sought to solicit any of JCS's clients or employees.

## Discussion

Preliminary injunctive relief is "an extraordinary and drastic remedy which should not be routinely granted." *Medical Society of the State of New York v. Toia, 560 F.2d 535, 538 (2d Cir. 1977); Earthweb, Inc. v. Schlack, 71 F. Supp. 2d 299, 308 (S.D.N.Y. 1999), remanded, 205 F.3d 1322* (2d Cir.), *aff'd, 2000 U.S. App. LEXIS 11446, 2000 WL 1093320* (2d Cir. May 18, 2000). Accordingly, the plaintiff must demonstrate: "(1) either a likelihood that he will succeed on the merits of his claim, or that the merits present serious questions for litigation and the balance of hardships tips decidedly toward the plaintiff; and (2) that without the injunction, he will likely suffer irreparable harm before the court can [*11] rule upon his claim." *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 122 (2d Cir. 1994); see also Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979).*

### A. Likelihood of success on the merits

Pursuant to the agreements at issue, the law of the State of New York governs this action. (*See* Yu Aff. Ex. B P 4 (Confidentiality Agreement); Yu Aff. Ex. C P 7 (Employment Agreement).)

New York courts use a standard of reasonableness in judging the validity of restrictive covenants. *See BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 388, 690 N.Y.S.2d 854, 856, 712 N.E.2d 1220 (1999).* "[A] restrictive covenant will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *BDO Seidman, 93 N.Y.2d at 389, 690 N.Y.S.2d at 857.* An employer may legitimately use a restrictive covenant (i) to prevent an employee's solicitation or disclosure of trade secrets, (ii) to prevent an employee's release of confidential information [*12] regarding the employer's customers, or (iii) in those cases where the employee's services to the employer are deemed special or unique. *See Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 70 (2d Cir. 1999); BDO Seidman,*

Case 5:12-cv-00858-GTS-TWD   Document 40   Filed 10/04/12   Page 58 of 66

Page 4

2001 U.S. Dist. LEXIS 9298, *; 144 Lab. Cas. (CCH) P59,393

*93 N.Y.2d at 388-89, 690 N.Y.S.2d at 856-57; Reed, Roberts Assocs., Inc. v. Strauman, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 679, 353 N.E.2d 590 (1976).*

Restrictive covenants are generally disfavored by law and are only enforced under limited circumstances. *See Business Networks of New York, Inc. v. Complete Network Solutions, Inc., 265 A.D.2d 194, 195, 696 N.Y.S.2d 433, 435* (1st Dep't 1999). The policy underlying this strict approach rests on notions of employee mobility and free enterprise. "Once the term of an employment agreement has expired, the general public policy favoring robust and uninhibited competition should not give way merely because a particular employer wishes to insulate himself from competition." *American Broad. Cos., Inc. v. Wolf, 52 N.Y.2d 394, 404, 438 N.Y.S.2d 482, 487, 420 N.E.2d 363 (1981).* "Important, too, are the powerful considerations of public policy which [*13] militate against sanctioning the loss of a man's livelihood." *American Broad., 52 N.Y.2d at 404, 438 N.Y.S.2d at 487* (quoting *Purchasing Assocs., Inc. v. Weitz, 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 604, 196 N.E.2d 245* (19.63)). On the other hand, "the employer is entitled to protection from unfair or illegal conduct that causes economic injury." *American Broad., 52 N.Y.2d at 404, 438 N.Y.S.2d at 487; see also Reed, Roberts Assocs., 40 N.Y.2d at 308, 386 N.Y.S.2d at 680.*

In this case, JCS contends that the restrictive covenant is necessary to protect its proprietary business information from disclosure to third parties and to maintain its customer relationships.[1]

> 1   To a lesser degree, JCS seeks to justify the restrictive covenant based on the "unique" services offered by Yu. (*See* Pl.'s Reply Mem. at 14-15.) This argument lacks merit. "Unique services have been found in various categories of employment where the services are dependent on an employee's special talents; such categories include musicians, professional athletes, actors and the like." *Ticor, 173 F.3d at 70.* However, racket technicians such as Yu were routinely replaced at JCS (Yu Aff. P 25) and there is no showing that the loss of his services caused JCS irreparable injury. *See Earthweb, 71 F. Supp. 2d at 313.*

[*14] *1. Trade secrets*

Under New York law, a trade secret has been defined as "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *Ashland Management Inc. v. Janien, 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 917-18, 624 N.E.2d 1007 (1993)* (quoting *Restatement of Torts § 757* cmt. b (1939)); *accord North*

*Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999).* In determining whether information constitutes a trade secret, New York courts have considered: (i) the extent to which the information is known outside of the business; (ii) the extent to which it is known by employees and others involved in the business; (iii) the extent of measures taken by the business to guard the secrecy of the information; (iv) the value of the information to the business and its competitors; (v) the amount of effort or money expended by the business in developing the information; and (vi) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Ashland Management, 82 N.Y.2d at 407, 604 N.Y.S.2d at 918;* [*15] *accord Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc., 154 F. Supp. 2d 586, 2001 U.S. Dist. LEXIS 5162, 2001 WL 434496, at *15* (S.D.N.Y. 2001); *Ivy Mar Co. v. C.R. Seasons Ltd., 907 F. Supp. 547, 556 (E.D.N.Y. 1995).* JCS seeks trade secret protection for four categories of its business information: players' customizing specifications, players' stringing preferences, the identity of its customers, and pricing information. (*See* Compl. PP 15, 38.)

