UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

EXELIS, INC.,

                        Plaintiff,

v.                                              Civil Action No.
                                                5:12-CV-0858 (GTS/TWD)
SRC, INC.; JOHN F. LoSECCO; ANDREA M.
BELMONT-GWILT; JAMES M.
MARCINKOWSKI; ROBERT A. MARCEAU;
MARK W.WEBB; ANTHONY G. CASALE;
and MICHAEL J. SEAKAN,

                        Defendants.
_____

APPEARANCES:                          OF COUNSEL:

WOLFORD LAW FIRM, LLP                 ELIZABETH ANN WOLFORD, ESQ.
  Counsel for Plaintiff              JAMES A. HOBBS, ESQ.
16 East Main Street                   SARAH SNYDER MERKEL, ESQ.
Rochester, NY 14614

BOND SCHOENECK & KING, PLLC           EDWARD R. CONAN, ESQ.
  Counsel for Defendants             LOUIS ORBACH, ESQ.
One Lincoln Center                    KATE I. REID, ESQ.
Syracuse, NY 13202

GLENN T. SUDDABY, United States District Judge

## MEMORANDUM-DECISION and ORDER

        Currently before the Court, in this action filed by Exelis, Inc. ("Plaintiff") against the

above captioned entity and individuals ("Defendants") asserting claims of misappropriation of

trade secrets, breach of contract and breach of fiduciary duty, is Plaintiff's motion for a

preliminary injunction.  (Dkt. No. 39.)  For the reasons set forth below, Plaintiff's motion is

denied.

I.      **RELEVANT BACKGROUND**

     A.      **Plaintiff's Complaint and Amended Complaint**

Generally, in its Complaint, Plaintiff (a defense contractor) alleges that, starting in approximately November 2011, Defendant SRC (a fellow defense contractor) and one of its employees, Defendant LoSecco, conspired with six employees of Plaintiff (specifically, Defendants Belmont-Gwilt, Marcinkowski, Marceau, Webb, Casale, and Seakan) to engage in harmful and wrongful actions to enable Defendant SRC to unfairly compete with Plaintiff for work from the Air Force Research Laboratory/Rome Research Site ("AFRL"), including work related to (1) the Information Server Security Environment ("ISSE") Cross Domain Development solution, (2) the Research, Enhancement and Development of Enterprise Cross Domain Solutions ("REDE-CDS") contract, (3) a software application known as Security And Workflow Enforcement Services ("SAWES"), (4) a white paper entitled Secure Orchestration for Cross-Domain Enterprise Review and Release ("SORCERER"), and (5) a white paper entitled Secure Cross Domain Orchestration Engine (hereinafter "SCORE").  (Dkt. No. 1, at ¶¶ 1-90.)

Generally, based on these factual allegations, Plaintiff's Complaint asserts the following eight claims against Defendants: (1) a claim of misappropriation of trade secrets against all Defendants; (2) a claim of breach of contract against the individual Defendants, arising from "Confidentiality and Proprietary Rights Agreements" executed on or about July 5, 2005; (3) a claim of breach of contract against Defendant Webb, arising from a "ITT Advanced Engineering & Sciences Letter of Understanding" executed on or about July 8, 2010; (4) a claim of breach of fiduciary duty against Defendants Belmont-Gwilt, Marcinkowski, Webb, Marceau, Casale and

Seakan; (5) a claim of tortious interference with contract against all Defendants; (6) a claim of aiding and abetting a breach of fiduciary duty against all Defendants; (7) a claim of conversion against all Defendants; and (8) a claim of unjust enrichment against all Defendants. (*Id*. at ¶¶ 91-133.)

Familiarity with the particular claims, and particular factual allegations supporting them, in Plaintiff's Complaint is assumed in this Memorandum-Decision and Order, which is intended primarily for review by the parties. (*Id*.)

Plaintiff filed an Amended Complaint in this action on October 31, 2012. (Dkt. No. 72.) Generally, Plaintiff's Amended Complaint differs from its original Complaint in that the Amended Complaint also asserts a claim of unfair competition. (*Compare* Dkt. No. 1 *with* Dkt. No. 31.)

**B.    Parties' Briefing on Plaintiff's Motion**

**1.    Plaintiff's Memorandum of Law in Chief**

Plaintiff filed its motion for a preliminary injunction on October 4, 2012. (Dkt. No. 39.) In its motion, Plaintiff seeks a preliminary injunction that does the following: (1) prevents Defendant SRC from using either directly or indirectly Plaintiff's trade secret, proprietary or confidential information, materials, documents or work product to prepare its response to an upcoming request for a proposal ("RFP") by AFRL regarding REDE-CDS; (2) prevents any of the individual Defendants from being involved directly or indirectly with Defendant SRC's proposal in response to the REDE-CDS RFP; (3) requires any member of Defendant SRC's proposal team for REDE-CDS (including any team members or subcontractors) to certify that they have not been exposed, either directly or indirectly, to any of Plaintiff's bid or proposal

information concerning REDE-CDS; and (4) requires Defendants to return to Plaintiff all documents, information and materials, originals and copies, in electronic or paper format, that have been misappropriated, taken or obtained from Plaintiff related to any of its work or programs, including but not limited to ISSE, SAWES, or SCORE, and including but not limited to its capture strategy and bid information related to REDE-CDS. (Dkt. No. 39, at 2 [Plf.'s Proposed Order to Show Cause]; Dkt. No. 4, at 27-28 [attaching pages "21" and "22" of Plf.'s Memo. of Law].)

Generally, in support of its request, Plaintiff asserts three arguments. First, Plaintiff argues, it is likely to succeed on its claims of unfair competition, breach of fiduciary duty, aiding and abetting a breach fiduciary duty, breach of contract, and misappropriation of trade secrets, based on the evidence adduced by Plaintiff, which includes certain email messages sent by or to Defendants LoSecco, Belmont-Gwilt, and Marcinkowski during the weeks leading up to the departure of Defendants Belmont-Gwilt, and Marcinkowski from Plaintiff's employment. (Dkt. No. 40, at 11-22 [attaching pages "5" to "16" of Plf.'s Memo. of Law].)

Second, Plaintiff argues, it will suffer irreparable harm in the absence of an injunction, because (a) Defendants' dissemination of Plaintiff's stolen information throughout Defendant SRC, and its integration into Defendant SRC's own documents and information, threatens Plaintiff with the permanent loss of trade secrets and other confidential information, which is causing Plaintiff irreparable harm, (b) a finding of irreparable harm is buttressed by the fact that, in the "Confidentiality and Proprietary Rights Agreements" that they signed, the individual Defendants agreed that injunctive relief is the only remedy for their wrongdoing, (c) Plaintiff did not unduly delay in bringing this motion, and (d) the scope and form of the relief requested is necessary. (Dkt. No. 40, at 23-29 [attaching pages "17" to "23" of Plf.'s Memo. of Law].)