Information detailing the characteristics and nature of customer specifications and preferences may be eligible for trade secret protection. *See Webcraft Techs., Inc. v. McCaw, 674 F. Supp. 1039, 1046-47 (S.D.N.Y. 1987); Churchill Communications Corp. v. Demyanovich, 668 F. Supp. 207, 212 (S.D.N.Y. 1987); Greenwich Mills Co. v. Barrie House Coffee Co., 91 A.D.2d 398, 405, 459 N.Y.S.2d 454, 459 (2d Dep't 1983);* Roger M. Milgram, *Milgram on Trade Secrets § 1.09[8] [a],* at 1-456 (2001). Nevertheless, trade secret protection will not attach to customer information that easily can be recalled or obtained from the customers themselves. *See Tactica Int'l, 2001 WL 434496, [*16] at *16; Earthweb, 71 F. Supp. 2d at 315; Ivy Mar, 907 F. Supp. at 558.*

Applying those principles here, this Court finds that the players' customizing specifications recorded on JCS's computer database are entitled to trade secret protection. The values used to customize players' rackets are generated by the JART, a patented device unique in the industry, and reflect precise measurements that are unknown to the players themselves. One of the values, the swing weight, is calculated by the JART's internal scale and is not readily reproduced by any other customizing method. The database also contains the players' specifications for molding and gripping, two customizing techniques that involve chemical and mechanical processes proprietary to JCS. In short, the customizing specifications and the molding and gripping processes are trade secrets because they afford JCS a competitive advantage, are regarded and treated as proprietary by the company, and are not known to outsiders.

Case 5:12-cv-00858-GTS-TWD   Document 40   Filed 10/04/12   Page 59 of 66

Page 5

2001 U.S. Dist. LEXIS 9298, *; 144 Lab. Cas. (CCH) P59,393

By contrast, the players' stringing preferences are not entitled to trade secret protection. The specific stringing needs and predilections of the players are readily ascertainable [*17] from the players themselves and, moreover, to large extent have been published by JCS on its website. Likewise, the identities of JCS's current or prospective customers are not confidential because they too are discoverable from JCS's website as well as from outside sources, namely any ranking of the world's top tennis professionals. *See American Inst. of Chemical Eng'rs v. Reber-Friel Co., 682 F.2d 382, 387 (2d Cir. 1982)*; *Reed, Robert Assocs., 40 N.Y.2d at 308, 386 N.Y.S.2d at 680.* Nor is JCS's pricing information to be accorded trade secret status. Yu last worked for JCS over nine months ago and whatever he can now recall about his former employer's costs and pricing margins is likely to be outdated. *See Tactica Int'l,* 2001 WL 434496, at *16 n.20; *Ivy Mar, 907 F. Supp. at 558.* Significantly, Yu had access to the names of JCS's clients, players' stringing preferences and JCS's pricing information at the Lipton Championships in 1995 and 1998 without being required to sign any confidentiality agreement. This is inconsistent with JCS's present contention that those categories of information should enjoy trade secret [*18] status.

### 2. *Reasonableness of scope and duration*

Even assuming, however, that all of the information JCS seeks to protect could be considered a trade secret, the restrictive covenant cannot be enforced unless it is "reasonably limited temporally and geographically." *Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp., 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 1006, 369 N.E.2d 4 (1977).* As stated, JCS seeks to enforce a noncompetition clause that precludes Yu from working "anywhere on earth" in his chosen profession for a period of two years. This Court previously refused to uphold a restrictive covenant containing similar terms. *See Heartland Sec. Corp. v. Gerstenblatt, 2000 U.S. Dist. LEXIS 3496,* No. 99 Civ. 3694 (WHP), 2000 WL 303274, at *7 (S.D.N.Y. March 22, 2000) (finding restrictive covenant with duration of two years and covering "the entire earth" to be unreasonable as a matter of law). JCS has failed to identify any New York case that supports enforcement of such a broad covenant. *Cf. Churchill Communications, 668 F. Supp. at 208, 215* (upholding restrictive covenant effective for two years, but limited to geographic areas in which employer conducted [*19] business); *Contempo Communications., Inc. v. MJM Creative Servs., Inc., 182 A.D.2d 351, 582 N.Y.S.2d 667* (1st Dep't 1992) (upholding non-compete agreement effective for two years that only barred defendants from soliciting accounts they actively worked on while in plaintiff's employ). Perhaps acknowledging the weakness of its position, JCS advised this Court that while it "believes the

original two year request is appropriate, a period of one full year running from the date of the court's decision seems reasonably calculated to protect JCS and its clients." (Letter from Anthony J. Ferrara dated May 22, 2001 at 3.)