Third, Plaintiff argues, the balance of hardships and the public interest weigh in favor of granting injunctive relief. (Dkt. No. 40, at 29-30 [attaching pages "23" and "24" of Plf.'s Memo. of Law].)

### 2.     Defendants' Opposition Memorandum of Law

Generally, in response to Plaintiff's motion, Defendants assert the following four arguments. First, Defendants argue, Plaintiff cannot demonstrate a likelihood of irreparable harm because (a) irreparable harm must be proven and cannot be "presumed," (b) the bar for proving irreparable harm is even higher where, as here, the injunction would affect a government procurement, (c) there is no irreparable harm because there is only a single contract at issue and the damages are quantifiable, (d) there is no irreparable harm because the Government's procurement process has its own remedies for unfair competition, (e) Plaintiff's delay also negates any serious claim of imminent irreparable harm, and (f) no "contract" can absolve Plaintiff of its burden to prove that imminent and irreparable harm will befall Plaintiff unless Defendant SRC and the individual Defendants are prohibited from preparing and submitting their REDE-CDS proposal to AFRL. (*See generally* Dkt. No. 46, at 8-18 [attaching pages "5" to "15" of Defs.' Opp'n Memo. of Law].)

Second, Defendants argue, Plaintiff has failed to demonstrate a likelihood of success on the merits because (a) Plaintiff must be held to the highest standard of proof (given the mandatory injunction it seeks), (b) Plaintiff has failed to identify what its "trade secret" is, (c) Plaintiff cannot claim "trade secret" protection for nascent REDE-CDS "capture" (i.e., marketing) strategies, (d) Plaintiff does not, and cannot, claim "trade secret" protection for government off-the-shelf technology, and (e) Plaintiff has failed to show a likelihood of success on the merits, because Plaintiff has not shown, and cannot show, that Defendants used Plaintiff's

proprietary information or trade secrets in connection with Defendant SRC's REDE-CDS proposal.  (*Id.* 18-24 [attaching pages "15" to "21" of Defs.' Opp'n Memo. of Law].)

Third, Defendants argue, even if the Court were called upon to balance the likely hardships, the balance tips overwhelmingly in favor of Defendants.  (*Id.* 24-25 [attaching pages "21" and "22" of Defs.' Opp'n Memo. of Law].)

Fourth, Defendants argue, Plaintiff's preliminary injunction should be denied, because (1) the Court must consider the impact of requested injunctive relief on the public interest, and (2) a preliminary injunction would disserve the public interest in a robust national security and in vigorous competition for military and national security contracts.  (*Id.* 25-28 [attaching pages "22" to "25" of Defs.' Opp'n Memo. of Law].)

### 3.     Plaintiff's Supplemental Memorandum of Law

At the conclusion of the hearing on Plaintiff's motion, the Court granted the parties leave to file post-hearing supplemental memoranda of law on the issue of irreparable harm.  (Dkt. No. 67, at 498-99, 501, 503-05 [Hrg. Tr.].)

Generally, in its supplemental memorandum of law, Plaintiff argues that, absent a preliminary injunction, it will suffer irreparable harm for the following four reasons.[1]  First, Plaintiff argues, the Court should find that Defendants have stolen Plaintiff's confidential information or trade secrets, based on (a) the adverse inference that should be drawn (based on the destruction of evidence by Defendants Belmont-Gwilt and Marcinkowski) that Defendants took and shared Plaintiff's trade secret information with Defendant SRC, (b) the fact that, based

---

[1]     At the conclusion of the preliminary injunction hearing, Plaintiff asserted essentially the same four arguments, albeit in a different order and with different level of specificity.  (Dkt. No. 67, at 458-75, 494-501 [Oral Argument of Plf.'s Counsel].)

on the evidence adduced thus far, it is clear that Defendants Belmont-Gwilt and Marcinkowski

shared Plaintiff's trade secret information with Defendant LoSecco (specifically, the Capture

Plan, Milestone Review, SCORE technical proposal, and AFRL's confidential response to the

SCORE technical proposal), and (c) the fact that, under the circumstances (including Defendant

Marcinkowski's service on the SRC proposal team for REDE-CDS), the disclosure of trade

secret information is inevitable, absent a preliminary injunction.  (Dkt. No. 64, at 9-17 [attaching

pages "3" through "11" of Plf.'s Suppl. Memo. of Law].)

       Second, Plaintiff argues, the Court should find that Defendants have impaired Plaintiff's

right to compete in a fair competitive bidding process for a government contract, causing

Plaintiff irreparable harm, because (a) the right to a fair bidding process is non-economic in

nature, (b) even if the right were economic in nature, Plaintiff would have difficulty proving that,

but for the wrongful conduct, it would have received the bid, (c) Plaintiff's status as an

incumbent contractor exacerbates the irreparable harm it would suffer, and (d) Plaintiff's prior

notice to the AFRL Contracting Officer of potential violations of the Procurement Integrity Act

("PIA") is not intended to adjudicate and provide a remedy to Exelis for the tortious conduct of

SRC and the other Defendants.  (*Id*. at 17-20 [attaching pages "11" through "14" of Plf.'s Suppl.

Memo. of Law].)

       Third, Plaintiff argues, the Court should find that the loss of the REDE-CDS contract

would cause irreparable harm to Plaintiff because it would cause Plaintiff to lose (a) the

reputation and goodwill that it enjoys with AFRL and other government agencies, and (b) related

ISSE work that is vital to its Rome office.  (*Id*. at 20-21 [attaching pages "14" and "15" of Plf.'s

Suppl. Memo. of Law].)

Fourth, Plaintiff argues, the Court should find that the loss of the REDE-CDS contract would cause irreparable harm to Plaintiff's Rome office because, next year, the REDE-CDS contract and related ISSE work would constitute approximately 60% of the revenue of that office. (*Id*. at 21 [attaching page "15" of Plf.'s Suppl. Memo. of Law].)

### 4.    Defendants' Supplemental Memorandum of Law

Generally, in their supplemental memorandum of law, Defendants argue, inter alia,[2] that Plaintiff has not shown irreparable harm for six reasons.[3]  First, Defendants argue, only a potential exists (rather than a likelihood) that Plaintiff may not ultimately win the REDE-CDS contract; and, in any event, any such harm could be compensated through money damages.  (Dkt. No. 65, at 8-9 [attaching pages "1" and "2" of Defs.' Suppl. Memo. of Law].)