The extreme breadth of the restrictive covenant is exemplified further by the fact that, apart from its racket customizing and stringing business, JCS engages in the retail, travel and concierge business. (Dep. of Jay Schweid dated March 26, 2001 ("Schweid Dep. II") at 62-63.) JCS's concierge business assists professional tennis players, agents, manufacturers or anybody related to a major tournament with arrangements at restaurants, nightclubs and shows. (Schweid Dep. II at 63.) Thus, beyond purporting to preclude Yu from working "anywhere on earth" in the [*20] tennis customizing industry, the restraint extends in similar geographic scope to the other enterprises of JCS without any apparent business justification.

Relatedly, the restrictive covenant also aims to preclude Yu from soliciting the business of any client or prospective client of JCS. (Yu Aff. Ex. C P 2(d).) JCS's definition of a prospective client appears to include any professional tennis player. (*See* Schweid Dep. II at 95.) As such, the restraint on solicitation is impermissibly broad and unenforceable as a matter of law. *See Ivy Mar, 907 F. Supp. at 560.*

While tempted to exercise its discretion and "blue pencil" the restrictive covenant, *see Karpinski v. Ingrasci, 28 N.Y.2d 45, 51-52, 320 N.Y.S.2d 1, 6-7, 268 N.E.2d 751 (1971)*, this Court declines to do so. The dynamic, relationship-based nature of the tennis racket customizing industry and its lack of geographical boundaries strongly militates against a judicially-crafted agreement. The parties are best served by a modified agreement reached on mutual consent.

### 3. *State law claims*

For its breach of contract claim, JCS argues that Yu breached the Employment Agreement by engaging [*21] in tennis racket customizing and stringing within the prohibited time period and by soliciting JCS's customers and employees. JCS has not demonstrated a likelihood of success on this claim because, as discussed, the restrictive covenant is unreasonable in scope and duration. In addition, the evidence that Yu has solicited JCS's clients is insubstantial. While JCS asserts that Yu lured away two professional tennis clients, Tim Henman and Justin Gimelstob, the record evidence shows that Yu had no discussions with either of them. (*See* Yu Aff. P 40.) In fact, Henman came to Priority One before Yu joined the company. (Yu Aff. P 40.) Moreover, Yu denies that he

solicited any of JCS's current employees to leave and join Priority One. (Yu Aff. P 40.)

Likewise, JCS has not established on this record that Yu misappropriated any trade secrets. There is no evidence that Yu sought to commit to memory any of JCS's confidential business information before leaving the company or that the database is being used to compete against JCS. While JCS points to the fact that Yu retained his laptop that holds a version of the JCS database, the record evidence shows that Yu is unable to access the information [*22] because the screen on his laptop is broken. Since leaving JCS, Yu only made one attempt to operate his laptop and did so in order to access personal e-mails; that attempt failed because he could not read the screen. Notably, the information stored on Yu's laptop is over seventeen-months old and many of the players' specifications are likely to be stale. (*See* Tr. at 58-59.) JCS also points to testimony that at one tennis tournament Yu showed Ferguson his JCS laptop. (*See* Van Asselt Aff. P 9.) Yu admits doing so, but states that he only displayed to Ferguson the menu page to the database which contains no substantive information. (Yu Aff. P 26.)

Since JCS has not established on this record that Yu solicited the company's customers on behalf of Priority One or misappropriated the company's confidential information, JCS also is unlikely to prevail on its claim for breach of fiduciary duty.

### B. *Irreparable harm*

A showing of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." *Bell & Howell: Mamiya Co. v. Masel Supply Co., 719 F.2d 42, 45 (2d Cir. 1983).* The mere possibility of harm is not sufficient: the harm must [*23] be imminent and the movant must show it is likely to suffer irreparable harm if equitable relief is denied. *JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990); Earthweb, 71 F. Supp. 2d at 308.* If irreparable harm is remote, speculative, or a mere possibility, the motion must be denied. *See Borey v. National Union Fire Ins. Co., 934 F.2d 30, 34 (2d Cir. 1991); Reuters Ltd. v. United Press, Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990).* In the Second Circuit, irreparable harm may be presumed if a trade secret has been misappropriated. *Haber, 188 F.3d at 49.*

Insofar as JCS has shown that the players' customizing specifications merit trade secret protection, JCS has not demonstrated on this record an imminent and likely risk of disclosure warranting preliminary injunction. Because the JART-based technology is patented and proprietary to JCS, JCS's customizing specifications have little or no value to competitors who have no access to the JART. *See Earthweb, 71 F. Supp. 2d at 310* (absent actual misappropriation by an employee, inevitable disclosure doctrine only applies [*24] where "the trade secrets at issue are highly valuable to both employers"). Schweid stressed in both his affidavit and oral testimony that without the JART, tennis rackets customized by JCS are "not readily reproducible without access to the data." (Schweid Aff. P 13; *see also* Schweid Aff. P 25 ("the tolerances and measurements of the racket cannot be readily reproduced without our expertise"); Tr. at 44 (testifying that "swing weight numbers are difficult to use if you don't have a JART machine"). Emblematic of this point, Yu testified that Nate Ferguson applies different customizing techniques and that he would have to learn them before he could start customizing at Priority One. (Tr. at 81.) Ironically, it is the very uniqueness of the JART to the tennis industry, a by-product of its patent protection, that prevents JCS from being able to show irreparable harm. Indeed, JCS finds itself in somewhat of a "Catch-22." Had JCS used conventional customizing methods, none of the racket specifications derived by JCS would enjoy trade secret protection. Once placed into the public domain, the rackets easily could be reproduced by a competitor. *See Hudson Hotels Corp. v. Choice Hotels Int'l, 995 F.2d 1173, 1177 (2d Cir. 1993),* [*25] *abrogated on other grounds, Nadel v. Play-by-Play Toys & Novelties, Inc., 208 F.3d 368, 379 n.9 (2d Cir. 2000).*