Second, Defendants argue, Plaintiff's argument that it will lose the opportunity to fairly compete for the REDE-CDS contract is insufficient to show irreparable harm, because (1) several cases have rejected that theory of irreparable harm for good reason (e.g., the fact that the theory would confer upon the losing party an automatic right to injunctive relief, the fact that the theory would substantially interfere with the provision of government services, etc.), (2) the cases that have accepted such a theory are distinguishable from the case before the Court (e.g., involving post-bid protests against the United States which do not permit the recovery of lost

_____

[2]       Defendants also assert arguments regarding the second prong of the preliminary-injunction standard (i.e., whether Plaintiff has shown either a likelihood of success on the merits, or a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping decidedly in its favor).  (Dkt. No. 65, at 20-22 [attaching pages "13" through "15" of Defs.' Suppl. Memo. of Law].)

[3]       At the conclusion of the preliminary injunction hearing, Defendants essentially asserted, inter alia, these six arguments (albeit with less specificity, given the late-blossoming nature of many of Plaintiff's arguments).  (Dkt. No. 67, at 475-93, 501-04 [Oral Argument of Defs.' Counsel].)

profits, involving injunctions of contract performance rather than the submission of bids, etc. ), and (3) no statute limits Plaintiff's potential recovery against Defendant SRC to the costs of bid and proposal preparation should Plaintiff eventually succeed on the merits. (Dkt. No. 65, at 9-13 [attaching pages "2" through "6" of Defs.' Suppl. Memo. of Law].)

Third, Defendants argue, Plaintiff's argument that it will lose the goodwill of its customers is insufficient to show irreparable harm, because (1) Plaintiff has failed to provide supporting evidence for how exactly it might lose goodwill, much less why any such loss could not be compensated with money damages (especially given that the loss of a $50 million contract would be less than one percent of Plaintiff's worldwide yearly sales), and (2) a conclusory allegation that a plaintiff will be harmed by a loss of goodwill is insufficient to show irreparable injury. (Dkt. No. 65, at 13-14 [attaching pages "6" and "7" of Defs.' Suppl. Memo. of Law].)

Fourth, Defendants argue, Plaintiff's argument that it may lose employees, business, or incumbency advantage if it does not win the REDE-CDS contract is insufficient to show irreparable harm, because (1) it offers mere speculation to support its argument that it may lose employees, business or incumbency advantage if it does not win the REDE-CDS contract, (2) even if it has shown that it will suffer such a loss if it does not win the REDE-CDS contract, it has not shown that the absence of an injunction is what will cause such a loss, given that it may lose that contract even with an injunction. (Dkt. No. 65, at 14-15 [attaching pages "7" and "8" of Defs.' Suppl. Memo. of Law].)

Fifth, Defendants argue, Plaintiff's argument that Defendant SRC will use Plaintiff's "trade secrets" in crafting SRC's REDE-CDS proposal to AFRL is insufficient to show irreparable harm, because (1) it does not specify what alleged "trade secrets" it is referencing, (2) in any event, it offers mere speculation to support its argument that Defendant SRC is likely to

use those trade secrets in its proposal, and (3) in any event, it offers mere speculation to support

its argument that, beyond *using* those trade secrets, Defendant SRC will *disseminate* those trade

secrets to anyone, rendering money damages inadequate as a remedy.  (Dkt. No. 65, at 15-16

[attaching pages "8" and "9" of Defs.' Suppl. Memo. of Law].)

       Sixth, Defendants argue, in any event, the fact that Plaintiff would have available to it the

following three avenues for fact-finding (in the event Defendant SRC wins the REDE-CDS

contract) precludes a finding of irreparable harm: (1) the procedure by which a disappointed

bidder may obtain a full briefing from the Department of Defense (including regarding the

overall ranking of all offers), pursuant to the relevant provisions of the federal Competition in

Contracting Act, 10 U.S.C. § 2305(b)(5)(A)-(B), implemented through the corresponding

Federal Acquisition Regulations, 48 C.F.R. § 15.506; (2) the procedure by which Plaintiff may

file a protest with the Government Accountability Office, in which case its counsel will be

entitled to receive, inter alia, the "proposal of the firm which is being considered for award," "all

[of the agency's] evaluation documents," "any other relevant documents," and an automatic stay

of the award decision, pursuant to 4 C.F.R. § 21.3(d) & (e) and 48 C.F.R. § 33.104(b) & (c); and

(3) the discovery mechanisms afforded by the by the Federal Rules of Civil Procedure to

ascertain the content of SRC's proposal.  (Dkt. No. 65, at 16-18 [attaching pages "9" through

"11" of Defs.' Suppl. Memo. of Law].)

## II.    RELEVANT LEGAL STANDARD

       Generally, the issuance of a preliminary injunction pursuant to Fed. R. Civ. P. 65

depends on the movant's demonstration of (1) irreparable harm and (2) either a likelihood of

success on the merits, or a sufficiently serious question as to the merits of the case to make it a

fair ground for litigation and a balance of hardships tipping decidedly in its favor.  *Tom Doherty*

*Assoc., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995).  However, a "movant [must] . . .

meet a higher standard where[] (i) an injunction will alter, rather than maintain, the status quo, or

(ii) an injunction will provide the movant with substantially all the relief sought and that relief

cannot be undone even if the defendant prevails at a trial on the merits."  *Tom Doherty Assoc.,

Inc.*, 60 F.3d at 33-34.  Pursuant to that higher standard, the injunction shall issue "only upon a

clear [or substantial] showing that the moving party is entitled to the relief requested, or where

extreme or very serious damage will result from a denial of preliminary relief."  *Id.* at 34.

Because the parties have demonstrated in the memoranda of law an adequate understanding of

this legal standard, the Court need not, and does not, further elaborate on this legal standard in

this Decision and Order, which is intended primarily for the review of the parties.

## III.    ANALYSIS

### A.    Irreparable Harm

After carefully considering the parties' arguments on this issue, the Court finds that

Plaintiff has not demonstrated that irreparable harm would result if the present motion were not

granted, for the reasons stated by Defendants in their memoranda of law.  (Dkt. No. 40, at 23-29

[attaching pages "17" to "23" of Plf.'s Memo. of Law]; Dkt. No. 65, at 8-18 [attaching pages "1"

through "11" of Defs.' Suppl. Memo. of Law].)  The Court would add only the following

analysis regarding (1) Plaintiff's adverse-inference argument, (2) Plaintiff's prior-disclosure

argument, (3) Plaintiff's inevitable-disclosure argument, (4) Plaintiff's loss-of-business and

employee-layoff argument, and (5) Defendants' affecting-government-procurement argument.