Along similar lines, JCS cannot show irreparable harm flowing from the imminent loss of clients. The evidence presented by JCS fails to tie Yu to the loss of the two clients it references, Henman and Gimelstob.

### *Conclusion*

For the reasons stated, plaintiff's motion for a preliminary injunction is denied. Counsel are directed to appear for a pretrial conference on July 23, 2001 at 2:00 p.m.

Dated: July 5, 2001

New York, New York

SO ORDERED:

WILLIAM H. PAULEY III

U.S.D.J.



SOUTH NASSAU CONTROL CORPORATION and SOUTH NASSAU CONTROL CORPORATION OF AMERICA, Plaintiffs, -against- INNOVATIVE CONTROL MANAGEMENT CORPORATION, CUSTOM CHEMICAL FORMULATORS, INC., MORGAN-GALLACHER, INC., d/b/a CUSTOM CHEMICAL FORMULATORS, MICHAEL H. KLIPPER, ROBERT KLIPPER, SEYMOUR KLIPPER, SHIRLEY KLIPPER, CLASSIC PERSONNEL HOME & HEALTH CARE CORP., and JAVIER ALBERT GONZALEZ, Defendants.

95-CV-3724 (DRH)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

*1996 U.S. Dist. LEXIS 22603*

June 17, 1996, Decided
June 20, 1996, Filed; June 20, 1996, Entered

**COUNSEL:** [*1] For Plaintiffs: Richard G. Gertler, LLP, Garden City, New York, By: Richard G. Gertler, Esq., Harold J. Levy, Esq.

For Defendant Michael Klipper: Peirez, Ackerman, Levine & Cohen, Great Neck, New York, By: John M. Brickman, Esq., Howard B. Sachs, Esq.

For Defendants Innovative Control, Robert Klipper, Seymour Klipper and Shirley Klipper: David Wander & Associates, New York, New York, By: David Wander, Esq., Lisa Golden, Esq.

For Defendant Custom Chemical Formulators: Robert P. Levine, Esq., New York, New York.

**JUDGES:** DENIS R. HURLEY, U.S.D.J.

**OPINION BY:** DENIS R. HURLEY

**OPINION**

*ORDER*

    HURLEY, District Judge

    Plaintiffs, South Nassau Control Corporation ("SNCC") and South Nassau Control Corporation of America ("SNCCA") move, pursuant to *Rule 65 of the*

*Federal Rules of Civil Procedure*, for a preliminary injunction enjoining defendants, Michael H. Klipper, Robert Klipper and Innovative Control Management Corporation ("ICM") "from selling to, servicing or soliciting any entity that has been a customer of South Nassau within the past two years." (Pls.' Post Hearing Mem. at 3.) The requested relief was the subject of a hearing held on September 22, October 3, October 12, November [*2] 7, and November 8, 1995.

    Plaintiffs' complaint against Michael Klipper is based on his alleged breach of a restrictive covenant in his employment agreement, as well as a claimed violation of his fiduciary duties as the former President of each of plaintiff corporations. Injunctive relief is sought against Robert Klipper and ICM based on the allegations that those defendants, aided by Michael Klipper, improperly diverted, and threaten to continue to divert, customers of plaintiffs to ICM. Initially, the present action was commenced to enjoin defendants' activities in Southern California. Thereafter, plaintiffs supplemented the focus of their complaint to include allegations that defendants were also endeavoring to divert plaintiffs' East Coast customers to ICM.

    For the reasons hereinafter indicated, the Court finds that plaintiffs have satisfied the criteria for the issuance of a preliminary injunction.

*BACKGROUND*

SNCC is a New York Corporation, with its principal place of business in Hicksville, New York. It formulates, manufactures and sells industrial and commercial laundry products, and provides a range of concomitant services to businesses operating within the industry. [*3] Its principal activities are conducted in the Northeastern United States. In 1988, SNCC expanded its operations into Southern California, via the establishment of SCNNA, a corporation organized under the laws of that State.

ICM is a New Jersey corporation, owned and operated by Michael Klipper's brother, Robert Klipper.

Ray Burke was a salesperson for SCNNA from October, 1993 to June, 1995. While so employed, he also became a salesperson for ICM in the Southern California market. Plaintiffs maintain that Michael Klipper, while the President of plaintiff corporations, orchestrated an effort on the West Coast--in complicity with his brother and Burke--whereby customers or potential customers of SCNNA were diverted to ICM.