#### 1.    Plaintiff's Adverse-Inference Argument

As explained above in Part I.B.3. of this Decision and Order, in support of its argument

that stealing confidential information or trade secrets constitutes irreparable harm, Plaintiff seeks

an adverse inference due to spoliation of evidence by Defendants Marcinkowski and Belmont-

11

Gwilt. (Dkt. No. 64, at 11-13 [attaching pages "5" through "7" of Plf.'s Suppl. Memo. of Law].) Specifically, Plaintiff seeks an inference that Defendants Marcinkowski and Belmont-Gwilt took and shared Plaintiff's trade secret information with Defendant SRC. (*Id.*)

"Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 457 (2d Cir. 2007) (internal quotation marks omitted). A party seeking sanctions for spoliation of evidence carries the burden of proving the following: (1) that the spoliating party had control over the evidence in question and a duty to preserve it at the time it was destroyed, lost, or significantly altered; (2) that the evidence was destroyed, lost, or significantly altered with a culpable state of mind; and (3) that the evidence was relevant to the moving party's claims or defenses. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).

### a.    Duty to Preserve

Generally, a party has a duty to preserve evidence when it has "notice that the evidence is relevant to litigation, or should have known that the evidence might be relevant to future litigation." *Fujitsi v. Fed. Exp. Corp.,* 247 F.3d 423, 426 (2d Cir. 2001). The duty to preserve extends to "any documents or tangible things ... [as defined by Fed. R. Civ. P. 34(a)] likely to have discoverable information that the disclosing party may use to support its claims or defenses.*" Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (internal quotation marks and citations omitted).

Here, the record establishes that Defendants Belmont-Gwilt and Marcinkowski each acknowledged receipt of a letter dated May 3, 2012, from Plaintiff's counsel reminding them of their obligations under a previously executed Confidentiality Agreement, and requesting written

confirmation that among other things, they have "have not disclosed any confidential, proprietary or trade secret information to SRC, either intentionally or inadvertently." (*See, e.g.,* Dkt. No. 46, Attach. 5 [Ex. A to Decl. of Andrea Belmont-Gwilt dated Oct. 10, 2012]; Dkt. No. 47, Attach. 7 [Ex. A to Decl. of James M. Marcinkowski dated Oct. 10, 2012].) The letter communicated that Exelis is represented by counsel and "is committed to protecting . . . its trade secrets," and that failure to respond with written confirmation as requested will result in Exelis's conclusion that a breach of the Confidentiality Agreement has occurred or will occur. (*Id.*) In closing, the letter stated that it "is sent with a full reservation of any and all rights that ITT Exelis may pursue against you or anyone else acting with you and/or on your behalf, and it is sent without a waiver of the same." (*Id.*)

In addition, the record establishes that both Defendant Marcinkowski and Defendant Belmont-Gwilt received service of this Court's Decision and Order of June 1, 2012, which denied Plaintiff's motion for a temporary restraining order seeking to ensure the maintenance and preservation of evidence, noting its disinclination to prohibit a party from doing something the party is plainly prohibited by law from doing. (Dkt. No. 6.) In that Decision and Order, the Court specifically warned Defendants that any finding "of spoliation of evidence in this action will be followed by the issuance of swift and severe sanctions." (*Id.* at 3 [emphasis removed].)

As a result, the Court finds that Defendants Marcinkowski and Belmont-Gwilt were clearly on notice of their duty to preserve evidence, since at least May 3, 2012.

### b.    Culpability

Prior to 2002, "(t)he law in this circuit (was) not clear on what state of mind" was sufficiently culpable. *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-08 (2d Cir. 2001). At various times, the Second Circuit had required showings that the party intentionally destroyed

evidence, that the party had acted in bad faith, and that the party acted with gross negligence. *Byrnie*, 243 F.3d at 107-08. Acknowledging that its precedents were inconsistent, the Second Circuit concluded that a case-by-case approach was appropriate. *Id*. However, in 2002, the Second Circuit held that even simple negligence was a sufficiently culpable "state of mind." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir.2002); *accord*, *Schwarz v. Fedex Kinko's Office*, No. 08-CV- 6486, 2009 WL 3459217, at *7 (S.D.N.Y. Oct. 27, 2009) ("In analyzing this prong of the spoliation test, courts in this Circuit have determined that a "culpable state of mind" ranges from willful destruction in bad faith to simple negligence.").

Here, Defendants Belmont-Gwilt and Marcinkowski both submitted declarations explaining that, after receiving the above-described letter of May 3, 2012, each destroyed external storage devices that might contain Plaintiff's documents by smashing the devices with a hammer and throwing them away. (Dkt. No. 46, Attach. 5, at ¶¶ 8, 11-13 [Decl. of Belmont-Gwilt]; Dkt. No. 46, Attach. 7, at ¶¶ 7-8 [Decl. of Marcinkowski].) In their declarations, both Defendant Belmont-Gwilt and Defendant Marcinkowski also state that they deleted the contents of their personal email accounts. (Dkt. No. 46, Attach. 5, at ¶ 8 [Decl. of Belmont-Gwilt]; Dkt. No. 46, Attach. 7, at ¶ 8 [Decl. of Marcinkowski].) Defendant Belmont-Gwilt stated that she deleted the contents of her personal email in order to make certain that she did not possess any of Plaintiff's documents. (Dkt. No. 46, Attach. 5, at ¶ 8 [Decl. of Belmont-Gwilt].)

At the preliminary injunction hearing in this matter, Defendant Marcinkowski testified that, after receiving the Court's Decision and Order of June 1, 2012, he located a PDF file regarding Sorcerer evaluation, panicked, and deleted the file. (Dkt. No. 66, at 315-17 [Hrg. Testimony of Marcinkowski].) In response to questions from Plaintiff's counsel, Defendant Marcinkowski admitted that he panicked because he was "afraid that this was going to show that [he] actually did have some Exelis confidential documents[.]" (*Id*.)

14

For these reasons, the Court finds that, at the very least, Defendants Belmont-Gwilt and Marcinkowski were negligent in their destruction of thumb drives and email messages, which is all that is required to establish culpability.  Indeed, the Court finds that the destruction of the evidence in question was willful and in bad faith.

### c.    Relevance

Typically, sanctions are not warranted merely because information is lost; the evidence must be shown to have been "relevant."  *See Residential Funding Corp.*, 306 F.3d at 107. "[W]hen the destruction is negligent, relevance must be proven by the party seeking sanctions." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004).  It is important to note that "relevant in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence."  *Residential Funding Corp.*, 306 F.3d at 108-09 (internal quotation marks omitted).  "Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction."  *Id.* (internal quotation marks omitted).

However, "[i]n certain cases where the spoliator acts with at least gross negligence, . . . relevance as required for sanctions (modest or severe) may be presumed."  *Kratsov v. Town of Greenburgh*, 10-CV-3142, 2012 WL 2719663, at *6 (S.D.N.Y. July 9, 2012).  Similarly, "[w]hen evidence is destroyed in bad faith (i.e., intentionally or willfully), that fact alone is sufficient to demonstrate relevance."  *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004).