Michael Klipper vigorously contests plaintiffs' claims, urging, *inter alia*, that he was unaware that Ray Burke was associated with ICM until after an ICM invoice was mistakenly sent to SNCC in March of 1995, and by characterizing his contacts with his brother as consisting of simply providing general advice regarding the industry, rather than endeavoring to promote ICM's interest at the expense of SNCCA. His opposition to the relief requested is also predicated [*4] on the propositions that the clauses in the employment agreement upon which plaintiffs rely suffer from overbreadth, and that, in any event, the agreement was signed by him under duress.

Robert Klipper did not testify or otherwise appear at trial. Nonetheless, he was ably represented, as was his corporation, by David Wonder and Associates, Lisa M. Golden, Esq., of counsel. His arguments largely mirrored those of Michael Klipper, with the additional thought that plaintiffs' law suit is "a blatant attempt to put ICM out of business in furtherance of Walter Hermann's scheme to destroy Michael Klipper's family." (Defs.' ICM and Robert Klipper's Post Hearing Mem. at 3.)

*DISCUSSION*

A. *Findings of Fact*

The Court's findings of fact are as follows:

1. Walter Hermann and Frank Ferrara founded SNCC in approximately 1980.

2. In 1984, the corporation hired Walter Hermann's son-in-law, Michael Klipper. By 1986, he had become the President of SNCC. As such, he, *inter alia*, oversaw

the manufacturing operations, and was actively engaged in soliciting customers. His activities were sufficiently broad in scope to warrant the label "chief cook and bottle washer" by Hermann, although [*5] the major decision-making responsibilities, including the power to hire and fire, rested primarily with Hermann and Frank Ferrara.

3. In approximately 1988, it was decided to extend the business from its East Coast origins to Southern California via the establishment of another corporation. Accordingly, SNCCA was established, with the stock being owned equally by Dominick Ferrara, Jack Ferrara, Randi Hermann-Gertler and Michael Klipper. The bulk of the resources required to establish and maintain SNCCA were provided by Frank Ferrara and Hermann, with minor contributions being made by the shareholders.

4. Michael Klipper was installed as the President of SNCCA and he, in turn, hired Ray Burke as a salesperson for the West Coast operation.

5. SNCC hired Robert Klipper in 1984. He was fired in 1989, ostensibly for taking excessive vacation time. He then established ICM which provides services similar to those offered by SNCCA.

6. On March 16, 1995, Hermann had a telephone conversation with Michael Klipper that extended in excess of two hours. During that conversation, Hermann identified himself as the "boss" of SNCC, and advised Michael that he was simply a "worker." He graphically [*6] called into question the wisdom of Michael having retained an attorney to serve as his spokesperson concerning the request that he, Hermann, had made several months before that Michael sign a restrictive covenant. Walter Hermann then proceeded to denigrate Michael's ability to run SNCC, and insisted that Michael sign the restrictive covenant "out of respect," even though it was legally "valueless" given the fact that the period of restraint exceeded one year. Michael was told at the beginning of the conversation, and towards its completion, that unless he signed a restrictive covenant he would be fired at 10:30 a.m. on March 17, 1995.

7. Parenthetically, the two-plus hour telephone conversation consisted of approximately five minutes or less of Michael speaking, with the rest of the time consumed by Hermann, *inter alia*, asking questions, which he then proceeded to answer in protracted monologues. It may be that the conversational imbalance met with the approval of Michael who was in the process of taping the call, possibly for the purpose of advancing his now proffered argument that his signing of the agreement was the product of duress.

8. Michael Klipper did sign the agreement [*7] before the 10:30 a.m. March 17th deadline, and continued as President of both SNCC and SNCCA. He testified that

he did so because his wife said that if he left her father's company she would leave him.

9. During that same month, *viz.* March of 1995, Ray Burke told Michael Klipper that he was experiencing financial problems. Michael Klipper asked if he would be interested in being a salesperson for his brother's company, ICM. Burke then called Robert Klipper and explained his situation. Robert Klipper sent him an employment agreement. After that agreement was signed, ICM provided him with a $ 2,500 check to be repaid from future commissions.

10. Ray Burke testified that he advised Michael Klipper that he had an anticompetition clause in his contract with SNCCA, but was told by Michael that "it was taken care of--no problem."

11. Robert Klipper informed Burke that the chemicals and pricing structure for ICM were identical to those used by SNCCA, and sent him a product index list reflecting that fact.

12. Before Burke entered into his dual capacity as a salesperson for both SNCCA and ICM, he had contacted the following companies on behalf of SNCCA: Republic Master Chef, Radiant [*8]  Services, Ideal Uniform, Beacon Laundry and St. Mary's Medical Center. Each of those companies, which was either being aggressively solicited by Burke on behalf of SNCCA or was an existing SNCCA customer, ultimately became a customer of ICM.

13. In March 1995, an ICM invoice was mistakenly received by SNCC. Frank Ferrara asked Michael Klipper about his knowledge of ICM's business activities in California. Michael feigned ignorance, indicating he would investigate the matter.