Here, because the Court has found above that the destruction of evidence by Defendants Belmont-Gwilt and Marcinkowski was willful and in bad faith, Plaintiff need not prove

relevance.  This fact is fortunate for Plaintiff because, with regard to the smashing of USB

drives, Plaintiff would have at least some difficulty persuading the Court that the act of

spoliation was relevant to Plaintiff's claim that Defendants Belmont-Gwilt and Marcinkowski

transferred confidential, proprietary or trade secret information to Defendant SRC: simply stated,

Plaintiff has not sufficiently established how the USB drives would have revealed such a

transfer.

### d.    Choice of Sanctions

Courts are vested with wide discretion in determining an appropriate sanction.  *See Reilly*

*v. Nat-West Markets Group, Inc.*, 181 F.3d 253, 267 (2d Cir. 1999).  In doing so, the Court

should consider whether the sanction "(1) deter[s] parties from engaging in spoliation, (2)

place[s] the risk of an erroneous judgment on the party who wrongfully created the risk, and (3)

restore[s] the prejudiced party to the same position he would have been in absent the wrongful

destruction of evidence by the opposing party."  *West v. Goodyear Tire & Rubber Co.*, 167 F.3d

776, 779 (2d Cir. 1999) (internal quotation marks omitted).

Of course, the spoliation of evidence can support an inference that the evidence would

have been unfavorable to the party responsible for its destruction.  *See Kronisch v. United States*,

150 F.3d 112, 126 (2d Cir.1998).  However, a sanction in the form of an adverse inference is

extreme and should not be imposed lightly, especially because, "[i]n practice, an adverse

inference instruction often ends litigation–it is too difficult a hurdle for the spoliator to

overcome."  *Curcio v. Roosevelt Union Free Sch. Dist.*, 10-CV-5612, 2012 WL 3236645, at *3

(E.D.N.Y. Aug. 10, 2012) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 219

[S.D.N.Y. 2003]).

After carefully considering the matter, the Court declines to impose this sanction at this stage of the proceeding.  Chief among the Court's concerns is the fact that the adverse inference would effectively interfere with Defendant SRC's bid and possibly end–at a relatively early stage–the bulk of the litigation, under circumstances in which money damages may well compensate Plaintiff for any harm.[4]  Rather, the Court finds that the sanction that is appropriate is an adverse-inference instruction to a jury, if and when this case is presented to a jury.  At that time, the Court will consider against which parties the adverse inference should be drawn, as well as the possibility of additional sanctions, such as an Order precluding Defendants from submitting certain evidence, asserting certain defenses, and/or imposing monetary sanctions (including attorney's fees and costs).

### 2.    Plaintiff's Prior-Disclosure Argument

As explained above in Part I.B.3. of this Decision and Order, also in support of its argument that stealing confidential information or trade secrets constitutes irreparable harm, Plaintiff asserts that, based on the evidence adduced thus far, it is clear that Defendants Belmont-Gwilt and Marcinkowski shared Plaintiff's trade secrets with Defendant LoSecco (specifically, the Capture Plan, Milestone Review, SCORE technical proposal, and AFRL's

---

[4]    The Court notes that, in its Supplemental Memorandum of Law, Plaintiff cites no cases in which an adverse inference due to spoliation was used in granting a motion for a preliminary injunction or temporary restraining order.  (*See generally* Dkt. No. 64.)  Furthermore, while the Court's legal research on the issue has by no means been exhaustive, the Court has been unable to find any such cases.  Indeed, the only on-point cases found by the Court are three cases refusing (albeit on grounds not applicable to the current case) to employ an adverse inference in support of a motion for a preliminary injunction.  *Oce N. Am., Inc. v. Brazeau*, 09-CV-2381, 2010 WL 5033310, at *6 (N.D. Ill. March 18, 2010); *Guardian Alarm Co. of Michigan v. Prough*, 06-CV-13721, 2006 WL 2990503, at *9-10 (E.D. Mich. Oct. 19, 2006); *Friends For All Children, Inc. v. Lockheed Aircraft Corp.*, 587 F. Supp. 180, 188-91 (D. D.C. 1984).

confidential response to the SCORE technical proposal).  (Dkt. No. 64, at 13-14 [attaching pages "7" and "8" of Plf.'s Suppl. Memo. of Law].)

For the sake of brevity, the Court will set aside the issue of whether Defendants Belmont-Gwilt and Marcinkowski have persuasively testified that they did not disclose at least certain portions of the information in question, and whether Defendant LoSecco has persuasively testified that he did not receive at least certain portions of the information in question.[5]  The Court will also set aside the issue of whether the information constitutes trade secrets or merely confidential or proprietary information.[6]

_____

[5]       (*Compare* Dkt. No. 46, Attach. 5, at ¶ 9 [Decl. of Belmont-Gwilt, denying disclosure of the contents of, inter alia, Plaintiff's capture plan and white paper]; Dkt. No. 46, Attach. 7, at ¶¶ 6-7, 12 [Decl. of Marcinkowski, denying disclosure of the contents of, inter alia, Plaintiff's capture plan and white paper]; Dkt. No. 46, Attach. 2, at ¶ 14 [Decl. of LoSecco, denying receipt of "any Exelis documents regarding REDE-CDS," or "any details regarding Exelis' REDE CDS capture effort"] *with* Dkt. No. 58, at 138-42, 154-57 [Hrg. Testimony of Belmont-Gwilt, admitting that disclosed to Def. LoSecco certain information regarding the "OH4" pricing/profit element of Plaintiff's capture plan, and that she communicated with Def. LoSecco about the white paper]; Dkt. No. 66, at 233-34, 236, 239-40, 298-302, 313-14, 327 [Hrg. Testimony of Marcinkowski, indicating that he knew the cost-estimate proposed in Plaintiff's white paper when he provided guidance to Def. LoSecco as to what the cost-estimate SRC should propose in its white paper, and he shared with Def. LoSecco the Tresys-partnering element of Plaintiff's capture plan]; Dkt. No. 66, at 375-77, 384-85, 401, 434 [Hrg. Testimony of LoSecco, admitting that he learned from Def. Belont-Gwilt certain information regarding the "OH4" pricing/profit element of Plaintiff's capture plan, and that he learned from Def. Marcinkowski the Tresys-partnering element of Plaintiff's capture plan].)

[6]       *See Marietta Corp. v Fairhurst*, 754 N.Y.S.2d 62, 67 (N.Y. App. Div., 3d Dept. 2003) ("[I]n our view, Supreme Court adopted an overly expansive definition of 'trade secret' so as to encompass *nearly* all confidential business documents . . . .") [emphasis added]; *Lansing Overhaul & Repair, Inc. v. Fross*, 86-CV-0867, 1988 WL 12582, at *3 (W.D.N.Y. Feb. 19, 1988) ("Not only are these drawings not trade secrets, they are not *even* properly categorized as confidential . . . .") [emphasis added]; *cf. U.S. v. Mahaffy*, 693 F.3d 113, 135 (2d Cir. 2012) ("Information may qualify as confidential . . . [for purposes of the mail fraud and wire fraud statutes] even if it does not constitute a trade secret."); *Hasbrouck v. BankAmerica Housing Servs.*, 187 F.R.D. 453, 455 (N.D.N.Y. 1999) (Hurd, M.J.) ("The information sought in discovery here is private, confidential information and not a trade secret or commercial information.").