14. Michael Klipper testified that he first learned of Burke's employment with ICM during his investigation following receipt of the errant notice, and that he did not divulge that information to Hermann or Frank Ferrara at Burke's request.

15. During this period when defendants were diverting business from SNCCA to ICM, Michael Klipper instructed Burke to use a false name on the ICM invoices. Moreover, at Michael Klipper's direction, the parties used code names when leaving beeper messages for one another. Michael Klipper explained to the Court that this last artifice was used so that Hermann and Frank Ferrara would not become aware of the amount of time (1) he was talking to his brother, and (2) he devoted [*9]  to concluding SNCCA affairs on the West Coast after its operations ceased in that market in June of 1995.

16. Michael Klipper was fired by plaintiff corporations on August 21, 1995.

17. In the Court's view, Michael Klipper's testimony was less than candid, and in certain instances--including the explanations for the use of code names and aliases, as well as the nature of his contacts with ICM and Ray Burke--he deliberately endeavored to mislead the Court as to material matters. Given the totality of the circumstances, it would appear that aliases and the code names were utilized to prevent plaintiffs from discovering defendants' improper activities, and that Michael Klipper's efforts at trial to distance himself from his co-defendants was intended to perpetuate his spurious claim of noninvolvement in the charged conduct. [1]

> 1  Mr. Burke similarly tailored his testimony to advance his agenda, which apparently was to curry favor with Hermann and Frank Ferrara. That he was endeavoring to exaggerate Michael Klipper's role in the scheme, while minimizing his own, became evident during cross-examination by Michael Klipper's attorney. The audio tape of Burke's conversation with Robert Klipper--played at the start of the cross-examination--seriously called into question much of his direct testimony. Nonetheless, the primary thrust of Burke's testimony--to wit, that he, Michael Klipper and Robert Klipper worked together to divert SNCCA's customers and prospective customers to ICM--is accepted as accurate given the existence of corroborative evidence elsewhere in the record, such as the undisputed movement of certain accounts between the two corporations and the unconvincing character of the explanations regarding concomitant matters proffered by Michael Klipper.

[*10]   18. As the corporate President, Michael Klipper has access to the full account history of all SNCC's customers. While he urged, at trial, that none of that information could be legitimately labeled as "confidential," he acknowledged his prior efforts to have Custom Chemical Formulators, Inc. sign a nondisclosure agreement which would have served to cloak in secrecy much of the information presently under discussion.

19. Michael Klipper testified that plaintiffs' products are essentially the same as those marketed by its competitors. Variables--such as nature of items to be cleaned, the type of equipment involved, and the composition and temperature of the water utilized by a particular customer were said to be individually, and cumulatively, irrelevant to servicing that customer's needs. However, Hermann credibly explained that the above variables, among others, create marked diversity within the market, both as to customers' needs, and how those needs are addressed by plaintiffs and their competitors. Competitive success does not turn simply, or even primarily on offering the

lowest price or best terms. To the contrary, the hearing evidence underscored that prospective customers [*11] are often solicited over extended periods of time and at considerable cost, through carefully crafted, individualized, presentations. By way of example, it is not unusual to perform a series of "test washes" at a prospective customer's place of business, with the chemical formula utilized being adjusted as the process unfolds to dovetail the product offered to the needs and preferences of the customer.

## CONCLUSIONS OF LAW

### 1. *Jurisdiction*

Subject matter jurisdiction in this case is predicated upon the claimed violation of *18 U.S.C. Section 1964* (*i.e.* civil remedy for damages caused by a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO")).

### 2. *Standard for Issuance of a Preliminary Injunction*

For a preliminary injunction to issue, movant must establish (a) irreparable injury and (b) either 1) a likelihood of success on the merits or 2) a sufficiently serious question going to the merits to make it a fair ground for litigation, together with the balance of hardship tipping decidedly in favor of the party requesting preliminary relief. *See Tom Doherty Assocs. v. Saban Entertainment, Inc., 60 F.3d 27, 33 (2d Cir. 1995)*; [*12] *Ecolab Inc. v. Paolo, 753 F. Supp. 1100, 1109 (E.D.N.Y. 1991)*.

### 3. *Plaintiffs Entitled to Preliminary Injunction*

#### A. *Irreparable Injury*

Plaintiffs did not produce evidence at the preliminary injunction hearing that Michael Klipper has physical possession of corporate records pertaining to confidential customer information. However, he did testify that he had access to such information in his position as chief executive officer of plaintiff corporations and that, during his tenure with plaintiffs, he drafted proposals for prospective customers, oversaw the operation of other sales individuals, and was significantly involved in the solicitation of business in his own right. As a result, he has knowledge of pivotal competitive information even though, perhaps, not in a written format. It is clear, based on the breach of his fiduciary duties to plaintiffs regarding the West Coast operation, that he is not adverse to misusing the property or information of another to advance his goals. Indeed, if he is not subject to some type of court imposed restraint, he is likely to enhance his position at the expense of plaintiffs utilizing information which "'would be unknown [*13] [to him] . . . but for information obtained during his prior employment.'"