18

The more important issue is whether, on a motion for a preliminary injunction, a showing that a competitor has misappropriated the movant's trade secrets constitutes an automatic showing of irreparable harm. After carefully reviewing the cases cited by the parties, the Court answers this question in the negative. Rather, the Second Circuit has explained, at most a rebuttable presumption arises; and it does so only if "there is a danger that, unless enjoined, [the] misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118-19 (2d Cir. 2009); *accord, IDG USA, LLC v. Schupp*, 416 Fed. App'x 86, 88 (2d Cir. 2011) ("Threatened *dissemination* of trade secrets generally creates a *presumption* of irreparable harm.") [emphasis added].[7]

Following the Second Circuit's issuance of *Faiveley*, several district courts have rejected a movant's argument of irreparable harm on the ground that, while sufficient evidence had been adduced that a competitor may *use* the trade secrets, sufficient evidence was not adduced that the competitor will *disseminate* the trade secrets to a wider audience. *See, e.g., Liberty Power Corp., LLC v. Katz*, 10-CV-1938, 2011 WL 256216, at *5-11 (E.D.N.Y. Jan. 26, 2011); *Sasqua Group, Inc. v. Courtney*, 10-CV-0528, 2010 WL 3613855, at *12 (E.D.N.Y. Aug. 2, 2010);

---

[7]       In explaining this point of law, the Second Circuit expressly rejected various district courts' reading of its decision in *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir.1984), as meaning that "a presumption of irreparable harm automatically arises upon the determination that a trade secret has been misappropriated." *Faiveley*, 559 F.3d at 118. The Court notes that the district court cases relied on by Plaintiff in support of its position (that a showing of irreparable harm is automatic) rely on a misreading of *FMC Corp*. and/or acknowledge that irreparable is merely presumed. *See Ayco Co., L.P. v. Frisch*, 795 F. Supp.2d 193, 205 (N.D.N.Y. 2011) (citing case that employs misreading of *FMC Corp.*); *Innoviant Pharmacy, Inc. v. Morganstern*, 390 F. Supp.2d 179, 189 (N.D.N.Y. 2005) (citing case that employs misreading of *FMC Corp*. and, in any event, stating merely that irreparable harm is presumed); *accord, Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp.2d 525, 532-33 (S.D.N.Y. 2004).

*Passlogix, Inc. v. 2FA Technology, LLC*, 08-CV-10986, 2010 WL 2505628, at *8-10 (S.D.N.Y. June 21, 2010)

    Such is the case here.  It is difficult to imagine how Defendant SRC's submission of a bid to AFRL that uses Plaintiff's trade secrets–as actionable and indeed as deplorable as that may be–can be characterized as a "dissemination [of those trade secrets] to a wider audience" under *Faiveley*, given the lack of any evidence (or even argument) that the trade secrets contained in the bid will at some point be made public.  *Cf. Geo Group, Inc. v. Cmnty. First Servs., Inc.*, 11-CV-1711, 2012 WL 1077846, at *5 (E.D.N.Y. March 30, 2012) ("[T]he bid proposal itself is protectable as a trade secret."); *Tao of Sys. Integration, Inc. v. Analytical*, 299 F. Supp.2d 565, 577 (E.D. Va. 2004) (finding that competitor's confidential proposal for government contract constituted protectable trade secret).[8]

### 3.    Plaintiff's Inevitable-Disclosure Argument

    As explained above in Part I.B.3. of this Decision and Order, also in support of its argument that stealing confidential information or trade secrets constitutes irreparable harm, Plaintiff asserts that, under the circumstances (including Defendant Marcinkowski's service on the SRC proposal team for REDE-CDS), the disclosure of trade secret information is inevitable, absent a preliminary injunction.  (Dkt. No. 64, at 14-17 [attaching pages "8" through "11" of Plf.'s Suppl. Memo. of Law].)

---

    [8]    In any event, the Court cannot help but note that, even if a certain portion of the trade secrets contained in such a bid would be made "public" if the bid were successful (e.g., due to public interest in the disclosure of awarded contract information), that portion of the trade secrets would have been made public anyway if Plaintiff used it in a bid that was successful. Such a fact would appear to weaken the causal link between Defendant SRC's use of the trade secrets and the harm that would befall Plaintiff, for purposes of a preliminary injunction analysis.

"[T]he inevitable disclosure doctrine treads an exceedingly narrow path through judicially disfavored territory." *EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 310 (S.D.N.Y. 1999). "If it is not to abrogate the requirement of a clear showing of actual and imminent irreparable harm, it must be applied with great care." *Am. Airlines, Inc. v. Imhof*, 620 F. Supp.2d 574, 582 (S.D.N.Y. 2009) (internal quotation marks omitted). This obligation demands the consideration of numerous factors, including whether the employee accused of theft could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets or confidential information of his former employer. *EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d at 310; *accord, PSC Inc. v. Reiss*, 111 F. Supp.2d 252, 257-59 (S.D.N.Y. 2000); *Marietta Corp. v. Fairhurst*, 754 N.Y.S.2d 62, 66 (N.Y. App. Div., 3d Dept. 2003).

In its Supplemental Memorandum of Law, Plaintiff citess no record evidence establishing that Defendants Marcinkowski or LoSecco (or any of the other Defendants) *must* use Plaintiff's trade secrets or confidential information in order to perform their duties with regard to Defendant SRC's REDE-CDS proposal. To the contrary, for example, Plaintiff's ISSE Guard Program Manager (Dave Gray) testified that the request for proposal that is expected to be issued by AFRL is not expected to require to include the orchestration solution contained in Plaintiff's white paper: rather, there are a variety of other orchestration solutions that could be used. (Dkt. No. 58, at 194, 196 [Hrg. Testimony of Gray].) Moreover, Defendant Marcinkowski testified that, in his role on SRC capture team, he has no role with regard to pricing the REDE-CDS proposal (a subject he learned at least something about while employed by Plaintiff). (Dkt. No. 66, at 325-26 [Hrg. Testimony of Marcinkowski].)

Under the circumstances, the Court finds that Plaintiff has not met its burden with regard to the inevitable-disclosure doctrine. *See First Health Group Corp. v. Nat'l Prescription*, 155 F.