*Panther Sys. II, LTD. v. Panther Computer Sys., Inc., 783 F. Supp. 53, 66 (E.D.N.Y. 1991)* (quoting *Abraham Zion Corp. v. LeBow, 593 F. Supp. 551, 569 (S.D.N.Y. 1984), aff'd, 761 F.2d 93 (2d Cir. 1985))*. The actual or likely use of such a former employer's confidential customer information, and the resulting possible loss of customers, constitutes irreparable harm. *Churchill Communications Corp. v. Demyanovich, 668 F. Supp. 207, 214 (S.D.N.Y. 1987)* ("With the knowledge he possesses regarding these customers' electronic mail volume and product requirements, as well as the price structures that had been worked out between them and Churchill, CEL could easily undercut Churchill in price and steadily deplete its entire customer base. Such a possibility is sufficient to establish that, absent injunctive relief, Churchill stands to suffer irreparable harm" (citation omitted)); *Ecolab, Inc. v. K.P. Laundry Mach. Inc., 656 F. Supp. 894, 899-900 (S.D.N.Y. 1987)* ("Ecolab has demonstrated that it will suffer irreparable harm absent preliminary [*14] relief. There is a substantial showing that Ecolab can lose a great deal of business and profits if it is not accorded enforcement of its contractual covenant with its employees. The extent of its loss may be very difficult to measure to the point that Ecolab might not be fairly compensated if left to a damage remedy." (citation omitted)).

The notion that plaintiffs have an adequate remedy at law insofar as they could sue for damages on each occasion that another customer is pirated by Michael Klipper is unsound, for it ignores the principle that "if a plaintiff can secure legal relief only through a multiplicity of lawsuits, plaintiff has suffered irreparable harm sufficient to warrant a preliminary injunction." *Ecolab Inc. v. Paolo, 753 F. Supp. at 1110* (citations omitted). In sum, plaintiffs have satisfied the irreparable injury criterion for the issuance of injunctive relief, given Michael Klipper's former position as President of each of the plaintiff corporations, coupled with his awareness of confidential customer information and his demonstrated propensity to use such information improperly for his benefit. He diverted customers to ICM in California, and there [*15] is reason to believe--given the nature of his activities in that jurisdiction--that he would do the same elsewhere unless enjoined from doing so.

#### B. *Likelihood of Success on the Merits and/or Sufficiently Serious Questions of law Going to the Merits to Make it a Fair Ground for Litigation and With a Balance of Hardship Tipping Decidedly in Movant's Favor*

As mentioned previously, Michael Klipper entered into a written employment agreement with SNCC on March 17, 1995. Therein, he agreed that for a period of five years after his employment with SNCC ceased, he would not have an interest in a business which competed

with SNCC, nor would he sell, or endeavor to sell, any competitive product to a person or entity which was a customer of SNCC during his tenure with that corporation. In seeking the present relief, plaintiffs rely, *inter alia*, on the aforementioned provisions of the March 17, 1995 agreement.

Defendants counter by claiming that the agreement (1) suffers from overbreadth, (2) improperly seeks to protect that which is unprotectable, given the absence of trade secrets or other confidential information, and (3) is unenforceable in any event because Michael Klipper's consent [*16] was procured via duress.

The law of New York regarding the enforceability of restrictive covenants is well synopsized in the following excerpt from *Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.*:

"Restrictive covenants relating to employment are disfavored at law, but such covenants will be enforced if reasonably limited in time and scope, to the extent necessary to protect the employer. . . ."

Additional factors the Court looks to include whether the (1) burden on the employee is reasonable; (2) general public is harmed; and (3) restriction is necessary for employer's protection.

*871 F. Supp. 709, 728 (S.D.N.Y. 1995)* (citations omitted).

The restrictive covenant at issue suffers from overbreadth with respect to its five year limitation and its absence of geographical boundaries. [2] However, under such circumstances, the Court may pare the areas of excess from the covenant to bring it within proper bounds. *See Webcraft Techs. Inc. v. McCaw, 674 F. Supp. 1039, 1047 (S.D.N.Y. 1987)* ("In appropriate circumstances, courts may 'blue pencil' an overbroad restrictive covenant to enforce only its reasonable provisions. [*17] " (citations omitted)). Such paring is not limited solely to deleting clauses which suffer from overbreadth, but also includes reducing contractual time frames and geographical boundaries to bring them within appropriate parameters. As shall be explained shortly, a restriction on the defendants' activities for a period not to exceed one year from the date the present decision is docketed, with the geographical scope limited to the continental United States (absent California), will be sufficient to protect the legitimate interests of plaintiffs, while recognizing society's interest in free competition and not unduly infringing upon the ability of Michael and Robert Klipper to earn a livelihood.

[2] The overbreadth issue is being considered at this preliminary stage of the proceeding because the enforceability of the restrictive covenant bears on the "likelihood of success" criterion for issuance of interim injunctive relief. However, the paring of the covenant, as detailed in the text of this opinion, is made solely for present purposes and is subject to alteration depending upon any additional information adduced at trial.