Supp.2d 194, 236 (M.D. Pa. 2001) ("It is plaintiff's burden to assert what trade secrets its former

employee would inevitably disclose, and why disclosure is inevitable. . . .  The question this

Court must answer is whether, as officer-in-charge of PACE under NPA, Norton could not

operate or function without relying on [Plaintiff's] alleged trade secrets. . . .  There is no evidence

that Norton would inevitably disclose and/or use First Health's salary structure if and when he

becomes officer-in-charge of PACE. While there is a possibility that he would disclose or use it,

such misappropriation is by no means inevitable. A preliminary injunction should not issue

where harm is speculative.").

### 4.     Plaintiff's Loss-of-Business and Employee-Layoff Argument

As explained above in Part I.B.3. of this Decision and Order, Plaintiff argues that the loss

of the REDE-CDS contract would cause irreparable harm to Plaintiff, because (1) it would cause

Plaintiff to lose, inter alia, related ISSE work that is vital to its Rome office, and (2) next year,

the REDE-CDS contract and related ISSE work would constitute approximately 60% of the

revenue of Plaintiff's Rome office.   (Dkt. No. 64, at 20-21 [attaching pages "14" and "15" of

Plf.'s Suppl. Memo. of Law].)  Plaintiff's loss-of-business argument is related to its loss-of-

employee argument, advanced in its post-hearing oral argument.  (Dkt. No. 67, at 469-70 [Oral

Argument of Plf.'s Counsel].)

At the hearing conducted on Plaintiff's motion, Plaintiff adduced evidence suggesting

that Plaintiff will lose approximately 50-60 percent of its business in its Rome office next year if

Plaintiff does not win the REDE-CDS contract.  (Dkt. No. 58, at 56, 85, 174 [Hrg. Testimony of

Payne, stating that "[t]he cross domain work embodied by the ISSE Guard program and then the

related technologies is probably 60 percent of the work in Rome," and that the contract would

constitute or relate to "more than half of our business" next year].)[9]

Plaintiff also adduced evidence suggesting that, of the 128 employees that there are in Plaintiff's Rome office, half of those employees would probably be "affected," and about 20 to 30 employees would probably be laid off, if Plaintiff does not win the REDE-CDS contract. (Dkt. No. 58, at 75, 84-85 [Hrg. Testimony of Payne, stating that "45 or so directed employees on the ISSE contract" would be "affected" by the loss of the contract, "[a] number of employees" who work on "related technologies" would be "affected," and "the support people that get paid for . . . the facility management contracts, finance" would also be "affected"]; Dkt. No. 58, at 174 [Hrg. Testimony of Gray, stating that "a good number of people, say twenty or thirty people, would probably end up selling houses, moving out of state, looking for other employment, looking for whole career paths" if Plaintiff does not win the contract].)

Finally, the hearing evidence showed that Plaintiff has approximately 20,000 employees, offices in at least the United States, Europe and the Middle East, and revenues of more than five billion dollars per year.  (*See* Dkt. No. 58, at 73-76, 83-84 [Hrg. Testimony of Payne]; Dkt. No. 67, at 469 [Oral Argument of Plf.'s Counsel].)

For the sake of brevity, the Court will set aside whether the loss of a $50-million-dollar contract, and/or the laying off of 20-30 employees, in an 128-person office of a 20,000-employee, world-wide, multi-billion-dollar corporation requires a finding of irreparable harm. More important is the fact that Plaintiff's argument ignores that (1) even with the preliminary injunction it seeks, it enjoys only a possibility of winning the contract in question, and (2) even if

---

[9]    (*See also* Dkt. No. 38, Attach. 2, at ¶ 9, 10, 12 [Decl. of Snell, stating that "[t]he primary work performed at [Plaintiff's] Rome Office relates to . . . ISSE . . . . The primary customer of [Plaintiff's] Rome Office is . . . AFRL . . . .  The REDE-CDS contract will include the continuing evolution of work currently performed under the ISSE . . . contract . . . .").

it loses the contract due to Defendant SRC's use of Plaintiff's trade secrets, an accompanying cause of any layoffs that Plaintiff may experience would appear to be the poor pre-contract financial condition of its Rome office (which caused that office to depend on a speculative contract for its financial solvency).  (*See, e.g.,* Dkt. No. 66, at 429-30 [Hrg. Testimony of LoSecco, stating that it appears there will be four to eight other companies bidding on the contract]; Dkt. No. 67, at 482 [Oral Argument of Defs.' Counsel, clarifying that only three of those bidders are expected to be prime bidders]; Dkt. No. 58, at 174 [Hrg. Testimony of Gray, acknowledging that "[t]he job market in the [Department of Defense] is on a downswing now."]; Dkt. No. 58, at 140 [Hrg. Testimony of Belmont-Gwilt, describing the Rome office's pre-existing financial troubles].)  Under such circumstances, the Court finds that Plaintiff has not established either the need for a preliminary injunction, or a causal connection between any use of the trade secrets and/or confidential information by Defendant SRC and the irreparable injury that Plaintiff describes.[10]

---

[10]     *See also Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981-82 (9th Cir. 2011) ("[T]the district court did not abuse its discretion in concluding that Perfect 10 failed to establish that Google's operations would cause it irreparable harm. While being forced into bankruptcy qualifies as a form of irreparable harm, . . . , Perfect 10 has not established that the requested injunction would forestall that fate. To begin with, Perfect 10 has not alleged that it was ever in sound financial shape. . . .  In sum, Perfect 10 has not shown a sufficient causal connection between irreparable harm to Perfect 10's business and Google's operation of its search engine."); *Graceway Pharm., LLC v. Perrigo Co.*, 722 F. Supp.2d 566, 579 (D.N.J. 2010) ("Graceway puts forward an affidavit stating that 'approximately 130 people are being let go.' . . .  Nycomed argues that these changes must have been planned in light of the expiration of Graceway's patents . . . .  Graceway responds that its business model planned on only lawful entry into the market by competitors until the '944 Patent expired in 2011 . . . [, and that these] layoffs arise because that plan was compromised.  Nycomed's inference in regard to lost jobs is not without documentary support. A 2009 Moody's publication downgraded Graceway's debt rating in light of the expected launch of generic competition, expected as early as February 2010, which corresponds exactly with what happened here. Moreover, given the limited time prior to expiration of the ' 944 Patent, when generic competition against Aldara-like copies would be expected, lost market share, sales, revenue, and jobs in the intermediate term would have been expected. Given these facts and that Graceway's price for Aldara is now higher than before the alleged infringement, the Court cannot conclude that the loss of these jobs is primarily caused by Nycomed's alleged infringement.").