[*18] The Court has also considered the duress defense proffered by Michael Klipper. In that regard, he carries the burden of proof which he failed to discharge. He was an "employee at will." As such, his employer had the legal right to condition his further employment upon his becoming a signatory to a restrictive covenant. Confronted with that choice, Michael Klipper made a decision to sign, and thereby continue as the President of plaintiff corporations. To the extent that decision was prompted in part by extraneous pressure exerted by his wife, that circumstance is not sufficient to render his contract with SNCC voidable at his election.

However, even if a restrictive covenant--in the present case, as pruned--is geographically and temporally reasonable and is not tainted by duress, it is not necessarily enforceable for the subject matter involved must entail trade secrets or confidential customer information. *See Reed, Roberts Assocs., Inc. v. Strauman, 40 N.Y.2d 303, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976).* However, if all the other prerequisites are shown to be present, the Court should "recognize the legitimate interest an employer has in safeguarding that which [*19] has made his business successful and to protect himself against deliberate surreptitious commercial piracy." *Id., 40 N.Y.2d at 308, 386 N.Y.S.2d at 680.* Here, it has been found that Michael Klipper, as the former chief executive officer of plaintiff corporations, is privy to "confidential customer information" and has shown a propensity to use that information to plaintiffs' detriment. Accordingly, movants have established a likelihood of success on the merits.

Short shrift will be given to the alternate, and now academic issue of whether movants have also established a sufficiently serious question of law going to the merits, with a marked balancing of hardship in its favor. Suffice it to say that there is authority to suggest that the information in this case may legitimately be characterized as a "trade secret." *See Ecolab, Inc. v. Paolo, 753 F. Supp. at 1111-12* (listing five factors New York courts consider in determining whether information constitutes trade secrets, and concluding that price discount, product use and preference information pertaining to various customers constituted trade secrets of Ecolab). *See also Ecolab, Inc. v. K.P. Laundry Mach., Inc., 656 F. Supp. at 900.* [*20]

1996 U.S. Dist. LEXIS 22603, *

4. *Form of Injunction*

Defendants ICM and Robert Klipper clearly worked in conjunction with Michael Klipper and similarly evinced a propensity to prey on plaintiffs' customers. Accordingly, injunctive relief will issue against them as well.

Walter Hermann testified that SNCC's market is now "national" in scope, although the bulk of its operations occur on the East Coast. That testimony stands largely undisputed except that the hearing evidence established that plaintiffs left California when SNCCA closed its doors in mid-1995. Whether that latter circumstance is traceable to defendants' improper conduct has not been established to the Court's satisfaction. Similarly unclear is whether plaintiffs presently harbor plans to reenter that market. Under the circumstances, an extension of injunctive relief into that State would serve no legitimate purpose. Indeed, it may be that ICM's continued activities in California may provide a yardstick against which to measure the concomitant damages allegedly sustained by plaintiffs. For the foregoing reasons, plaintiffs' application to enjoin defendants' activities in California is denied.

However, as to the remainder of the continental United [*21] States, plaintiffs have established grounds for the issuance of a preliminary injunction. Michael Klipper, with the complicity of ICM and Robert Klipper, has violated restrictive covenants of his employment agreement with SNCC, as well as misused his knowledge of plaintiffs' confidential customer information. Each transgression is, independently, an appropriate predicate for injunctive relief. The mere fact that the purloined accounts were sited in California does not preclude protection from being afforded elsewhere, for defendants are likely to engage in similar predatory tactics in any locale in which plaintiffs conduct business.

As testified by Michael Klipper, and developed during the cross-examination of Hermann, the commercial laundry business is broad based. Potential customers for entities such as SNCC and ICM are numerous and readily identifiable. [3] Plaintiffs' share of the market universe is *de minimis*. Accordingly, an injunction which prohibits defendants from improperly taking plaintiffs' accounts

will not unreasonably infringe on the ability of Michael Klipper or Robert Klipper to earn a livelihood.

3 While "potential customers" are readily identifiable, converting a prospect to an account entails, as explained earlier in the text, an arduous and individualized process during which confidential customer information is acquired.

[*22] Based on the foregoing, Michael Klipper, Robert Klipper and ICM, Inc., its officers, agents, servants, and employees, and any person or entity in active concert or participation with any one or more of them who receives actual notice of this order, are enjoined from servicing, selling, or soliciting the sale of any product or service competitive with those of either plaintiff to any "customer" of either plaintiff.

The preliminary injunction provided for in the above paragraph is limited, however, in the following particulars:

1. Its geographical scope is limited to the continental United States, minus California.

2. A "customer" for purpose of this order means a customer of either plaintiff corporation as of August 21, 1995, *i.e.* the date Michael Klipper left the employ of SNCC and SNCCA. Counsel for plaintiffs shall furnish a list to defense counsel forthwith of those individuals and entities which fall within that category.

3. The preliminary injunction shall go into effect upon the filing of a $ 50,000 bond (which bond must be filed in the Clerk's Office within fifteen days of the date this order is docketed) and shall remain in effect for one year thereafter, or until [*23] further order of this Court or another court of competent jurisdiction, whichever first occurs.

The above constitutes the decision and order of this Court.

SO ORDERED.

Dated: Hauppauge, New York

June 17, 1996

DENIS R. HURLEY, U.S.D.J.