### 5.     Defendants' Affecting-Government-Procurement Argument

Having referenced or described the grounds on which this Decision and Order is based, it is appropriate to briefly describe a ground on which it is *not* based.  More specifically, the Court respectfully rejects Defendants' argument that Plaintiff must make a "stronger showing" of irreparable harm than usual because the injunction would "affect a government procurement." (Dkt. No. 46, at 11-12 [attaching pages "8" and "9" of Defs.' Opp'n Memo. of Law].)  Based on the case cited by Defendants, such a rule appears to apply only where bids have already been submitted, and the issue before the court regards what to do with those bids.  *Smith & Wesson, Division of Bangor Punta Corp. v. United States*, 782 F.2d 1074, 1081 (1st Cir. 1986) (regarding injunction seeking to enjoin the government from further proceeding with a procurement program until the plaintiff is reinstated as a contract candidate) (citing two cases involving injunctions seeking relief after bids were submitted *and contract awarded*).

For all of these reasons, the Court rejects Plaintiff's argument that failure to grant its motion will result in irreparable harm.

### B.     Likelihood of Success on the Merits, or Sufficiently Serious Questions Going to the Merits and Balance of Hardships

Because the Court has concluded that Plaintiff has failed to demonstrate irreparable harm, the Court need not linger on the issue of whether Plaintiff has demonstrated either (1) a likelihood of success on the merits or (2) a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping decidedly in its favor.  Rather, under the circumstances, the Court finds it is appropriate to make three brief points.  Of course, these observations are dicta given the dispositive nature of the Court's ruling in Part III.A. of this Decision and Order.

First, the Court finds that, based on the evidence adduced on its motion, Plaintiff has demonstrated a likelihood of success on the merits for the reasons stated in its memorandum of law.  (Dkt. No. 40, at 11-22 [attaching pages "5" to "16" of Plf.'s Memo. of Law].).[11]

Second, the Court respectfully rejects Defendants' characterization of the first two forms of injunctive relief requested by Plaintiff (i.e., an Order that [1] prevents Defendant SRC from using either directly or indirectly Plaintiff's trade secret, proprietary or confidential information, materials, documents or work product to prepare its response to an upcoming RFP by AFRL regarding REDE-CDS, and that [2] prevents any of the individual Defendants from being involved directly or indirectly with Defendant SRC's proposal in response to the REDE-CDS RFP) as *mandatory* in nature in that it requires the taking of a positive act (e.g., the removal of Defendant Marcinkowski from his  existing REDE-CDS team position), thus requiring a showing of a *clear or substantial* likelihood of success on the merits.  (Dkt. No. 46, at 18-20 [attaching pages "15" through "17" of Defs.' Opp'n Memo. of Law]; Dkt. No. 67, at 488-89 [Oral Argument of Defs.' Counsel].)

Rather, the first two forms of injunctive relief request an Order that merely *prevents* Defendants from submitting a bid that contains certain information or was partially prepared by

---

[11]    The Court notes that Plaintiff's claim of unfair competition was not pending in this action when Plaintiff filed its motion for a preliminary injunction.  (*See* Dkt. Nos. 1, 39, 72.) Ordinarily, that fact would preclude a movant from seeking injunctive relief with regard to that claim.  *See Murray v. Wissman*, 05-CV-1186, 2008 WL 4682450, at *2 (N.D.N.Y. Oct. 20, 2008) (Suddaby, J.) (citing cases); *Gordon v. Watts*, 06-CV-0450, 2008 WL 717689, at *1 (N.D.N.Y. Mar. 17, 2008) (Kahn, J.); *Williams v. Goord*, 05-CV-247, 2007 WL 703202, at *2 (N.D.N.Y. Mar. 2, 2007) (Scullin, J.).  However, here, Defendants had fair notice of that claim, due to the fact that it was contained in a proposed Amended Complaint pending when Defendants filed their opposition memorandum of law.  (Dkt. No. 38.)  Moreover, Defendants do not argue that such preclusion applies, instead addressing the merits of that claim.  (*See, e.g.,* Dkt. No. 46, at 23-24 [attaching pages "20" and "21" of Defs.' Opp'n Memo. of Law, arguing that Plaintiff has failed to show a likelihood of success on its claim of unfair competition].)

certain individuals; Defendants would be free to prepare and submit a bid that did not possess

such characteristics.  Simply stated, here, the status quo is properly characterized as the absence

of the submission of an offending bid, not the process of preparing of (and possession of an

absolute right to submit) an offending bid.[12]  Any testimony elicited by defense counsel from

Plaintiff's ISSE Guard Program Manager (David Gray) suggesting that the relief requested by

the injunction is to prevent Plaintiff's REDE-CDS team from submitting *any* bid is unpersuasive,

because it contradicts, and infringes on a legal conclusion to be drawn by the Court from, the

face of Plaintiff's motion.  (Dkt. No. 58, at 192 [Hrg. Testimony of Gray].)

Third, and finally, the Court finds that, based on the evidence adduced on its motion,

Plaintiff has demonstrated sufficiently serious question as to the merits of the case to make it a

fair ground for litigation and a balance of hardships tipping decidedly in its favor for the reasons

stated in their memorandum of law.  (Dkt. No. 40, at 11-22, 29-30 [attaching pages "5" to "16,"

and "24" and "25," of Plf.'s Memo. of Law].)  The Court notes that, in their opposition

memorandum of law, Defendants argue that denying the motion is consistent with the public

interest in "free and fair competitive bidding . . . and the Government's contractual needs." (Dkt.

---

[12]        *See Carr v. Axelrod*, 798 F. Supp. 168, 174 (S.D.N.Y. 1992) ("Carr has not shown that he will suffer irreparable harm if the enforcement proceedings are allowed to continue. The State is not attempting to close APC's offices but instead seeks to ensure that APC advertises its services and conducts its business in accordance with state law. New York does not seek to preclude Carr's right to provide health information on abortion nor his right to speak against abortion. The preliminary injunction sought by New York when its enforcement proceeding was pending in the state court requested that the court enjoin APC from, among other things, diagnosing pregnancy without a valid license to practice medicine, administering laboratory tests, advertising under the heading 'Birth Control Information Centers,' and 'Abortion Information Services,' and misrepresenting directly or by implication that APC was an abortion or birth control clinic or would make such referrals. The State also requested that APC be required to affirmatively disclose its anti-abortion posture to potential clients. The complaint requests the same relief. No request has been made to limit any content-based speech. Therefore, Carr cannot show that the enforcement proceeding will irreparably damage his first amendment right to speak on the abortion issue.").

No. 46, at 26-28 [attaching pages "23" through "25" of Defs.' Opp'n Memo. of Law].)

However, Defendants have not persuaded the Court how permitting a company to misappropriate

and potentially use its competitor's confidential information fosters free and fair competition,

nor how the Government has a need for such repugnant conduct.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for a preliminary injunction (Dkt. No. 39) is

**DENIED**.

Dated: November 7, 2012
       Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge

28